IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VALERIE W. WAKEFIELD, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | Civil Action No. 05 CV 79 – Erie |
| | ) | |
| v. | ) | Honorable Maurice B. Cohill, Jr. |
| | ) | |
| JOY MINING MACHINERY | ) | JURY TRIAL DEMANDED |
| COMPANY, a division of Harnischfeger | ) | |
| Industries, | ) | |
| | ) | *Electronically Filed* |
| Defendant. | ) | |
| | ) | |
| | ) | |

## CONCISE STATEMENT OF MATERIAL FACTS FILED IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

AND NOW, comes the Defendant, Joy Mining Machinery ("Joy"), by and through its counsel, Pietragallo Bosick & Gordon LLP, and files this Concise Statement of Material Facts in Support of Motion for Summary Judgment, setting forth as follows:

## FACTS AND CLAIMS MADE

### Background

1.     Plaintiff Valerie Wakefield's ("Plaintiff") claims arise out of her allegations that, for a period while she worked at Joy, she had been subjected to a sexually hostile work environment based on the conduct of a co-worker, Larry Meade ("Mr. Meade") (See

Complaint filed in the Court of Common Pleas of Venango County, Pennsylvania, at case number 290-2005 ("Complaint") at Tab "1" of the Appendix filed herewith, at ¶¶122-124).[1]

### Plaintiff's and Larry Meade's Employment With Joy

2.      Plaintiff has been employed with Joy as a cleaning service person since August of 2001, and remains in that position today (Deposition of Valerie W. Wakefield taken September 15, 2006 ("Plaintiff Deposition"), excerpts of which are at Tab "2" of the Appendix filed herewith, at p.15:l.13-19.

3.      Larry Meade ("Mr. Meade") has been employed with Joy as a draftsman for 30 years, and remains in that position today (Deposition of Larry Meade taken September 20, 2006 ("Meade Deposition"), excerpts of which are at Tab "3" of the Appendix filed herewith, at p.68:l.14-15, p.70:l.1-7).

4.      Mr. Meade's position as a draftsman is not a supervisory position at Joy.[2]

5.      Through the course of her employment, Plaintiff's job required her to visit various locations in Joy's Administration Building in order to perform her cleaning duties, including areas on the first and second floors  (Plaintiff Deposition at p.52:l.4-13).

6.      The engineering department in which Mr. Meade works is on the second floor of the Administration Building (Plaintiff Deposition at p.58:l.6-8).

7.      Since the time Plaintiff began working at Joy in August 2001, she would see Mr. Meade in the Administration Building and the two of them would exchange

---

[1] The Complaint originally included Plaintiff's husband as a plaintiff, Mr. Meade as a defendant and various state law claims.  By Order dated March 29, 2006, this Court granted Joy's Motion to Dismiss, which resulted in Plaintiff's husband, Mr. Meade and the state law claims being dismissed.

[2] In questioning Mr. Meade, Plaintiff's counsel did not establish that Mr. Meade has any supervisory duties at Joy (Meade Deposition at p.70:l.1-14).

pleasantries, such as saying "hi" and asking how the other was doing (Plaintiff Deposition at p.51:l.18-23, p.55:l.13-18, p. 56:l.2-23).

8.    Sometime in April 2002, Mr. Meade and Plaintiff had a conversation at work during which Mr. Meade shared that he had suffered the tragic loss of his teenage son as a result of an automobile accident (Plaintiff Deposition at p.56:l.24-p.57:l.13, p.61:l.4-7).

9.    During that conversation, Mr. Meade seemed sad and Plaintiff felt sympathy for him and his wife (Plaintiff Deposition at p.61:l.8-10).

### Plaintiff's Family Background

10.    Plaintiff is married to Harold Wakefield (Mr. Wakefield), who is also a Joy employee (Complaint at ¶ 1; Deposition of Harold I. Wakefield taken September 14, 2006 ("Mr. Wakefield Deposition"), excerpts of which are at Tab "4" of the Appendix filed herewith, at p.19:l.5-17).

11.    Mr. Wakefield had been previously married on two occasions and had a son, Justin, during one of those marriages (Mr. Wakefield Deposition at p.7:l.17-21, p.10:l.8-10, 23-p.11:l.3).

12.    On or about April 9, 2002, Justin was killed as a result of a single vehicle accident (Complaint at ¶ 7).

### The Days Following Justin's Death

13.    Co-workers from Joy, including Mr. Meade, visited Plaintiff's home following Justin's death and offered their condolences (Plaintiff Deposition at p.62:l.14-p.63:l.1, p.63:l.22-p.64:-l.7; Mr. Wakefield Deposition at p.72:l.11-23).

