# Tab 1

IN THE COURT OF COMMON PLEAS OF VENANGO COUNTY, PENNSYLVANIA

| | |
|---|---|
| VALERIE W. WAKEFIELD and<br>HAROLD I. WAKEFIELD, Husband and Wife,<br><br>PLAINTIFFS,<br><br>vs.<br><br>JOY MINING MACHINERY COMPANY, a division of HARNISCHFEGER INDUSTRIES, INC. and LARRY MEADE,<br><br>DEFENDANTS. | CIVIL DIVISION<br><br>No. 290-2005 |

## COMPLAINT IN CIVIL ACTION

AND NOW, come the Plaintiffs VALERIE W. WAKEFIELD and HAROLD I. WAKEFIELD, by and through their attorneys THE LINDSAY LAW FIRM, P.C., Alexander H. Lindsay, Jr., Esquire and bring this Complaint in Civil Action against Defendants Joy Mining Machinery Company, a division of Harnischfeger Industries, Inc. and Larry Meade for Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Negligent Retention of an Employee, Negligence and Violation Of Title VII Of The 1964 Civil Rights Act, 42 U.S.C. §§2000e – 2000e-17 and in support thereof, avers the following:

1. The Plaintiffs Valerie W. Wakefield and Harold I. Wakefield are Husband and Wife living at 318 Adams Street, Franklin, PA 16323.

2. Defendant Joy Mining Machinery Company, a division of Harnischfeger Industries, Inc. is a Corporation doing business in the State of Pennsylvania at 120 Liberty Street, Franklin, Pennsylvania 16323.

Venango County, S.S.
Certified to be a full and true copy of Record

MAR 07 2005

*Peggy L. Miller*
PEGGY L. MILLER
PROTHONOTARY/CLERK OF COURTS

-1-

3. Defendant, Lawrence Meade is an adult individual residing at 169 South Main, Seneca, PA 16346.

4. On or about August 6, 2001 Plaintiff Valerie W. Wakefield began working as a cleaning service person for the Defendant, Joy Mining Machinery Company, a division of Harnischfeger Industries, Inc. ("Defendant Joy Manufacturing").

5. At all times pertinent hereto the Plaintiff, Harold I. Wakefield has also been employed at Joy Manufacturing as a welder for 29 years.

6. At all times pertinent hereto the Defendant Lawrence Meade ("Defendant Meade") has been an agent of and employed by Joy Manufacturing as an engineer.

7. On April 9, 2002, the eldest son of the Plaintiffs was killed in a car accident.

8. On April 11, 2002, the Defendant Larry Meade appeared in the driveway of the Plaintiffs' residence located at 318 Adams Street, Franklin, PA 16323.

9. On that date the Defendant Meade indicated to the Plaintiffs that he had been through a similar tragedy with his son some years before and offered his sympathies.

10. During the week of April 21, 2002, the Plaintiffs Valerie W. Wakefield and Harold I. Wakefield returned to their jobs at the Defendant Joy Manufacturing.

11. Upon her return to work the Defendant Meade exploited the Plaintiff Valerie Wakefield's bereavement by seeking out the Plaintiff Valerie Wakefield on a daily basis to inquire as to how she was doing.

12. At those times the Defendant Meade discussed the grief process with the Plaintiff Valerie Wakefield.

13. Occasionally on these occasions the Defendant Meade mentioned to the Plaintiff Valerie Wakefield how pretty he thought she was.

-2-

14. These daily visits continued until the end of May, 2002.

15. In the course of her duties as a cleaning service person, the Plaintiff Valerie Wakefield cleaned "Men's Rooms".

16. When cleaning a Men's Room the Plaintiff entered and she would place a sign in front of the Men's Room stating, "DO NOT ENTER".

17. Following the Plaintiff Valerie Wakefield's return to work in April 2002 the Defendant Meade occasionally came into the Men's Room while the Plaintiff Valerie Wakefield was busy cleaning the restroom.

18. The actions of the Defendant Meade startled and scared the Plaintiff.

19. In June of 2002 Defendant Meade entered the Men's Room while the Plaintiff Valerie Wakefield was working.

20. At that time the Defendant Meade indicated to the Plaintiff Valerie Wakefield that she seemed to be having a bad day and asked permission to give her a hug.

