**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **VALERIE W. WAKEFIELD** | : | **CIVIL DIVISION** |
| | : | |
| **Plaintiff** | : | **Civil Action No.  05 CV 79 - Erie** |
| | : | |
| | : | **Honorable Maurice B. Cohill, Jr.** |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **JOY MINING MACHINERY** | : | |
| **COMPANY, a division of Harnischfeger** | : | **Electronically filed** |
| **Industries** | : | |
| | : | |
| **Defendants.** | : | |

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**</u>

**AND NOW** comes the Plaintiff, Valerie W. Wakefield, by and through her attorneys,

The Lindsay Law Firm, P.C., and Alexander H. Lindsay, Jr., and files the following Plaintiff's

Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment:

<u>**FACTUAL BACKGROUND**</u>

The Plaintiff began working for the Defendant, Joy Mining, as cleaning service

personnel in August of 2001 and remains in her employment today. In April of 2002, the

Plaintiff suffered the tragic loss of her twenty-year old stepson in an automobile accident.

Immediately following the death of the Plaintiff's stepson, her co-worker, Larry Meade,

began paying special attention to her. Mr. Meade had also lost his son in an automobile

accident a decade earlier. This special attention to a bereaved female at work by Mr. Meade

was not peculiar to the Plaintiff.  As will be shown, he had engaged in this type of behavior

before.  Initially, Mr. Meade would make it a point to find the Plaintiff at work every day.

(Plaintiff Deposition, p. 86:19-22) The Plaintiff didn't find anything wrong with Mr. Meade's

conduct at first, as the two shared a common life experience and they could discuss the loss of their sons. However, Mr. Meade's actions soon began to make the Plaintiff uncomfortable and eventually resulted in him stalking and sexually harassing the Plaintiff, taking advantage of her psychological vulnerability. Larry Meade's conduct with regard to the Plaintiff is far more egregious than the Defendant acknowledges.[1]

- Larry Meade made it a point everyday to find out where the Plaintiff was working and then show up there. The Plaintiff would put signs up in front of the restrooms she was cleaning stating that the restroom was "closed." Larry Meade continually bypassed these signs, cornering the Plaintiff in the men's restroom while she was cleaning. (Plaintiff Deposition, p. 86-19-22; 89:16-23)

- The Plaintiff was uncomfortable with Larry Meade following her around and coming into the restroom and so she changed her work habits in an attempt to avoid him. (Plaintiff Deposition, p.95:10-23; p.104:19-24)

- The Defendant bypassed the "closed" sign to the men's the restroom in order to get a hug from the Plaintiff, and then grabbed her buttocks as he was hugging her. (Plaintiff Deposition, p. 114:13-116:8)

- After the buttocks incident, Larry Meade once again cornered the Plaintiff in the restroom so that she would hug him. He tried kissing her during one of these hugs, to which the Plaintiff responded by pushing him, "Why do you continually do this stuff?" (Plaintiff Deposition, p. 120:14-22; 121:22-122:23).[2]

- Larry Meade continued to ask the Plaintiff to go to his house to see an oil painting of his son despite the fact that the Plaintiff told him she was not interested in the painting. (Plaintiff Deposition, p.97:11-25).

- He kept inviting her to go to the cemetery with him as well, despite her repeatedly telling him that she did not want to go with him. (Plaintiff Deposition, p. 97:17-29).

---

[1] In its version of the facts, the Defendant lists four separate incidents in which Larry Meade acted inappropriately. This list represents a small fraction of the actual conduct Larry Meade engaged in.

[2] The Defendant repeatedly attempts to make an issue of the fact that the Plaintiff first stated in her deposition testimony that this incident occurred in February or March of 2003 and then later testified that the incidents occurred in June or July of 2002. In repeatedly making this assertion, the Defendant is attacking the Plaintiff's credibility. However, a motion for summary judgment is not the proper forum for credibility determinations, but rather credibility is a factual determination to be made by the trier of fact at trial. "At the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." *Boyle v. County of Allegheny Pennsylvania,* 139 F.3d 386, 393 (3d Cir. 1998).

- Larry Meade would tell the Plaintiff repeatedly how pretty she was and that she would look great in a bikini. (Plaintiff Deposition, p.92:6-19).

