TAB "F"

EXCERPTS FROM
JOHAN MARITZ
DEPOSITION

9

```
1   Q.   Was it part of your job to investigate complaints
2        of sexual harassment here in Franklin during the
3        time frame we've discussed, 2002, 2003, 2004?
4   A.   Yes.
5   Q.   Was there a protocol, if you understand my
6        question, as to how to investigate these
7        complaints?
8   A.   There is not a written protocol.  Human resource
9        professionals in Joy are taught how to conduct
10       these investigations.
11  Q.   Would you tell us was there a procedure then that
12       you would use -- you did use to investigate
13       sexual harassment complaints?
14  A.   Yes.
15  Q.   What was that procedure?  Could you give us a
16       step-by-step analysis or survey of that
17       procedure, if you will?
18  A.   Obviously to hear the complaint first-hand, to
19       then conduct investigations, interviews with
20       people based on whatever information was provided
21       during the complaint.  If necessary to follow
22       back up with the complainant and conduct further
23       interviews, if possible.  Then to take action to
24       make sure that if there was any substance to the
25       complaint to make sure that the situation does
```

11

1    A.    It's to come back to the complainant in case

2          something came out in those interviews and we

3          needed more clarification to go back to the

4          complainant to see if there was anybody else who

5          saw anything or who could provide more

6          information.

7    Q.    And then you may take further interviews; is that

8          correct?

9    A.    Correct.

10   Q.    And then you say, take action; is that correct?

11   A.    If appropriate.

12   Q.    Is there anywhere in this protocol do you meet

13         with the alleged perpetrator, if you will?

14   A.    Yes.

15   Q.    And where does that fit in?

16   A.    Right at the beginning, after the complaint had

17         been lodged.

18   Q.    Okay.  And also do you get witnesses from them if

19         it's appropriate?

20   A.    If it's appropriate.

21   Q.    Now, when you worked in Franklin in the time

22         frame we've been talking about, 2002, 2003, 2004,

23         can you give us an idea about how many complaints

24         of sexual harassment did you investigate?

25   A.    Only one.

12

| | | |
|---|---|---|
| 1 | Q. | And that was this one? |
| 2 | A. | Correct. |
| 3 | Q. | And when I say this one, I'm talking about the |
| 4 | | Wakefield? |
| 5 | A. | Correct. |
| 6 | Q. | All right.  How did you first become aware that |
| 7 | | there was a complaint by Mrs. Wakefield? |
| 8 | A. | When in March, I believe it was March of 2003, |
| 9 | | when Mrs. Wakefield was brought to my office by |
| 10 | | another HR employee. |
| 11 | Q. | And who was that? |
| 12 | A. | Cornelia Adams. |
| 13 | Q. | Okay.  Can you tell us what you remember about |
| 14 | | that meeting? |
| 15 | A. | When Mrs. Wakefield was brought to my office, it |
| 16 | | wasn't immediately followed by a meeting.  She |
| 17 | | was pretty distraught so there was a recess and |
| 18 | | later then after a while, I can't remember if it |
| 19 | | was an hour or two hours, there was a meeting |
| 20 | | with Mrs. Wakefield and what was relayed to me |
| 21 | | was that Mr. Larry Meade had shown up at the |
| 22 | | Wakefield's home and Mrs. Wakefield felt that he |
| 23 | | was unwelcomed and that obviously shouldn't have |
| 24 | | been there in the first place and that he had |
| 25 | | said things that she didn't find welcomed. |

13

1   Q.   Do you remember what those were?

2   A.   Yes.  I believe it had to do with Mrs. Wakefield

3        said, that Mr. Meade had made proposals that they

4        should go away together, that he loved her and

5        that she should leave and be with him.

6   Q.   Did you make a memorandum of that meeting?

7   A.   Yes.  I made notes.

8   Q.   We have things that were given in discovery and

9        rather than me going through the file because I'm

10       confused about the date, do you just want to look

11       and forget the yellow tabs.  Those were just so

12       that my staff would make copies.  But is there

13       any memorandum that dealt with that meeting?

14  A.   Yes.  It is the -- it is document marked Joy 001,

15       dated 3-14.