14.    Plaintiff testified that she introduced Mr. Meade to her husband and Mr. Meade shared with him that he and his wife had also lost a son, stated that he knew

exactly what the Wakefields were going through and offered to help them if they ever needed help, which the Wakefields found comforting (Plaintiff Deposition at p.63:l.3, 9-21; Mr. Wakefield Deposition at p.64:l.23-p.65:l.14).

15.    Plaintiff also testified that she recalled that Mr. Meade called her home and spoke to Mr. Wakefield a few days later, asking how the Wakefields were doing (Plaintiff Deposition at p.64:l.25-p.65:l.4).

### Plaintiff's Return to Work and Support She Received From Others at Work

16.    Plaintiff returned to work at Joy at the end of April 2002 (Plaintiff Deposition at p.65:l.5-9).

17.    Plaintiff testified that a co-worker, Cornelia Adams ("Ms. Adams"), who worked in the Human Resources Department at Joy and had also lost a son, was particularly supportive and helpful after Justin's death (Plaintiff Deposition at p.68:l.2-10).[3]

18.    Specifically, Ms. Adams offered to be there if Plaintiff needed to talk to someone anytime and gave Plaintiff some books dealing with loss, including the loss of a child (Plaintiff Deposition at p.68:l.18-p.69:l.1, p.69:l.14-21).

19.    Thereafter and at least until four to five months after Justin died, Plaintiff found Ms. Adams easy to speak to and spoke to her in person when they would contact one another during working hours, and via telephone outside of working hours when Plaintiff would call Ms. Adams at home, regarding how Justin's death was affecting Plaintiff and her family (Plaintiff Deposition at p.69:l.2-14, 22-p.70:l.2, p.72:l.12-p.73:l.22).

---

[3] Ms. Adams also testified that she lost her son in 1992 and offered Plaintiff help and support (Deposition of Cornelia Adams taken September 21, 2006 ("Adams Deposition"), excerpts of which are at Tab "5" of the Appendix filed herewith, at p.7:l.5).

20.    Plaintiff was fully receptive to Ms. Adams' help and did not view anything Ms. Adams said or did as intrusive, nor did she feel that Ms. Adams was too interested in helping her (Plaintiff Deposition at p.71:l.23-p.72:l.11).

21.    Her first day back to work, Plaintiff and Mr. Meade had a "basic, brief conversation" during which Mr. Meade asked Plaintiff how everything was going and whether she was okay (Plaintiff Deposition at p.85:l.22-p.86:l.5).

22.    Plaintiff recorded in a written narrative, which was prepared sometime beginning in March 2003 and discussed below ("Narrative"), that Mr. Meade would ask her how she and her family were and made casual conversation and that she "felt comfortable with talking about the death with him due to the fact that he had the same experience with his son" (Plaintiff Deposition at p.164:l.3-13; See Exhibit 1 to Plaintiff Deposition, Narrative, excerpts of which are at Tab "6" of the Appendix filed herewith, at p. 1).[4]

23.    Plaintiff and Mr. Meade "mutually and voluntarily embraced" each other "[m]aybe once a month" beginning within the first 2 weeks that she returned to work at the end of April 2002 (Plaintiff Deposition at p.111:l.11-19, p.164:l.14-p.165:l.3; See Narrative at p. 1).[5]

24.    Plaintiff agreed that the hugs they exchanged were friendly, platonic hugs (Plaintiff Deposition at p.121:l.2-7).

25.    Plaintiff testified that their hugs were brief and that she and Mr. Meade hugged face-to-face with her arms over Mr. Meade's shoulders and Mr. Meade's arms

---

[4] Joy has added page numbers to the Narrative and, due to the fact that it is handwritten and may be difficult to read, has highlighted the text to which it is citing, for ease of reference.

[5] Plaintiff's Narrative states: "He would often give me a hug when I was feeling depressed and sad. He always seemed to know when I was having a bad day" (Plaintiff Deposition at p.164:l.8-13; See Narrative at p. 1).

around her waist or on the small of her back behind her waist (Plaintiff Deposition at p.113:l.21-p.114:l.12, p.115:l.17-24).

26.    Plaintiff states that Mr. Meade asked her permission before hugging her and that she declined a few times because she did not want one, which Mr. Meade respected (Plaintiff Deposition at p.111:l.20-p.112:l.3).