21. As the Defendant Meade put his arms around the Plaintiff he grabbed her buttocks.

22. At that time the Plaintiff Valerie Wakefield immediately jumped back and told him to leave.

23. A few days later the Defendant Meade sought out the Plaintiff Valerie Wakefield and apologized, stating that the day before the incident had occurred in June it had been his son's birthday and he really felt the need for a hug.

24. In late June or early July, the Defendant Meade once again came into the Men's Room as the Plaintiff Valerie Wakefield was cleaning and scared her.

25. At that time he apologized for scaring the Plaintiff Valerie Wakefield and came close to her and attempted to kiss her.

26. The Plaintiff Valerie Wakefield then pushed the Defendant Meade away and told him that she did not appreciate his behavior and asked him to leave her alone.

27. Following the previous incident the Defendant Meade left the Plaintiff Valerie Wakefield alone more, however, he still sought her out periodically and carried on conversations with her.

28. The Plaintiff Valerie Wakefield was not interested and tried to ignore the Defendant Meade.

29. In August of 2002 the Defendant Meade asked the Plaintiff Valerie Wakefield what she was doing for her son's headstone.

30. At that time the Defendant Meade suggested that the Plaintiff Valerie Wakefield accompany him to the cemetery to look at his son's grave.

31. The Plaintiff Valerie Wakefield told him "No", however, the Defendant Meade continued to repeat his request several more times.

32. Also during August of 2002 the Defendant Meade asked the Plaintiff Valerie Wakefield to go to his house to see a painting of his deceased son.

33. At that time the Defendant Meade suggested to the Plaintiff Valerie Wakefield that she could tell her husband, the Plaintiff Harold I. Wakefield that she was going to Wal-Mart; she declined.

34. The Defendant Meade continued to seek out the Plaintiff Valerie Wakefield throughout the Fall of 2002.

35. On one such occasion the Defendant Meade indicated to the Plaintiff Valerie Wakefield that she would look great on his boat sunbathing in a bikini.

36. On another occasion the Defendant Meade asked the Plaintiff Valerie Wakefield if she wore "thong underwear".

37. On still another occasion the Defendant Meade showed up at Wal-Mart one evening when the Plaintiff Valerie Wakefield had taken her son to have his picture taken.

38. At that time the Defendant Meade indicated to the Plaintiff Valerie Wakefield that he remembered her mentioning something about going to Wal-Mart and that was why he was there.

39. This time the Plaintiff Valerie Wakefield became aware that her efforts to discourage the Defendant Meade through means of avoiding him were futile.

40. At that point the Plaintiff Valerie Wakefield started acting mean and rude to the Defendant Meade in an effort to avoid his attention.

41. On Thanksgiving of 2002 the Defendant Meade approached the Plaintiff Valerie Wakefield and suggested that he wanted to go with her on the Plaintiffs' up-coming trip to Florida.

42. At that time the Plaintiff Valerie Wakefield told the Defendant Meade that she was going with her husband and son and hoped never to see the Defendant Meade again.

43. Following this incident, the Defendant Meade left the Plaintiff Valerie Wakefield alone for some time.

44. In January of 2003 the Plaintiff Valerie Wakefield became dehydrated from the flu and had to be hospitalized.

45. Upon the Plaintiff Valerie Wakefield return to work in January of 2003 the Defendant Meade approached her and indicated that he would have visited her in the hospital had he known she was hospitalized.

46. At that time the Plaintiff Valerie Wakefield told him that she did not want him to come near her.

47. Despite this warning the Defendant Meade continued to seek out the Plaintiff Valerie Wakefield routinely every couple of days and attempted to make small talk.

48. Throughout this period of time the Plaintiff Valerie Wakefield had hoped to be able to stop the Defendant Meade's behavior by herself.

49. The death of the Plaintiffs' eldest son had taken a serious toll on the Plaintiff Valerie Wakefield's husband and younger son and her.

50. Considering the emotional turmoil that the family was already under and the fact that the Plaintiff Harold Wakefield's first wife had left him as a result of an affair that she was having, the Plaintiff Valerie Wakefield did not want to cause additional emotional upset to her husband or son.

51. On Sunday, March 2, 2003 the Defendant Meade appeared at the Plaintiff's home.

52. At that time the Defendant Meade indicated to the Plaintiff Valerie Wakefield that he knew she was home alone because he had been watching her family and knew that her husband and son were at the Mall.

53. The Defendant Meade told the Plaintiff Valerie Wakefield that he was in love with her and wanted to have sex with her and that she did not need her husband and son.