- He would ask her what kind of underwear she was wearing.[3] (Plaintiff Deposition, p. 92:6-8).

- He told her that he had a boat and that she would look good on his boat. (Plaintiff Deposition, p. 92:22-24)

- He repeatedly invited her to go to Florida alone with him, despite the fact that Plaintiff continually told him she didn't want to go with him. (Plaintiff Deposition, p. 96:20-22)

- Larry Meade's conduct was also physically threatening. He followed the Plaintiff to Wal-Mart, telling her that he was there to see her because he knew that she was taking her twelve-year old son there to get his picture taken. (Plaintiff Deposition, p. 99:24-100:3).

- Larry Meade showed up uninvited at the Plaintiff's home. He told her that he was there because he knew her husband and son were not at home. He professed his love to her and told her that he wanted to have sex with her right then and there. He told her that he had seen her at the mall over the weekend and described in perfect detail what she had been wearing and how good he thought she had looked. He told her that he wanted to marry her and that they could go off to Florida and have a wonderful time together. He told her she didn't need her husband and son and that he could take care of her because he had lots of money. When the Plaintiff insisted that he leave, Larry Meade threatened to commit suicide and sped out of the driveway. (Plaintiff Deposition, p. 134:24-136:21)

- The Plaintiff attempted to file a PFA against Mr. Meade but was told she could not because he was not and had never been a part of her household. (Plaintiff Deposition, p. 152:16-155:18).

The Plaintiff has since discovered that Mr. Meade had a history of sexually harassing female employees at Joy Mining. The Defendant had been made aware of Larry Meade's harassment of female employees as early as the 1970s when Mr. Meade possibly was reprimanded for grabbing a female employee from behind. (Robert Dahle Deposition

---

[3] Although the Defendant asserts that Larry Meade only asked the Plaintiff what type of underwear she was wearing "once or twice," this is a misstatement of the Plaintiff's testimony. The Plaintiff in reality testified that Larry Meade asked her what type of underwear she was wearing once or twice *in August* in response to Defense Counsel's question of "How many times did he ask you this *in August?*" (Plaintiff Deposition, p. 93:24-25)

attached as Plaintiff's Tab "J," p. 6:18-11; Johan Martitz notes attached as Plaintiff's Tab "I," Interview with Bob Dahle—June 4, 2004) In the early 1980s, Larry Meade pushed a female employee that he didn't even know up against the wall in an attempt to kiss her. When she refused his advances, he told her that "all divorced women want it." (Eleanor Averill Deposition attached as Plaintiff's Exhibit "D," p.6:19-7:20). The incident was reported to the woman's superior. In the late 1990s, a secretary for the Defendant lost her husband. Shortly after her loss, Larry Meade began "pursuing her," stopping by her desk nearly everyday and even calling her home. (Jill Seyler Deposition attached at Plaintiff's Tab "E," p. 8:7-16; 10:2-23:1) Mr. Meade is known as and referred to in the engineering department as "the dirty old man." (Johan Maritz notes attached as Plaintiff's Tab "I," Interview with Bob Dahle—June 4, 2004).  The female cafeteria employees also accused him of unwelcome conduct, including massaging their necks (Seyler Deposition, p.17-18).

Curiously, none of this information appears in Mr. Meade's work file. (Maritz Deposition, p.19:11-12) The Defendant, however, in implementing its sexual harassment policy, relies on an employee's work file to determine what type of punishment is appropriate for employee misconduct. (Maritz Deposition, p. 61:5-8) Furthermore, the Defendant's "policy" requires that in order for any form of remedial action to be taken with regard to an employee's misconduct, the misconduct must be witnessed by a third party. This "policy" was further implemented by a Human Resources Manager who had only dealt with a sexual harassment case once before while he was employed in South Africa.

The Defendant's action with regard to the Plaintiff's complaint of sexual harassment was simply placing a letter in Larry Meade's file only with regard to him going to the Plaintiff's home and giving her "mutual" hugs. This letter appears in his file only because

Larry Meade admitted that he went to the Plaintiff's home and gave her hugs. (Maritz Deposition, p. 57:20-24; 64:18-65:20)  The Defendant did not, and could not because of its policy, believe the Plaintiff's version of events, as a third party had not witnessed the incidents. As evidenced by the Defendant's repeated attacks on the Plaintiff's credibility in its Motion, Concise Statement and Brief in Support of Summary Judgment, the Defendant still does not believe that any of incidents described by the Plaintiff occurred.