16  Q.   Was that later typed up in any way or was that

17       the only notes you have of that meeting?

18  A.   This would have been typed up I believe so that

19       people could read my handwriting.

20  Q.   Do you want to see if you could find the typed

21       version of those?

22  A.   I believe it's Joy 051.

23  Q.   For some reason there's one of 2004.  If it is,

24       it is.

25  A.   Yes.  This is definitely --

1      him, did you proceed to go to the next step of

2      your procedure as to conduct an investigation?

3   A.  What I did is I asked Mrs. Wakefield at the end

4      of our first meeting to provide me with any names

5      of people that could give me further information,

6      which she could not at that stage, at that first

7      meeting.  What I did after the meeting was to

8      review Mr. Meade's files and also any files we

9      had in human resource that would be evidence of

10     any prior situations such as the complaint.

11  Q.  Did you find any?

12  A.  No.

13  Q.  Okay.  What did you do then?  What's the next

14     thing that you can recall and if you need to use

15     your notes, that's fine or at least the notes

16     that I have or any other notes?

17  A.  No.  There were no further notes as a result of

18     that very first meeting.  I continued to speak to

19     other folks in HR to see if anybody knew

20     anything.

21  Q.  Who did you speak with?

22  A.  I believe I spoke with Diane Kemick and asked her

23     if she had any knowledge of any prior incidents

24     involving Mr. Meade?

25  Q.  Anybody else that you recall you spoke to other

57

```
 1    Q.   Anything else?
 2    A.   I believe that was all that she said.
 3    Q.   What was the next thing you did in your
 4         investigation?
 5    A.   It was 6-18.  I believe, obviously I was still
 6         trying to get ahold of Mike Calderone.  I recall
 7         sitting down and reviewing all of the materials
 8         and all of the interviews and all the notes and
 9         then trying to decide what to do at that point
10         without obviously I hadn't spoken with Mike
11         Calderone and Peggy Doyle.  My first objective,
12         as I said earlier, was to make sure that -- to
13         ensure that nothing happen ever again that would
14         make Mrs. Wakefield uncomfortable and I knew that
15         nothing new had happened since I spoke with
16         Mr. Meade in March to tell him to stay away from
17         Mrs. Wakefield, to avoid contact with her.  I
18         then sat down and reviewed my notes and decided
19         whether I had -- whether I should take any action
20         or not.  Two things made me decide at that point
21         to draft a formal reprimand to Mr. Meade and it
22         was essentially the fact that he had admitted to
23         going to her home, but more than that, that he
24         admitted to hugging going on.  And whether that
25         was mutual or not really didn't matter to me at
```

```
 1  Q.  When you --
 2  A.  I was just going to say there were two types of
 3      written -- those were all the ones at my
 4      disposal.
 5  Q.  What criteria do you use in exercising these
 6      forms of discipline?  In other words, what are
 7      the things that you consider?
 8  A.  I consider the file record of the employee.
 9  Q.  All right.
10  A.  I consider -- I consider -- and what Joy does is
11      we consider what is the least severe method of
12      discipline that would correct the behavior.
13  Q.  Anything else you consider?
14  A.  Obviously the nature of whatever somebody has
15      done to have transgressed.
16  Q.  All right.
17  A.  And I guess we just for balance of evidence of
18      how severe the act was and how clear it was.
19  Q.  All right.  We have a term in the criminal
20      justice system that we call prophylaxis, which is
21      sending the message.  In other words, one of the
22      functions of a law enforcement discipline is not
23      just these other factors, but you have to make
24      people aware in a community what is a serious
25      violation and so forth.  Is prophylaxis something
```