27.    Plaintiff testified that others in the office gave Plaintiff hugs following the death of her son, including Ms. Adams, Diane Kemick and Mike Calderone, who had also lost a son and knew what she was going through (Plaintiff Deposition at p.145:l.8-13).

28.    Plaintiff agrees that she hugged Mr. Meade more frequently than anyone else in the office (Plaintiff Deposition at p.145:l.14-17).

29.    In May and June 2002, Mr. Meade checked in on Plaintiff for a few minutes daily at work to see how she was doing and, some of those days, Plaintiff was not doing well (Plaintiff Deposition at p.86:l.6-17, p.87:l.10-17).

30.    Once or twice in May and a few times a week in June and July 2002, Mr. Meade and Plaintiff would talk while she was cleaning the men's restrooms on the second floor where Mr. Meade worked (Plaintiff Deposition at p.88:l.1-9:l.1-8, p.89:l.1-15, p.91:l.9-13).

31.    Plaintiff testified that, other than the fact that some of their conversations occurred in the men's restrooms, there was nothing troublesome about the conversations she had with Mr. Meade during that time (Plaintiff Deposition at p.91:l.13).

32.    Plaintiff and Mr. Meade talked not only about the loss of their sons during that time, but also about other subjects, including what they did the night before or on the weekend (Plaintiff Deposition at p.89:l.19-p.90:l.4, p.90:l.18-p.91:l.8).

33.    Plaintiff alleges that Mr. Meade told her in August 2002 that he had a boat and a cottage in Florida that his family went to every year and that "if [she] wanted to . . .

[she could] go with him there and . . . [could] lay out on his boat out in the sun" (Plaintiff Deposition at p.92:l.5-p.93:l.4).

34.    Plaintiff testified that she told Mr. Meade that she did not want to go to Florida with him and also testified that she did not think Mr. Meade was serious about wanting her to go to Florida (Plaintiff Deposition at p.93:l.9-15).[6]

35.    In September or October 2002, Plaintiff alleges that Mr. Meade invited her two or three times to his come to see the oil painting he had painted of his deceased son, since it was very nice and she may want one as well (Plaintiff Deposition at p.97:l.11-17, p.98:l. 1-3).

36.    Also in September of October 2002, Plaintiff alleges that she shared with Mr. Meade that she and her husband were making plans for their son Justin's headstone and that, thereafter, Mr. Meade invited her to go to the cemetery to see his son's headstone because he thought it might help them in making their plans (Plaintiff Deposition at p.98:l.4-19).

37.    Also sometime during September or October 2002, Plaintiff alleges that Mr. Meade was at the Walmart where she took her son to have his photograph taken, which was the only Walmart in town, and asked to walk through the store with them as they did their shopping, but Plaintiff declined (Plaintiff Deposition at p.99:l.12-p.100:l.19, p.100:l.23-p.101:l.6).

38.    Plaintiff went on vacation with her family to Florida for 10 days at the end of December 2002 over Christmas (Plaintiff Deposition at p.107:l.3-7, p.108:l.3-7).

---

[6] In fact, when asked whether she was offended by any comments Mr. Meade made in August 2002, Plaintiff did not mention these alleged comments about going to Florida or on the alleged boat (Plaintiff Deposition at p.93:l.16-25).

39.    Plaintiff returned to the office for a day or two and then was out of the office for another two weeks through mid-January, as she was hospitalized due to dehydration caused by the flu and, therefore, did not see Mr. Meade from the end of December through mid-January (Plaintiff Deposition at p.107:l.14-p.108:l.12).

40.    Upon her return to work in mid-January 2003, Mr. Meade expressed that he felt bad she was sick and that he would have come to visit her in the hospital and checked on how she and her husband were doing (Plaintiff Deposition at p.108:l.13-p.109:l.5).


### Plaintiff's Allegations of Unwelcome Conduct by Mr. Meade

41.    Plaintiff alleges that, in August 2002, Mr. Meade started asking personal questions, such as what kind of underwear she had on, told her how pretty she looked and that she could be working somewhere more glamorous than Joy and that she would look good in a bikini (Plaintiff Deposition at p.92:l.5-19).

42.    Plaintiff specifically alleged that Mr. Meade asked her what color her underwear were "maybe once or twice" (Plaintiff Deposition at p.93:l.22-25).