54. The Plaintiff Valerie Wakefield became angry with the Defendant Meade and told him that she loved her husband very much and she would never do anything to jeopardize her marriage.

55. At that time the Defendant Meade left the Plaintiffs' home and screeched his tires as he pulled out of their driveway.

56. The following day the Plaintiff Valerie Wakefield already had an appointment with a counselor that she had been seeing since her son's death.

57. The Plaintiff Valerie Wakefield explained to the therapist what had happened on March 2nd and asked her help in deciding how to tell her husband.

58. On the evening of March 3, 2003 the Plaintiff told her husband only what had happened on the 2nd of March and nothing prior.

59. On March 4, 2003 the Plaintiff Harold I. Wakefield called the Defendant Meade and told him to never look at his wife, the Plaintiff Valerie Wakefield or think about her or talk to her again.

60. By this time the situation was effecting the Plaintiff Valerie Wakefield so badly that she was having difficulty sleeping.

61. Finally, the Plaintiffs decided to talk to Human Resources about their problem.

62. A meeting was held by Johan Moritz of the Human Resources Department of the Defendant Joy Manufacturing.

63. At that meeting the only people attending were males and the Plaintiff Valerie Wakefield was too embarrassed to bring up the rest of what had occurred with the Defendant Meade.

64. For a period of approximately one week and a half, no word was heard from Human Resources in response to the Plaintiffs' complaint.

65. The Plaintiff Valerie Wakefield then went to see Johan Moritz at the Human Resources Office to determine what had been done.

66. Johan Moritz indicated that they had had a meeting with Defendant Meade and that he would be leaving her alone.

67. The Defendant Meade did not leave her alone.

68. The Defendant Meade continued to blatantly walk through areas where she was working knowingly causing the Plaintiff Valerie Wakefield distress.

69. Tensions grew for the Plaintiff Valerie Wakefield so much so that on the 3rd of June she suffered a nervous breakdown while at work.

70. Upon telling her Supervisor what had happened he took her home and she told him at that time all the details that had been going on since the previous year.

71. Upon the Supervisor's return to the Defendant Joy Manufacturing, he told the people at the Human Resources about the specific details that the Plaintiff Valerie Wakefield had been subjected to by the Defendant Meade.

72. At that point the Plaintiff Valerie Wakefield's psychologist told her to go to the local Emergency Room; it was then determined that she was having a nervous breakdown.

73. The Plaintiff Valerie Wakefield was then hospitalized at a Psychiatric Facility for a period of four (4) days.

74. The Plaintiff Valerie Wakefield also underwent regular treatment with a psychiatrist as a result of the sexual harassment by the Defendant Meade.

75. The Plaintiff Valerie Wakefield was released and returned to work on June 16, 2003.

76. Upon the Plaintiff Valerie Wakefield's return to work, Human Resources did not suggest a change in her work environment, although, they were well aware of the nervous breakdown and what had led to it.

77. The Plaintiff Valerie Wakefield then took the initiative and requested that they change her work place, in the building so that she would no longer have to be subjected to unregulated visits by the Defendant Meade.

78. The Defendant Joy Manufacturing agreed and started having her clean different areas of the building.

79. The Defendant Meade continued to come through the lobby area when she was cleaning there despite these efforts causing her substantial distress.

80. On July 1, 2003 the Plaintiff Valerie Wakefield sent a request to the Administration of Defendant Joy Manufacturing asking that she be moved from the administration building to Plant #1.

81. In that request the Plaintiff Valerie Wakefield indicated to the Defendant Joy Manufacturing that "I do not feel comfortable with the action the company has taken on this Complaint. If you have any questions, feel free to contact me."

82. At a later date the Plaintiff Valerie Wakefield was informed that she was not allowed to be moved to another building as a result of the Union Contract.

83. Throughout this time the Defendant Meade continued to walk through areas where she was cleaning which created a hostile, offensive and intimidating work environment for the Plaintiff Valerie Wakefield.

84. On August 6, 2003 the Plaintiff Valerie Wakefield had a Grievance Meeting regarding harassment of the Defendant Meade toward her.

85. Following that meeting, the Plaintiffs went to Human Relations once again and explained how upset Plaintiff Valerie Wakefield was by the fact that the Defendant Meade continued to walk through the area she was working in.