In June of 2003, the Plaintiff suffered an emotional breakdown for which she was hospitalized. Upon her return to work, she requested that her work location be changed so that she would no longer see Mr. Meade. The Defendant refused this request.  Both the Plaintiff and Larry Meade continue to work as employees of the Defendant.

The Plaintiff filed a Complaint against the Defendant and Mr. Meade in the Court of Common Pleas of Venango County on or about March 7, 2005, alleging various counts of negligence and one violation of Title VII. The Defendant removed the action to this Court. All counts except for the Title VII violation against the Defendant Joy Mining were subsequently dismissed. On or about March 27, 2007, the Defendant Joy filed a Motion for Summary Judgment, which Motion is the subject of this response.

## STANDARD OF REVIEW

A party's motion for summary judgment should be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Courts should not weigh conflicting evidence or make factual findings, but rather should "consider all evidence in the light most favorable to the non-moving party" to decide whether "the evidence is such that a

reasonable jury could return a verdict of the nonmoving party" in deciding a motion for summary judgment. ***Schnall v. Amboy Nat'l Bank,*** 279 F.3d 205, 209 (3d Cir. 2002). "At the summary judgment stage, a court may not weight the evidence or make credibility determinations; these tasks are left to the fact-finder." ***Boyle v. County of Allegheny Pennsylvania,*** 139 F.3d 386, 393 (3d Cir. 1998).

## <u>ARGUMENT</u>

I. **The Plaintiff can establish all elements of a *prima facie* case of co-worker sexual harassment under Title VII, including the existence of *respondeat superior* liability on the part of the Defendant.**

According to United States Supreme Court and Third Circuit precedent, to succeed in a sexual harassment claim based on a hostile work environment, the plaintiff must show five elements: (1) the employee suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. ***Kunin v. Sears Roebuck and Co.,*** 175 F.3d 289, 293 (3d Cir. 1999); ***Pa. State Police v. Suders,*** 542 U.S. 129, 133 (2004).

a. **The Defendant could have and should have known of the sexual harassment of the Plaintiff by Larry Meade as Larry Meade had a history of inappropriate conduct with female employees, but where the Defendant's woefully inadequate sexual harassment "policy" prevented the Defendant from recording such incidents.**

The Defendant first argues that it neither knew nor should have known about Mr. Meade's harassment of the Plaintiff until the Plaintiff officially reported it. The Third Circuit has adopted traditional principles of agency law to determine when an employer is liable for sexual harassment by a coworker. ***Andreoli v. Gates,*** ----F.3d----, 2007 WL 1029690 (3d

Cir. 2007). "An employer will be liable for the harassing conduct of the alleged victim's coworker if the employer was 'negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment." ***Andreoli,*** 2007 WL 1029690 at 2 (quoting ***Bonenberger v. Plymouth Twp.,*** 132 F.3d 20, 26 (3d Cir. 1997). "An employer is negligent if it 'knew or should have known about the harassment, but failed to take prompt and adequate remedial action.'" ***Id.*** (quoting ***Jensen v. Potter,*** 435 F.3d 444,453 (3d Cir. 2006)). The United States Supreme Court has held that the mere existence of a grievance procedure, coupled with a Plaintiff's failure to invoke such procedure does not automatically insulate an employer from liability. ***Meritor Sav. Bank, FSB v. Vinson,*** 477 U.S. 57, 72-73 (1986).

The record in the instant case shows that the Defendant was negligent in the implementation of its purported "sexual harassment policy." The Defendant knew or should have known of the Plaintiff's harassment, as the Defendant permitted its employee, Larry Meade, to prey on its female employees for more than two decades. The Defendant's woefully inadequate procedures in dealing with such harassment effectively permitted Larry Meade to stalk and sexual harass his victim, the Plaintiff. The Defendant had been made aware of Larry Meade's harassment of female employees as early as the 1970s. The Defendant's employees recall an event in the late 1970s in which Mr. Meade grabbed a female employee from behind. Mr. Meade was reprimanded for this conduct. (Dahle depo Exhibit 1) Yet, the Defendant permitted this conduct to continue for the next twenty years.