63

```
1   Q.   I'm not suggesting broadcasting it.  Do you agree
2        that any discipline that you mete out, no matter
3        how private, people be aware that this happened
4        to somebody?
5   A.   To me it's the message to the individual.
6   Q.   All right.  Mrs. Wakefield met with you on a
7        number of occasions as testified, correct?
8   A.   Correct.
9   Q.   And she made a number of allegations about the
10       conduct of Mr. Meade; is that correct?
11  A.   Correct.
12  Q.   Did you believe her?
13  A.   I did not believe or disbelieve her.  I tried to
14       find out by talking to the folks that she had
15       mentioned, by looking at prior records to make up
16       my own mind on, if you want to call it a balance
17       of probabilities of whether.
18  Q.   All right.  On a balance of probabilities, did
19       you believe her?
20  A.   I believed as far as the visit to the home was
21       concerned.  He admitted to that.  I believed her
22       that as far as the fact that he hugged her.  I
23       could not make a judgment on whether those hugs
24       were mutually acceptable or initiated as a mutual
25       hug and then turned into something else.  I was
```

64

| | | |
|---|---|---|
| 1 | | just focused on, okay, if he's been at the house |
| 2 | | and if there have been hugs, this is enough for |
| 3 | | me to issue a reprimand to this guy to make sure |
| 4 | | that it stops and to make sure because it had |
| 5 | | stopped in March, but to make sure he got the |
| 6 | | message that this was really serious. |
| 7 | Q. | Did you believe her when she said that he kissed |
| 8 | | her? |
| 9 | A. | Again, I don't want to call her a liar and I |
| 10 | | don't want to call him a liar. I had two people, |
| 11 | | one person saying he kissed her and one person |
| 12 | | saying that he didn't. Nobody supporting that |
| 13 | | with any direct evidence of witnessing it. So |
| 14 | | how could I say I believe either one of them. |
| 15 | Q. | In your evaluation of this case, do you make that |
| 16 | | determination who is to be believed and who is |
| 17 | | not? |
| 18 | A. | Only insofar as the two incidents that I just |
| 19 | | relayed, the fact that he visited her home and |
| 20 | | that he said he hugged her. |
| 21 | Q. | I take it, sir, that from what you're saying is |
| 22 | | that any discipline that you gave Larry Meade was |
| 23 | | based solely on the fact that he visited her home |
| 24 | | and that he had hugged her, that's it; is that |
| 25 | | correct? |

65

```
1   A.   Yes.  And the fact that she filed a complaint.
2        Employees can visit each other's home and hug
3        each other where they wouldn't get disciplined.
4   Q.   Did you believe Larry Meade?
5   A.   Not any more or any less than Mrs. Wakefield.
6        You must understand that I look at this from a --
7        it is probably my labor law training, but I look
8        at the facts, I look at the evidence that either
9        supports it or not or if there's no evidence that
10       supports either side, I say a need to just
11       disregard and I have to look at what I have and
12       make a determination of what I have.
13  Q.   Did you believe Jill Seyler?
14  A.   I believe that Jill saw him as a nuisance because
15       she told me he was a nuisance.
16  Q.   Did Jill Seyler's statement have any impact on
17       whether or not you believed Larry Meade or
18       Valerie Wakefield?
19  A.   No.  Ultimately that would not have swung my
20       decision either way.
21  Q.   Am I to understand, Mr. Maritz, that if Larry
22       Meade had denied that he had gone out to her
23       house or denied that he hugged her, he would not
24       have been disciplined at all?
25                MS. COCHENOUR:  Objection.  It's
```

66

```
 1        very speculative.
 2   Q.   Can you answer the question?
 3   A.   It's difficult to answer that in isolation of all
 4        the other circumstances around this case.
 5   Q.   Well, this is the only sexual harassment case you
 6        ever had while working at Franklin, correct?
 7   A.   Correct.
 8   Q.   Has there, since you have been moved to
 9        Warrendale, have you dealt with any others?
10   A.   No.
11   Q.   Did you deal with any others at South Africa?
12   A.   One.
13   Q.   Okay.  What occurred in that case?
14   A.   That was a different set of circumstances.  It
15        was a manager-employee situation.
16   Q.   Okay.  Do you deal in your position or during the
17        period of 2002, 2003, 2004, while you worked in
18        Franklin, did you deal with other situations
19        where you were required to mete out discipline?
20        When I say mete, I think it's spelled m-e-t-e.
21   A.   I know.  Yes, in the -- I can recall one
22        situation.
23   Q.   What was that?
24   A.   A violation of a safety rule.
25   Q.   Can you be more specific?
```