43.    Plaintiff claims that, at the end of August, she told Mr. Meade that she didn't mind their discussions about their sons and about normal daily activities, but did not want him to make any more comments about what she is wearing or her appearance, and Mr. Meade said "okay" (Plaintiff Deposition at p.94:l.1-15. p.104:l.25-p.105:l.12).

44.    According to Plaintiff, Mr. Meade did not question Plaintiff or make any comments about her underwear or anything else problematic thereafter for four (4) months from September through December 2002 (Plaintiff Deposition at p.105:l.13-24, p. 106:l.10-19).

45.    From September through December 2002, Plaintiff states that she and Mr. Meade engaged in non-problematic conversations regarding how each other was feeling and

that she shared with Mr. Meade that she and her family were planning a trip to Florida to visit her husband's brothers (Plaintiff Deposition at p.105:l.24-p.106;l.9, p. 107:l.8-13).

46.    In her deposition, Plaintiff testified that in late January or early February 2003, she and Mr. Meade hugged while she was cleaning a restroom at work (Plaintiff Deposition at p.111:l.6-10)

47.    At the time of the alleged hug in January or February 2003, Plaintiff alleges she was not "feeling good and thinking about Justin and everything," Mr. Meade noticed she looked bad and offered to give her a hug, stating that he needed one, too, as he was also having a bad day (Plaintiff Deposition at p.109:l.24-p.111:l.7).

48.    Plaintiff testified that the hug was as other hugs in the past, with her arms on Mr. Meade's shoulders and Mr. Meade's arms around her waist or on the small of her back behind her waist (Plaintiff Deposition at p.114:l.4-15, p.115:l.17-24).

49.    During the alleged hug, Plaintiff first testified that the hug lasted approximately 30 seconds or less and that Mr. Meade's hands wandered down to the top of her butt closest to her waist (Plaintiff Deposition at p.114:l.19-21, p.115:l.6-9, 24-p.116:l.12).

50.    Thereafter, when asked whether she felt Mr. Meade's hands move from her waist to a little bit below or whether they just started there, Plaintiff then testified that "[t]hey just like started there" (Plaintiff Deposition at p.116:l.13-16).

51.    Plaintiff alleges that she pushed Mr. Meade away on his shoulders asking Mr. Meade, "What did you do that for?" and that Mr. Meade replied, "What did I do? What?" (Plaintiff Deposition at p.116:l.25-p.117:l.9).

52.    Plaintiff also alleges that she told Mr. Meade to leave and that he said "I'm sorry" and left, and also that no further incidents of Mr. Meade hugging her and putting his hands at the top of her butt ever occurred again (Plaintiff Deposition at p.117:l.10-19).

53.     Plaintiff alleges that Mr. Meade tried to apologize a few days later, but Plaintiff was being "bullheaded" and would not accept his apology (Plaintiff Deposition at p.118:l.7-23).

54.     Plaintiff testified that she did not see Mr. Meade for 3-4 weeks, including Valentine's Day and the most of February 2003 (Plaintiff Deposition at p.118:l.24-p.119:l.12).

55.     Thereafter, Plaintiff testified that at the end of February or beginning of March, she and Mr. Meade had a conversation while she was cleaning a restroom regarding how they were doing and the death of Mr. Meade's son, since his son's birthday was coming up (Plaintiff Deposition at p.120:l.2-16).

56.     Plaintiff alleges that Mr. Meade kept getting closer and told her he needed a hug, that Plaintiff agreed and that Mr. Meade tried to kiss her (Plaintiff Deposition at p.120:l.17-22).

57.     Plaintiff states that right before she went to release off of Mr. Meade's shoulders, Mr. Meade turned his head toward her and tried to kiss her on the lips, so she pushed him away, told him to leave and he left (Plaintiff Deposition at p.121:l.22-23, p.122:l.6-7, 14-16, p.123:l.19-22).

58.     When asked how she knew Mr. Meade was trying to kiss her, she responded that it was "so close to her" that she could "feel his lips right at the corner of her lips" (Plaintiff Deposition at p.122:l.8-12).

59.     When asked to clarify the time frame during which this kiss occurred, Plaintiff agreed that she was clear in her recollection that the alleged attempted kiss occurred sometime during the end of February or early March 2003 (Plaintiff Deposition at p.123:l.23-p.124:l.9).

60.     Plaintiff later testified that the alleged incident where Mr. Meade touched the top of her butt occurred at the end of January or beginning of February 2003, and that the alleged incident where Mr. Meade tried to kiss her occurred at the end of February 2003 (Plaintiff Deposition at p.137:l.4-15, 21-23).