86. A female employee of the Human Resources Department named Diane Kemmick was also in attendance at that meeting.

87. During the meeting the Plaintiff Valerie Wakefield became worked up and started to cry and Diane Kemmick took her to the Ladies Room where she suggested that she take the rest of the day off.

88. On August 15, 2003 Ms. Kemmick asked the Plaintiff Valerie Wakefield how things were going.

89. At that time the Plaintiff Valerie Wakefield informed Ms. Kemmick that Defendant Meade was still walking through the areas that she was working in which created a hostile environment for her.

90. Ms. Kemmick indicated to the Plaintiff Valerie Wakefield that she would inform Johan Moritz of Human Resources about this problem.

91. Nothing further was said by Human Resources Service to the Plaintiff Valerie Wakefield following this complaint.

92. On August 19, 2003 the stress once more became extreme for the Plaintiff Valerie Wakefield and she left work to avoid further encounters with the Defendant Meade.

93. The fact that the Defendant Meade continued to come through areas where she was working and that Human Resources appeared to be indifferent to this behavior

despite the complaints of the Plaintiff Valerie Wakefield had an impact upon her physical and mental health.

94. The Plaintiff Valerie Wakefield had become so anxious while working at the Defendant Joy that she felt that she was unable to work.

95. Upon meeting with her psychiatrist on that date in August, it was decided that she should not return to work until September 5, 2003.

96. This period of leave was unpaid.

97. On September 8, 2003 the Plaintiff Valerie Wakefield returned to work.

98. The Plaintiff Valerie Wakefield also stopped working any overtime in order to prevent being alone in the building in the early morning hours with the Defendant Meade.

99. The Plaintiff Valerie Wakefield was laid off from work on October 27, 2003.

**Prior actions of Defendant Meade**

100. In February of 2003 while the Plaintiff Valerie Wakefield was talking to a group of other female employees the Defendant Meade walked by.

101. At that time as he passed, one of the woman indicated that "He is one to stay away from".

102. Future discussions with other women at the Defendant Joy Manufacturing indicated that this problem behavior with the Defendant Meade have been going on for many, many years.

103. In the late 1980's Defendant Meade came into a room and pushed a female employee of the Defendant Joy Manufacturing up against the wall while making sexual advances to her.

-11-

104. The actions of the Defendant Meade were reported to female employee's supervisor and the manager of the MIS Division of the Defendant Joy Manufacturing.

105. Over the years that he has been employed by the Defendant Joy Manufacturing, the Defendant Meade has been involved in several exploits involving both female employees as well as wives of male employees of the Defendant Joy Manufacturing that were sexual harassing in nature.

106. On a prior occasion it was reported by another engineer to Defendant Joy Manufacturing that Defendant Meade had, come up behind a secretary, reached around and grabbed her breast.

107. Despite the engineer's efforts, the Defendant Meade continued to be retained by the Defendant Joy Manufacturing.

108. The Defendant Meade called the wives of engineers that were out of town working and make sexual suggestions to them over the telephone and generally harass them.

## COUNT I. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**Valerie Wakefield and Harold Wakefield vs.
Defendant Joy Manufacturing and Defendant Larry Meade.**

109. The Plaintiffs hereby incorporate Paragraphs 1 through 108 as though the same were fully set forth at length.

110. The Plaintiffs aver that the conduct of the Defendants outlined in the preceding paragraphs was extreme and outrageous and was done intentionally and recklessly to cause severe emotional distress to the Plaintiffs and their family.

WHEREFORE, the Plaintiffs aver that the Defendants' intentional and reckless conduct caused them extreme emotional distress and therefore demand judgment against the Defendants in an amount in excess of $25,000.00, together with costs and attorneys' fees. **A JURY TRIAL IS DEMANDED**

### COUNT II. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Valerie Wakefield and Harold Wakefield vs.
Defendant Joy Manufacturing and Defendant Larry Meade.

111. The Plaintiffs hereby incorporate Paragraphs 1 through 110 as though the same were fully set forth at length.

112. The Plaintiffs aver that the conduct of the Defendants outlined in the preceding paragraphs created an unreasonable risk of causing emotional disturbance to the Plaintiff Valerie Wakefield and her husband the Plaintiff Harold Wakefield.