In the early 1980s, Eleanor Averill was working on the telephone system for the Defendant. (Averill Deposition, p. 6:19) One day she was in the phone room, which is located in the basement of the engineering building, down a long dark hallway. Larry Meade

7

came into the phone room and began a conversation with Ms. Averill. He then pushed her up against the wall, trying to kiss her. When she pushed him away, Larry Meade told her that "all divorced women want it."  Ms. Averill reported this incident to her superior. Her superior told her that he would take care of it. He then told her that she was not to go down in the telephone room alone and that Mr. Meade was to stay away from her. (Averill Deposition, p. 6:19-7:20) This incident does not appear anywhere in Mr. Meade's employment file with the Defendant. (Maritz Deposition, 19:11-12)

In the late 1990s, Jill Seyler, a secretary at Joy, lost her husband. Shortly after her loss, Larry Meade began "pursuing her." (Seyler Deposition, 8:7-16) He frequently stopped by her desk and commented on her looks and complimented her. At first, Ms. Seyler laughed it off. (p. 10:4-6) But Mr. Meade's pursuit continued and eventually became obnoxious and annoying. (p. 10:7-13) He called her house, told her the two of them should go away together, and told her inappropriate things. (p. 21:1-21) Ms. Seyler made her supervisor aware of Larry Meade's unwelcome conduct in passing. (p. 22:9-12) Finally, Ms. Seyler told one of her co-workers that if Mr. Meade came to her desk one more time, she was going to report him to HR. (p. 11:4-14) Mr. Meade never stopped at her desk again. None of this information appears in Mr. Meade's employment file. (Maritz Deposition, p. 19:11-12)

Mr. Meade also has a reputation among the Defendant's other employees. He is known as and referred to in the engineering department as "the dirty old man."  The female

cafeteria employees also accused him of unwelcome conduct, including massaging their necks[4] (Seyler Deposition, p. 18:5-19:1).

The Defendant argues that it neither knew nor should have known about Larry Meade's sexual harassment of the Plaintiff until the Plaintiff reported the incidents in June of 2003[5]. Not surprisingly, in arguing this point, the Defendant fails to mention the decades of harassment of female employees by Larry Meade as partially listed above. The Defendant's supervisors were made aware of this conduct; curiously, none of this information appears in Larry Meade's work file. It is not surprising then, that the Defendant now claims it could not have known of Mr. Meade's behavior.

The Defendant's "woefully inadequate policies, procedure, and management practices … allowed a known sexual harasser, if not sexual predator, to prey upon its female employees."   (See report of expert Steven C. Millwee, attached at Plaintiff's Tab "H," Page 1-2) .

The Defendant's "policy" further did not allow it to record past reported sexual misconduct or harassment of its employees unless such behavior was witnessed by a third party. **Id.** at 2. This ineffectual, and indeed malignant  "policy" requires that in order for any form of remedial action to be taken with regard to an employee's misconduct, the misconduct must be witnessed by a third party. In so structuring its policy, the Defendant sends a message that none of the victims will be believed unless they have a witness. (Millwee report at page 2)  On the "flip side" of this equation, a sexual predator receives the message that, he me may exercise sexual depredation with impunity, as long as there is no

---

[4] When asked about massaging the cafeteria workers' neck massages, Mr. Meade responded that it "possibly" could have happened, but that he didn't remember it happening. (Maritz notes attached at Tab "I," Notes from Meeting with Larry Meade 6/17/03—1:00 p.m.)
[5] This is an incorrect assertion on the part of the Defendant, as in March of 2003 the Plaintiff reported to HR that Larry Meade had visited her home in March of 2003. **citation**

third party witness. The folly of such a policy is particularly acute in sexual harassment cases where there is rarely, if ever, a third party witness. This is further evidenced by the Defendant's response to the Plaintiff's complaint: putting a letter in Larry Meade's file which only addressed that he went to the Plaintiff's home and engaged in "mutual" hugs with her. Not coincidentally, these are the only two things which Larry Meade admitted had happened between him and the Plaintiff.