69

```
 1   A.   Some cases.
 2   Q.   Is it part of your job to resolve those
 3        differences and determine what actually happened?
 4   A.   If there are conflicting statements or evidence,
 5        it would be my job to the best of my ability to
 6        find out what is the more likely scenario.
 7   Q.   In this case, however, you did not do that, did
 8        you?
 9   A.   Can you be more specific about which --
10   Q.   Which case?
11   A.   No.  Not which case.  Which -- as you talked
12        about witnesses, conflicting statements and I
13        don't believe I had conflicting statements except
14        between Mrs. Wakefield and Mr. Meade.
15   Q.   That's right.  But you didn't resolve that
16        conflict, did you?
17   A.   Because there was no -- there was not a single
18        person that I could point to for specific
19        evidence about any of those incidents.
20   Q.   Can we agree, sir, that in viewing the situation
21        that hugging someone, a mutually agreed hug out
22        of sympathy is far different than hugging someone
23        and placing your hands or having wondering hands,
24        so to speak.  It's a much different situation, is
25        it not?
```

70

```
 1    A.    Yes.

 2    Q.    And it's a significant difference in evaluating a

 3          sexual harassment claim, is it not?

 4    A.    Yes.

 5    Q.    And can we agree that talking to someone at their

 6          house about the next time you'll see me in a

 7          funeral home is a far different scenario than

 8          suggesting that they have sex, that you want to

 9          marry them and that you love them, is a much

10          different scenario, is it not?

11    A.    Yes.

12    Q.    One is far more serious than the other, is it

13          not?

14    A.    Yes.  Both could be unwelcome.

15    Q.    But in the context of the sexual harassment

16          claim, one is far more serious than the other, is

17          it not?

18    A.    If that had to happen, yes, if I had to just look

19          at someone saying visiting the home and saying

20          next time you see me is in a funeral home versus

21          the other situation, yes, the other would be more

22          serious in a sexual harassment claim.

23    Q.    I guess there is a word people use for these

24          types of conflicts -- it's not a word, it's a

25          phrase, "he said/she said".  Have you ever heard
```

71

1       that?

2   A.  Mm-hmm.

3   Q.  And where you have these "he said/she said"

4       disputes, you don't resolve the differences; is

5       that correct?  Without outside witnesses?

6   A.  I guess yes.  It's difficult to resolve.

7   Q.  You don't resolve it?

8   A.  Yes.

9   Q.  Okay.

10  A.  You don't resolve it beyond any doubt.

11  Q.  Sir, in your experience as a trained person in

12      this field, when we talk about sexual harassment,

13      isn't it almost always, "he said/she said"?

14  A.  I have to qualify when you say trained person in

15      this field.  I've had theoretical training.  I've

16      had two cases to investigate.  This is the first

17      one that I had a "he said/she said" without any

18      witnesses.

19  Q.  You haven't had any sexual harassment claims

20      where there were witnesses, correct?

21  A.  Except the one in South Africa.

22  Q.  There were witnesses?

23  A.  Yes.

24  Q.  We have the sexual harassment policy that we've

25      referred to earlier in this deposition.

72

1   A.   Yes.

2   Q.   Has there -- is there any other textbooks,

3        guidelines, manuals or anything that you use to

4        assist you in how to address a sexual harassment

5        claim?

6   A.   There's not a single prescribed procedure or

7        textbook that we use.

8   Q.   For example, you said you went to seminars where

9        it came up, correct?

10  A.   Correct.

11  Q.   Did you bring back with you some type of a

12       publication that they gave you at this seminar?

13  A.   Yes.

14  Q.   Do you have that?

15  A.   I don't know.

16  Q.   Do you use it?  Or did you ever use it?  Did you

17       use it in 2002, 2003, 2004?

18  A.   I don't recall whether I referred to a particular

19       manual.  I felt comfortable that I was doing the

20       right thing.  I followed the right procedure.

21       Again my focus was to stop the behavior and it

22       stopped.

23  Q.   Okay.  Would you do me a favor, would you check

24       and see if you have any of those publications or

25       manuals and just tell your attorney what they are