61.     Plaintiff at first stated that nothing occurred with Mr. Meade the rest of March 2003 (Plaintiff Deposition at p.124:l.22-25).

62.     Later in her deposition, Plaintiff recalled an alleged event on Sunday of the first weekend of March where Mr. Meade allegedly came to her home knowing her husband and son were not there, professed his love for her and stated that he wanted to marry her and asked her to have sex with him (Plaintiff Deposition at p.132:l.7, p.133:l.18-p.134:l.20, p.136:l.7-12).

63.     During this alleged incident, which was five to ten minutes or less long, Plaintiff alleges that Mr. Meade was standing inside her house in the foyer near the doorway and that she was further into the house into the dining room area approximately 13 feet apart (Plaintiff Deposition at p.138:l.1-8, p.139:l.8-18, 24-25, p.140:l.3-6).

64.     Plaintiff agreed that Mr. Meade did not touch her at any time during this alleged incident (Plaintiff Deposition at p.140:l.1-2).

65.     Plaintiff alleges that she responded by telling Mr. Meade that he was "playing with fire" and that Mr. Meade was "going overboard with everything" and that the two of them together "couldn't be" (Plaintiff Deposition at p.135:l.19-p.136:l.7).

66.     Plaintiff asked Mr. Meade to leave, he did so and, as he was leaving, made a comment that the next time Plaintiff would see him would be at Morrison's Funeral Home, got in his car and pulled away with the tires squealing (Plaintiff Deposition at p.136:l.19-p.137:l.2).

67.     Plaintiff alleges that she went to work the next day and did not see Mr. Meade (Plaintiff Deposition at p.142:l.14-22).

68.     Plaintiff testified that, thereafter, on March 4, 2003, Plaintiff spoke to her brother (a police officer), who suggested that she keep a diary of events that occurred (Plaintiff Deposition at p.150:l.5-11, p.161:l.2).

69.     Plaintiff thereafter started to prepare a document from memory and her best recollection of past events, the "Narrative" discussed earlier herein, which was not prepared on a daily basis contemporaneous with the events as they occurred  (Plaintiff Deposition at p.162:l.5-p.163:l.8; See Narrative).

70.     Plaintiff also prepared another document or "journal" in a composition book after speaking to her brother in March 2003 that was also prepared from memory at first and eventually was prepared contemporaneously as events occurred, but Plaintiff could not say when that occurred (Plaintiff Deposition at p.179:l.3-6, p.181:l.9-21, p.182:l.6-14, p.183:l.11-p.184:l.4, l.14-p.186:l.17, p.187:l.7-p.188:l.9, p.189:l.23-p.190:l.1, p.199:l.9-17); See Journal, excerpts of which are at Tab "7" of the Appendix filed herewith).[7]

71.     Despite Plaintiff's earlier testimony that the alleged incident where Mr. Meade attempted to kiss her occurred at the end of February or beginning of March 2003, Plaintiff's Narrative provides: "One day in June 2002 he came to see how I was doing, gave me a hug and tried to kiss me" (Plaintiff Deposition at p.165:l.4-8; See Narrative at p. 1).

72.     Plaintiff testified that Mr. Meade only attempted to kiss her once (Plaintiff Deposition at p.123:l.4-6, p.165:l.9-11).

---

[7] Joy has also added page numbers to the Journal and, due to the fact that it is handwritten and may be difficult to read, has highlighted the text to which it is citing, for ease of reference.

73.     Plaintiff agreed that her earlier testimony was incorrect and that the attempted kiss occurred in June 2002, not February or March 2003 (Plaintiff Deposition at p.165:l.12-23).

74.     Plaintiff's Journal also confirms that such attempted kiss occurred either in late June or early July 2002 (Plaintiff Deposition at p.192:l.15-p.193:l.4)

75.     Similarly, despite Plaintiff's earlier testimony that the alleged incident where Mr. Meade's hand touched the top of her butt occurred in February or March 2003, Plaintiff's Diary provides that such incident occurred in late June or early July 2002, three weeks after the attempted kiss in June 2002 (Plaintiff Deposition at p.165:l.24-p.166:l.12, 20-22).

76.     Plaintiff's Narrative and Journal also confirm that such incident occurred in June 2002 (Plaintiff Deposition at p.192:l.9-14; See Narrative at p. 1; Journal at p. 13).