WHEREFORE, the Plaintiffs aver that the Defendants' negligent conduct caused them extreme emotional distress and therefore demand judgment against the Defendants in amount in excess of $25,000.00, together with costs and attorneys' fees. **A JURY TRIAL IS DEMANDED**

### COUNT III. NEGLIGENT RETENTION OF AN EMPLOYEE

Plaintiffs' Valerie Wakefield and Harold Wakefield vs.
Defendant Joy Manufacturing

113. The Plaintiffs hereby incorporate Paragraphs 1 through 112 as though the same were fully set forth at length.

114. The Plaintiffs aver that the Defendant Joy Manufacturing was negligent in employing and retaining the Defendant Meade.

115. The Plaintiffs aver that Defendant Joy Manufacturing should have known or in the exercise of ordinary care should have known of the prior offensive and sexually harassing conduct of Defendant Meade.

**WHEREFORE,** the Plaintiffs aver that the Defendants negligent retention of Defendant Meade caused them extreme emotional distress and therefore, demand judgment against the Defendant Joy Manufacturing in an amount in excess of $25,000,00, together with costs and attorneys' fees. **A JURY TRIAL IS DEMANDED.**

## COUNT V. NEGLIGENCE

**Valerie Wakefield and Harold Wakefield vs. Defendant Joy Manufacturing**

116. The Plaintiffs hereby incorporate Paragraphs 1 through 115 as though the same were fully set forth at length.

117. As the employer of Defendant Meade and as the employer of the Defendants Valerie Wakefield and Harold Wakefield, the Defendant Joy Manufacturing had a duty to conform to a certain standard of conduct with respect to the Plaintiffs.

118. The conduct of the Defendant Meade as noted by the Plaintiffs in their prior paragraphs of this Complaint indicate that both Defendants Larry Meade and Defendant Joy Manufacturing breached their duty to the Plaintiffs.

119. Based on the information provided by the Plaintiffs in this Complaint there is a causal connection between the conduct of the Defendants and the resulting injury to the Plaintiffs.

120. As a direct result of the negligence of the Defendants in this matter, the Plaintiffs have suffered economic losses in the form of lost wages as well as psychological damages and emotional damages to both Plaintiffs Harold and Valerie Wakefield.

WHEREFORE, the Plaintiffs Valerie Wakefield and Harold Wakefield aver that the Defendant Meade and the Defendant Joy Manufacturing have been negligent against them. The Plaintiffs therefore demand judgment against the Defendants in an amount in excess of $25,000.00, together with costs and attorneys' fees. **A JURY TRIAL IS DEMANDED.**

### COUNT VI. VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT, 42 U.S.C. §§2000e – 2000e-17

**Valerie Wakefield and Harold Wakefield vs. Defendant Joy Manufacturing and Defendant Larry Meade**

121. The Plaintiffs hereby incorporate Paragraphs 1 through 120 as though the same were fully set forth at length.

122. The conduct of the Defendants, Joy Manufacturing and Larry Meade herein, was in direct contravention of Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§2000e – 2000e-17.

123. The conduct of the Defendant Larry Meade as aforesaid, constituted "sexual harassment".

124. The conduct of the Defendant Larry Meade created a "hostile" or "abusive environment" where the Plaintiff, Valerie Wakefield, a female employee, was required to endure his offensive behavior.

125. The conduct of the Defendant Joy Mining and Manufacturing, as aforesaid permitted, condoned and indeed encouraged the Defendant Meade to engage in the

aforesaid predatory behavior and created a "hostile" or "abusive environment" where the Plaintiff, Valerie Wakefield, a female employee, was required to endure offensive behavior.

WHEREFORE, showing these things it is requested that this Court order:

1. Compensatory damages to the Plaintiffs herein;

2. Punitive damages to the Plaintiffs herein;

3. Reasonable attorneys fees and costs;

4. Such other relief as the Court deems appropriate.

**A JURY TRIAL IS DEMANDED.**

Respectfully submitted:

THE LINDSAY LAW FIRM, P.C.

Alexander H. Lindsay, Jr., Esquire
Attorney for Plaintiffs
PA I.D. #15088

128 South Main Street
Butler, PA 16001
724-282-6600

## VERIFICATION

I, **VALERIE W. WAKEFIELD,** do hereby verify that the statements contained in the foregoing document are true and correct to the best of my knowledge, information, and belief. I understand that false statements made herein are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

_____
VALERIE W. WAKEFIELD

## VERIFICATION

I, HAROLD I. WAKEFIELD, do hereby verify that the statements contained in the foregoing document are true and correct to the best of my knowledge, information, and belief. I understand that false statements made herein are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

*[signature]*
HAROLD I. WAKEFIELD