"The employer created an unreasonable burden and institutional standard that due to its ineffective investigative and interviewing experience and skills allowed those it knew, could or should have known posed a continued threat of future harassment or sexual harassment to have unrestricted and unsupervised access to its unprotected employees."

*Id.* The Defendant's "policy" is inadequate in many ways:

1.    It did not provide for a competent investigation of harassment and sexual harassment complaints;

2.    The Defendant arbitrarily decided to remove or destroy any records of past allegations that the Defendant deemed to lack a foundation because the only witness to the misconduct was the complainant and a third party did not observe the misconduct;

3.    The Defendant failed to warn its supervisors that had a need to know to carefully monitor employees it knew, could or should have known were engaging in sexually harassing behavior when the Defendant was aware of such conduct from other employees. Supervisors who are responsible for monitoring employees must know that an employee;

4.    The Defendant failed to warn the Plaintiff that she was at risk of becoming a target of unwanted sexual comments, criminal battery, kissing, touching, intrusions at her home, and other hostile and unwanted behavior by an employee that the Defendant permitted to remain in the workplace despite its knowledge that he preyed on female employees;

5.    The Defendant retaliated against the Plaintiff by believing only a portion of her complaint and further made a conscious decision not to

move the Plaintiff to another building under the Defendant's control,
and thereby effectively compounding the hostile work environment;

*Id.* at 2-3.

The sexual harassment of the Plaintiff was foreseeable and preventable. The Defendant, however, rendered itself incapable of foreseeing such harassment by dismissing and/or failing to use commonly accepted business, security, HR and management practices. *Id.* In failing to use such standards, the Defendant failed to provide the Plaintiff with a hostile free, safe, and secure workplace.

It was the Defendant's own negligence in failing to institute an effective sexual harassment policy which ultimately permitted Larry Meade to continue this pattern of harassing behavior for decades, eventually resulting in the sexual harassment and severe emotional distress of the Plaintiff. Larry Meade knew how to play the bereavement card. The Defendant should have had a record of his past misconduct and they did not. If the Defendant had an effective and reasonable sexual harassment policy in place, the psychologically vulnerable Plaintiff would not have been subjected to such abusive behavior at her workplace. Indeed, the Defendant should have known about Larry Meade's sexual harassment of the Plaintiff and could have prevented such harassment, but failed to do so. As the Defendant was negligent and reckless in failing to train, discipline or take remedial action where it knew or should have known of the harassment, the Defendant's Motion for Summary Judgment must fail.

**b. Joy could not take prompt and appropriate remedial action, as its inadequate "policy" permitted Larry Meade to prey on the Plaintiff in the first place.**

The Defendant further alleges that it is entitled to summary judgment as its response to Plaintiff's complaint stopped the harassment. In so arguing, the Defendant ignores the

issue that its "policy" permitted the harassment to occur in the first place. In support of this

position, the Defendant quotes an unreported Eastern District of Pennsylvania opinion and a

case out of the United States Court of Appeals for the 7th Circuit. The Third Circuit has held

that when an employer's response stops harassment, there cannot be Title VII liability.

**Kunin,** 175 F.3d 289,294.

The Defendant's actions in the instant case defy the notion of "remedial." The

Defendant's defective sexual harassment policy not only permitted Larry Meade to sexually

harass the Plaintiff, but the policy further prevented the Defendant from taking prompt

remedial action. "The message the Defendant is sending potential victims of harassment

and this Plaintiff is that it intends to take no action unless there are witnesses or other

corroboration beyond an unwitnessed complaint. This type of antiquated policy and practice

only educates employees to not report harassment in the workplace and to not expect

remedial action when you comply with the policy by reporting the misconduct as the

complaint will be unfounded unless you have a third party witness." (Milwee Report at page

5).  The Plaintiff was subjected to more than a year of sexual harassment at the hands of

Larry Meade because of the ineffectiveness of the Defendant's policy.