77.     Plaintiff testified that Mr. Meade only touched her butt once (Plaintiff Deposition at p.166:l.13-15).

78.     Plaintiff agreed that her earlier testimony was incorrect and that Mr. Meade allegedly touched her butt in late June or early July 2002, not February or March 2003 (Plaintiff Deposition at p.166:l.20-p.167:l.12).

79.     According to Plaintiff, nothing happened between she and Mr. Meade between March 2003 and June 2003 (Plaintiff Deposition at p.175:l.16-24, p.216:l.2-8).

80.     On June 3, 2003, Plaintiff alleges that she had an emotional breakdown due to flashbacks of the events that occurred with Mr. Meade in June 2002 while she was cleaning a restroom at work, and that she was hospitalized at her counselor, Susan Stewart's, suggestion (Plaintiff Deposition at p.175:l.10-15; See Narrative at p. 3).

81.     Plaintiff testified that she called her supervisor, Wayne Hilliard, to tell him she needed to go home and Mr. Hilliard told her not to leave, but that he would come to talk

to her because he knew she was not feeling well and should not leave in such a state (Plaintiff Deposition at p.216:l.18-p.217:l.7).

82.    Mr. Hilliard offered to drive Plaintiff home and Plaintiff agreed (Plaintiff Deposition at p.217:l.19-25).

83.    Plaintiff had not seen Mr. Meade on June 3, 2003 and nothing Mr. Meade did that day triggered her alleged emotional breakdown (Plaintiff Deposition at p.217:l.8-12).

84.    Plaintiff did not have any physical contact with Mr. Meade in June or July 2003 (Plaintiff Deposition at p.230:l.16-p.231:l.3).

85.    Plaintiff saw Mr. Meade in July 2003, but Mr. Meade did not speak to her (Plaintiff Deposition at p.231:l.4-10).

86.    Plaintiff filed a grievance on June 20, 2003 (See Request for Negotiating Employees' Grievances at Tab "8" of the Appendix filed herewith).

87.    According to Plaintiff, she did not have any problems with Mr. Meade after she filed her grievance on June 20, 2003 through the date of her deposition on September 15, 2006 (Plaintiff Deposition at p.239:l.11-14).

88.    In fact, from March 2003 through September 2006, in over three years, Plaintiff only saw Mr. Meade once on April 24, 2006 in the lobby area at Joy (See Notes of April 25, 2006 meeting between Plaintiff, Jerry Miller, Diane Kemick and Gary Wozniak of Joy, April 24, 2006 meeting between Mr. Meade and Ms. Kemick and April 26, 2006 meeting between Plaintiff, Mr. Miller, Ms. Kemick and Randy Beightol of Joy, at Tab "9" of the Appendix filed herewith).[8]

---

[8] Mr. Meade did not speak to or make any eye contact with Plaintiff when she saw him in the lobby area on April 24, 2006 (See Notes of April 25, 2006 meetings).

### Joy's Sexual Harassment Policy

89.    Joy has a Harassment Policy in place, which was in effect at all times during the incidents Plaintiff alleges occurred with Mr. Meade (See copy of Joy's Harassment Policy at Tab "10" of the Appendix filed herewith; Deposition of Johan Maritz taken September 20, 2006 ("Maritz Deposition"), excerpts of which are at Tab "11" of the Appendix filed herewith, at p.7:l.3-8, p.7:l.23-p.8:l.7).

90.    The Harassment Policy is posted on notice boards and available electronically on Joy's intranet (Maritz Deposition at p.7:l.3-17)..

91.    Plaintiff was aware of the fact that Joy had a sexual harassment policy at the time of all of the alleged instances of unwelcome conduct (Plaintiff Deposition at p.157:l.8-12).


### Plaintiff's Reporting of Mr. Meade's Alleged Unwelcome Conduct

92.    Plaintiff did not tell anyone at Joy, including her supervisor or anyone in Human Resources, or her husband about her interaction with Mr. Meade, including all alleged instances of Mr. Meade's claimed unwelcome conduct, from May 2002 through March 2003 (Plaintiff Deposition at p.90:l.5-10, p.91:l.16-p.92:l.4, p.94:l.16-21, p.101:l.20-p.102:l.5., p. 104:l.11-15, p.106:l.20-p.107:l.2, l.8-10, p.117:l.20-p.118:l.6, p.188:l.19-20, p.124:l.12-21, p.151:9-22, p.156:l.16-p.157:l.10, p.159:l.25-p.160:l.8).

93.    Plaintiff did not tell anyone at work about any interaction with Mr. Meade at all until March 14, 2003 (Plaintiff Deposition at p.177:l.9-23, p.204:l.12-15; Maritz Deposition at p.12:l.6-12).