Less than two months after reporting the sexual harassment to the Defendant, the

Plaintiff was hospitalized for a severe emotional breakdown. The Plaintiff attributes this

breakdown to her sexual harassment. Although the Defendant asserts the harassment

stopped after the Plaintiff spoke to the Defendant about the harassment[6], the Plaintiff

continued to see Larry Meade at work and was further traumatized by such contact.  To

further aggravate the situation, the Defendant refused to move the Plaintiff to another

---

[6] The Defendant further incorrectly asserts that the Plaintiff never again saw Mr. Meade despite the Plaintiff's testimony
to the contrary. The Plaintiff testified that although she did not have any physical contact with Larry Meade in June and
July of 2003, she saw him at work. (Plaintiff Deposition, p. 230:16-231:12).

location at the same company cite despite the Plaintiff's repeated requests and their knowledge of her fragile emotional state.

"The Plaintiff provided a reasonable request for relief and accommodation as the victim of sexual harassment and relied upon Joy's executive to provide her a safe harbor. Despite her protests, the Defendant continued its willful pattern of disregarding the safety, security and well being of a sexual harassment complainant over what it perceived to be its labor and contractual obligations that would have had no reasonable impact on its workforce or profitability." Such refusal by the Defendant can hardly be deemed "prompt remedial action," particularly where the Plaintiff suffered a mental breakdown several months after the Plaintiff officially reported the sexual harassment.

Despite this refusal, the Defendant asserts that it acted "reasonably and responsibly" and that its actions ended the alleged harassment. In making this argument, the Defendant fails to recognize that the harassment never would have occurred in the first place but for the Defendant's woefully inadequate sexual harassment policy. The policy by it's nature is a green light to sexual predators and a red light to any victim of harassment. "Prompt and remedial" action in this sense would have been the protection of its female employees and prevention of such conduct where the Defendant was well aware that Larry Meade preyed on female employees.

**II. The Plaintiff can establish that the sexual harassment amounted to severe and pervasive conduct, creating a hostile working environment, where the Defendant's employee stalked her and engaged in inappropriate conduct for more than a year.**

The Defendant next alleges that the Plaintiff cannot establish that the sexual harassment was "sufficiently' severe or pervasive" so as to create a hostile working

environment. In support of this argument, the Defendant relies on its own misguided interpretation of the facts and non-precedential case law.[7]

Workplace conduct that includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature is actionable sexual harassment under Title VII. **Meritor,** 477 U.S. at 65 (quoting 29 CFR § 1604.11(a)(1985)). This conduct constitutes prohibited sexual harassment "where such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." **Id.** (quoting 29 CFR § 1604.11(a)(3)). "Sexual harassment so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment' violates Title VII." **Faragher v. City of Boca Raton,** 524 U.S. 775, 786 (1998).

In order to be actionable, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. **Faragher,** 524 U.S. at 787. "We directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." **Id.** at 787-88.

---

[7] Initially in support of its argument, the Defendant relies on a case from the United States Court of Appeals for the Eighth Circuit and a non-published United States District Court opinion. The Defendant then lists 15 examples where courts have held that the facts alleged by a Plaintiff did not rise to the level of severe of pervasive conduct required for recovery under Title VII. Eight of the 15 cases are non-published opinions. The remaining seven are from different various circuit and district courts. None of the 15 are from the Third Circuit nor the United States District Court for the Western District of Pennsyvlania.

The Third Circuit has also applied the "severe or pervasive" test and the objective and subjective standards as enumerated by the Supreme Court in ***Harris v. Forklift Sys., Inc.,*** 510 U.S. 17 (1993). *See **Spain v. Gallegos,*** 26 F.3d 439, 447-48 (3d Cir. 1994). The Third Circuit further noted that "to determine whether an environment is 'hostile' or 'abusive' a court must look at 'all the circumstances.'" ***Spain,*** 26 F.3d at 447.

As noted in the Plaintiff's Response to Defendant's Concise Statement of Material Facts Filed in Support for Motion for Summary Judgment, the Defendant has not been forthcoming in its statement of the facts in the instant case. The Defendant has repeatedly mischaracterized the Plaintiff's statements and left out important factual assertions made by the Plaintiff. Indeed, the Defendant's torturing of the facts in its Motion for Summary Judgment alone demonstrates the existence of genuine issues of material facts with regard to the issues presented.