94.    Plaintiff alleges that she first talked to Cornelia Adams alone and tried telling her about what Mr. Meade had allegedly done to her, but could not because she was

crying, and the only words she could get out were "Larry Meade being mean" (Plaintiff Deposition at p.208:l.3-p.210:l.1).

95.     Plaintiff and her husband then met with Johan Maritz, Joy's current Director of Human Resources and then Manager of Human Resources, and Jerry Miller, also of Joy's Human Resources Department, and Plaintiff told them that Mr. Meade had come to her home and that she called Mr. Meade's wife (Plaintiff Deposition at p.211:l.16-p.212:l.16; Maritz Deposition at p.5:l.21-23, p.8:l.8-10).

96.     At that meeting on March 14, 2003, Plaintiff did not tell Mr. Maritz or Mr. Miller (and also had not yet told her husband) about the hugs she and Mr. Meade shared, the alleged attempted kiss of the alleged hug with Mr. Meade's hands on the top of her butt (Plaintiff Deposition at p.212:l.17-p.213:l.2).[9]

97.     Plaintiff also did not tell Mr. Maritz that Mr. Meade said he wanted to have sex with her (Maritz Deposition at p.18:l.9-11).

98.     Plaintiff testified that, on June 3, 2003, on her way home with Mr. Hilliard, she "just started telling Wayne everything that happened," including their hugs and the alleged attempted kiss (Plaintiff Deposition at p.218:l.4-12).[10]

99.     Despite the fact that Ms. Adams, who worked in the Human Resources Department, and Plaintiff had frequent contact regarding Ms. Adams' support to help Plaintiff deal with the grief of losing her son, Ms. Adams testimony indicates that the first

---

[9] Plaintiff also did not share these alleged incidents with her counselor, Susan Stewart, in March 2003 upon meeting with her and discussing the alleged March 2003 visit to her home (Plaintiff Deposition at p.171:l.11-22).  Plaintiff, in fact, did not tell Ms. Stewart about the alleged June 2002 instances until June 2003 (Plaintiff Deposition at p.220:l.21-22, p.221:l.20-p.222:l.5).

[10] Plaintiff testified that, on June 3, 2003, she also told her husband for the first time about the mutual hugs, including that she would sometimes ask Mr. Meade for hugs, and Mr. Meade's alleged offer to come to see the oil painting of his son and to see his son's headstone (Plaintiff Deposition at p.218:l.13-p.219:l.10).

time Plaintiff informed her that she was having any problems with Mr. Meade was in June 2003, when Plaintiff told her about the alleged March 2003 incident at Plaintiff's home (Adams Deposition at p.5:l.9-21, p.10:l.6-10).

### Remedial Action Taken by Joy
### Following Plaintiff's Reporting of Mr. Meade's Unwelcome Conduct

100.    As provided above, a meeting was held on March 14, 2003 at which Plaintiff, her husband and Johan Maritz were present, and at which time  Plaintiff reported only the alleged March 2003 incident of Mr. Meade coming to her home (Maritz Deposition at p.12:l.6-8; See notes of March 14, 2003 meeting marked "JOY051" and at Tab "12" of the Appendix filed herewith).

101.    Mr. Maritz asked Plaintiff at that meeting to provide him with names of anyone who could provide further information, but Plaintiff could not (Maritz Deposition at p.19:l.3-7).

102.    That same day, Mr. Maritz, along with Cornelia Adams, met with Mr. Meade, told him the matter would be investigated and to have no contact with Plaintiff (Maritz Deposition at p.17:l.3-23; See notes of March 14, 2003 meeting marked "JOY052" and at Tab "13" of the Appendix filed herewith).

103.    After Plaintiff went home on June 3, 2006, Johan Maritz called Plaintiff at home to inquire into what had happened that day, to see how Plaintiff was doing and to see if there was anything Joy could do (Mr. Wakefield Deposition at p.132:l.9-21, p.134:l.15-17; Maritz Deposition at p.22:l.15-25).

104.    When Mr. Maritz called Plaintiff's home, Mr. Wakefield seemed upset and aggravated and told Mr. Maritz that Plaintiff had not told people at Joy the whole story (Mr. Wakefield Deposition at p.134:l.18-22; Maritz Deposition at p.23:l.1-21).