The Defendant attempts to mitigate the incidents of sexual misconduct, stating that the Plaintiff "alleges that two isolated instances of harassment occurred one time each (touching the top of her butt and attempting to kiss her) in June or July 2002, that Mr. Meade made some unwelcome comments to her in August 2002 and that Mr. Meade visited her house, profess his love for her and asked to have sex with him in March 2003." (*See* Brief in Support of Defendant's Motion for Summary Judgment at 16). This rendition of the facts in the case is absurd. The Plaintiff's testimony reveals a pattern of stalking and harassing that amounts to frequent and severe sexual misconduct by the Defendant's employee, Larry Meade.

Contrary to the Defendant's description of events, the Plaintiff testified that Larry Meade made it a point everyday to find out where she was working and would then show up

there. He would bypass the signs at the entrance to the men's restroom stating that the restroom was closed, and come into the restroom while the Plaintiff was cleaning. The Plaintiff testified that this made her uncomfortable and that she went so far as to change her work habits so as to avoid him. She testified that Larry Meade cornered her in the restroom so that she would hug him. He tried kissing her. He grabbed her buttocks, rather than "touching the top of her butt" as the Defendant nicely describes his actions. Larry Meade continued to ask the Plaintiff to go to his house to see an oil painting of his son despite the fact that the Plaintiff told him she was not interested in the painting. He kept inviting her to go to the cemetery with him as well. Larry Meade would tell the Plaintiff how pretty she was and that she would look great in a bikini. He asked her what kind of underwear she was wearing. He told her that he had a boat and that she would look good on his boat. He repeatedly invited her to go to Florida alone with him, despite the fact that Plaintiff continually told him she didn't want to go with him.

Larry Meade's conduct was also physically threatening. He followed the Plaintiff to Wal-Mart, telling her that he was there to see her because he knew she was taking her son there to get his picture taken (the Defendant failed to mention this incident anywhere in its Motion). Larry Meade also showed up at the Plaintiff's home, telling her that he was there because he knew her husband and son were not at home and he wanted to have sex with her right then and there. He told her at that time that he had seen her that weekend at the mall and described in detail what she had been wearing. He professed his love for her and stated that he wanted to marry her; that they could go off to Florida and have a wonderful time together; that she didn't need her husband and son; and that he could take care of her because he had lots of money. When she asked him to leave, Larry Meade sped out of her

16

driveway with his tires squealing and threatening to kill himself. At this point, the Plaintiff attempted to file a PFA against Larry Meade. In June of 2003 the Plaintiff suffered a mental breakdown and was admitted to the hospital on the recommendation of her therapist as a result of Larry Meade's continual sexual harassment. (86:19-22; 87:4-7; 92:5-19; 93:20-25; 97:19-25; 99:24-100:3; 104:19-24; 113:21-114:12; 114:13-21; 116:6-8; 120:14-22; 133:17-13; 134:24-136:21; 139:25-140:5; 152:16-155:18; 223-225). This lengthy list of incidents is indeed pervasive and/or severe and much more serious than the Defendant lets on.

In support of its position, the Defendant lists numerous non-binding, non-published and non-precedential decisions where other courts found that specific factual scenarios did not amount to severe or pervasive conduct. The Third Circuit has held that an employee can demonstrate a sexually hostile work environment without even proving blatant sexual misconduct, as exists in the Plaintiff's case. (*See Spain,* 26 F.3d at 447).

In *Spain,* rumors stemming from the plaintiff's co-workers circulated throughout her place of employment that she was having an affair with her superior. The plaintiff alleged that her superior's conduct in meeting with her privately to discuss financial loans perpetuated the rumors and that she found such rumors embarrassing and that the rumors caused her co-workers to ostracize her. The plaintiff claimed that this ultimately led to her being passed by for a promotion, as her supervisors graded her low in the "integrity" category of her evaluation for the promotion. In reversing the District Court's grant of the defendant's motion for summary judgment, the Third Circuit held that whether or not the discrimination of the plaintiff was pervasive and regular was a fact question for trial.