105.    Mr. Maritz, along with Don Biondi of Joy, met with Plaintiff and her husband on June 16, 2003 for at least an hour, which is the first time Plaintiff described the alleged harassment other than Mr. Meade coming to her home. (Maritz Deposition at p.28:l.16-21, p.29:l.8-p.30:l.3 p.32:l.13-20).

106.    Plaintiff testified that Diane Kemick of Joy's HR Department would follow up with her from time to time to make sure Plaintiff was doing okay (Plaintiff Deposition at p.249:l.11-14).

107.    As previously discussed, Ms. Kemick who has been a Human Resources Representative at Joy for approximately 8 years, met with Mr. Meade in April 2006 to make sure he remembered he was not to have any contact with Plaintiff (Deposition of Diane Kemick taken September 20, 2006 ("Kemick Deposition"), excerpts of which are at Tab "14" of the Appendix filed herewith, at p.6:l.6-11, p.14:l.20-24).

108.    Sometime in 2006, Ms. Kemick recalls Mr. Meade, who is also an Emergency Medical Technician, calling her to let her know that he had left his work area to assist with a medical emergency near Plaintiff's work area (Kemick Deposition at p.15:l.2-9).

109.    Mr. Meade wanted HR to be aware that he was going to be in that area for that purpose (Kemick Deposition at p.15:l.9-11).

## Procedural Background

110.    On or about March 7, 2005, Plaintiff and her husband filed a Complaint at No. 290-2005 in the Court of Common Pleas of Venango County against Joy Mr. Meade, purporting to state the following claims:

- *Count I:  Intentional Infliction of Emotional Distress*: Husband and Wife Plaintiffs v. Joy and Meade;

- *Count II:  Negligent Infliction of Emotional Distress*: Husband and Wife Plaintiffs v. Joy and Meade;

-    *Count III:  Negligent Retention of an Employee*: Husband and Wife Plaintiffs v. Joy;

-     *Count V:  Negligence*:  Husband and Wife Plaintiffs v. Joy;

-    *Count VI: Violation of Title VII of the Civil Rights Act of 1964*:  Husband and Wife Plaintiffs v. Joy and Meade

(See Complaint).

  111. Joy and Mr. Meade removed this action to this Court on or about March 10, 2005 (See Notice of Removal at Tab "15" of the Appendix filed herewith).

  112. Upon consideration of a Motion to Dismiss filed by Joy and Mr. Meade, on March 29, 2006, the Court dismissed Counts I, II, III and V of the Complaint containing all of Plaintiffs' state law claims as barred by the applicable statutes of limitation, leaving only Count VI containing the Title VII claim (See March 29, 2006 Opinion and Order at Tab "16" of the Appendix filed herewith).

  113. The court also dismissed Mr. Meade as a Defendant in the remaining Title VII claim (See March 29, 2006 Opinion and Order).

  114. Thereafter, on or about June 12, 2006, since the Court's March 29, 2006 Opinion and Order resulted in the dismissal of any claims brought against Mr. Meade and the dismissal of any claims brought on behalf of the Husband-Plaintiff, Joy and Mr. Meade filed a Motion to Amend the Caption requesting that the Court delete Mr. Meade and Mr. Wakefield from the caption of this action, which was granted on or about June 13, 2006 (See June 13, 2006 Order at Tab "17" of the Appendix filed herewith).

  115. The only claim remaining is one for alleged violation of Title VII of the Civil Rights Act of 1964 based on allegations of sexual harassment by a co-worker.

Respectfully submitted,


*/s/ Pamela G. Cochenour, Esquire*
PAMELA G. COCHENOUR, ESQUIRE
Pa. I.D. #47761
ERIC P. REIF, ESQUIRE
Pa. I.D. #00194
PIETRAGALLO BOSICK & GORDON LLP
Firm #834
One Oxford Centre
The Thirty-Eighth Floor
Pittsburgh, PA  15219
(412) 263-2000

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing **CONCISE STATEMENT OF MATERIAL FACTS FILED IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** will be forwarded via the ECF system to counsel of record listed below this **13th** day of **December, 2006**:

Alexander H. Lindsay, Jr., Esquire
The Lindsay Law Firm, P.C.
128 South Main Street
Butler, PA  16001

*/s/ Pamela G. Cochenour, Esquire*
PAMELA G. COCHENOUR, ESQUIRE
Pa. I.D. #47761
PIETRAGALLO, BOSICK & GORDON LLP
Firm #834
One Oxford Centre
The Thirty-Eighth Floor
Pittsburgh, PA  15219

(412) 263-2000