In the instant case, Larry Meade's sexual misconduct toward the Plaintiff was frequent. A pattern of harassment developed and continued for nearly a year. The

misconduct was severe as it was physically threatening as opposed to a mere offensive utterance. Larry Meade physically stalked the Plaintiff, showing up in restrooms she was cleaning, following her to Wal-Mart, and eventually showing up uninvited at her home. The Plaintiff found these actions to be hostile and abusive, as any reasonable person in her shoes would. The Plaintiff even went so far as to attempt to get a PFA order against Larry Meade.

Throughout this litigation the Defendant has taken great lengths to characterize the relationship between Larry Meade and the Plaintiff, Valerie Wakefield, as two people who suffered a tragic loss who mutually supported each other and engaged in "mutual" hugs. The Plaintiff on the other hand is seeking the opportunity to show that, in fact, Mr. Meade is a seasoned sexual predator.  Having suffered a loss many years before, his learned *modus operandi* was to prey on females who have suffered a similar loss.

The insidious nature of Mr. Meade's depredations are best demonstrated by referring to the testimony of Ms. Wakefield's therapist, Susan J. Stewart, L.C.S.W.  When a person, like Mrs. Wakefield who suffered the loss of a step-son, is in a grief posture, they are far more vulnerable to victimization because of this state.  Meade was approaching Valerie as a friend who had been through the same situation.  He was aware of what she was feeling and was offering some support and consolation which is understandable.  In the process of doing that, he is hugging her, as he is consoling her, as he was able to cry with her and able to understand what she is going through.   At some point in time she began to be uncomfortable.  Furthermore, Stewart testified that although Ms. Wakefield may have felt uncomfortable at some point in time, she became more vulnerable "because you don't want to give that up".  When Ms. Stewart was asked whether she was surprised that Valerie

Wakefield did not report this immediately, Ms. Stewart testified that she was not surprised because as she put it, "it goes back to the whole idea of 'if this happens who is going to believe me?  I am going to be blamed?  Did I do something wrong by accepting his hugs to begin with?  Should I have seen it coming and done something?'"

Ms. Stewart testified that then comes a sense of shame and guilt and there is also the aspect of "I can't deal with this right now, because I've got all this other stuff that I'm already dealing with.  Maybe if I just put it out of my system, it will go away."  Ms. Stewart testified that most people in this situation suppress it.  Therefore it is very common that people do not come forward for a long time afterwards when they have been the victim of such an individual.  (Stewart Deposition, p.135:22-p.139:3)

Ms. Stewart also explained how, after reporting Mr. Meade's conduct, seeing him merely one time could cause substantial anxiety for Ms. Wakefield.  This anxiety would arise, "because he is still present in the building, there is a concern that he would not abide by the restrictions that were placed on him".  (Stewart Deposition, p.145:19-p.146:1)

As stated, the Defendant chooses to characterize Mr. Meade as a person who is suffering mutual grief with the Plaintiff.  The Plaintiff on the other hand believes there is substantial evidence that he was no such thing.  It is the position of the Plaintiff that the decision of which characterization is true is a decision that should be left to the jury..

Larry Meade's conduct further altered the Plaintiff's employment. The Plaintiff changed her work habits to avoid him, and eventually suffered a mental breakdown because of the circumstances of her work environment. Thus, the record evidence demonstrates the sexual harassment was pervasive, regular and severe and that there

exists a genuine issue of material fact in this regard between the parties. As such, the

Defendant's motion for summary judgment should not be granted.

### CONCLUSION

For the foregoing reasons, the Plaintiff has amply demonstrated that Plaintiff has

established a *prima facia* case of co-worker sexual harassment under Title VII, including the

existence of *respondeat superior* liability on the part of  the Defendant Joy Manufacturing.

Furthermore, a review of the Defendant's motion for summary judgment and concise

statement of material facts indicates that, to a large extent, the Defendant is raising the

issue of credibility of the witnesses and not whether a *prima facia* case can be established.

Therefore, the Defendant's motion should be denied and this matter should proceed to trial.

Respectfully submitted:

THE LINDSAY LAW FIRM, P.C.


**s/ *Alexander H. Lindsay, Jr.***
Attorney for Plaintiff

128 South Main Street
Butler, PA  16001
(724) 282-6600