TAB "H"

# STEVEN MILLWEE EXPERT REPORT

# *SecurTest, Inc.*

**Steven C. Millwee, CPP**
**Board Certified in Security Management**

13902 N. Dale Mabry Highway, Suite 250
Tampa, Florida 33618-2433
 (800) 445-8001  (813) 888-8000  (813) 889-8200 (fax)
smillwee@securtest.com



HR, Security & Risk
Management Solutions
Since 1978

November 24, 2006

Alexander H. Lindsay, Jr.
Senior Partner
Lindsay, Jackson, & Martin, P.C.
128 South Main St.
Butler, PA 16001

Re:   Expert Witness Report
        Valerie W. Wakefield (Plaintiff) vs. Joy Mining Company, a division of Harnischfeger Industries (Defendant)
        The United States District Court for the Western District of Pennsylvania
        Civil Action Number: 05 CV 79 - Erie

Dear Mr. Lindsay:

> *The opinions expressed are based on my review of court records, internal memos of the defendant, handwritten notes of the plaintiff, depositions, policies of the defendant and other items listed on Millwee Exhibit 2 and my years of experience including my experience advising and training employers regarding employment and management practices, sexual harassment policy development, sexual harassment investigations and remedial action steps, conducting sexual harassment investigations for employers, security, loss prevention, risk assessment, workplace violence, negligence regarding hiring, retention, supervision, and security.  The opinions are based on generally accepted common employment and security practices of businesses in 2003 and the self-imposed standards and business practices and policies of the defendant.*

## Summary

*Willful Negligence By The Defendant Due To It's Self-Imposed Inadequate Sexual Harassment Policies and Practices That Allowed A Known Sexual Harasser To Have Unrestricted Access To The Plaintiff.*

The genesis or creation of the harassment, sexual harassment, battery, and false imprisonment of Valerie Wakefield (plaintiff) was created by Joy Mining's (defendant - employer) woefully inadequate policies, procedures, and management practices that allowed a known sexual harasser, if not sexual predator, to prey upon its female employees for over a decade leading up to the harassment and sexual harassment of Valerie Wakefield (plaintiff).  The employer created a restrictive, self-imposed standard and policy that did not allow it to record past reported sexual misconduct or sexual harassment of its employees unless such acts were witnessed by a third party.  The employer knew, could, or should have known that most sex related crimes or sexual harassment is committed privately without witnesses other than the complainant and the employee accused of the misconduct.  Therefore, the employer created an unreasonable burden and institutional standard that due to its ineffective investigative and interviewing experience and skills allowed those it knew, could or should have known posed a continued threat of future harassment or sexual harassment to have unrestricted and unsupervised access to its unprotected employees.  The Plaintiff and other employees were never warned of the risks, behaviors, and patterns of misconduct that was already known and secreted from those very employees that entrusted their employer for their safety, security, well being and a harassment free work environment.

This willful blindness and overt decision to never institutionalize complaints by female employees coupled with its intentional decision to not move the plaintiff to another work location allowed for an on going hostile work environment that could have easily been remedied by the Defendant.

This report will detail my opinions and findings to measure the defendant against its own institutionalized and historical policies, practices, internal standards, management practices, security, and investigative practices or lack thereof.  Moreover, opinions and findings will also be based on commonly accepted practices of employers and their duty to provide a safe workplace free of workplace violence, harassment, sexual harassment, false imprisonment, and other acts of negligence in 2003.

## Overall Negligence Categories

The overall negligence categories can be classified as:

1. **The Defendant was negligent in its creation of its harassment policy.**

2. **The Defendant was negligent in its implementation of a reasonable policy that provided for a competent investigation of harassment and sexual harassment complaints.**

3. **The Defendant was negligent in its willful decision to arbitrarily remove or destroy any records of past allegations that it solely deemed to lack a foundation because the only witness was the complainant and no other witnesses observed the misbehavior.**

4. **The Defendant failed to warn its supervisors that had a need to know to carefully monitor employees it knew, could or should have known were engaging in harassing or sexually harassing behavior when warned by other employees. Supervisors that are responsible for monitoring employees must know that an employee requires closer supervision, if not constant monitoring, when executives and management have been forewarned about past sexual harassment allegations.**

5. **The Defendant failed to warn the Plaintiff that she was at risk of becoming a target of unwanted sexual comments, criminal battery, kissing, touching, intrusions at her home, and other hostile and unwanted behavior by an employee that it allowed to remain in the workplace despite its past knowledge that he preyed upon female employees. Thus, the Defendant was negligent in its failure to warn.**

6. **The Defendant effectively retaliated against the Plaintiff by believing only a portion of her complaint when finding that Larry Meade had violated one of its most important governance and employee protective policies (harassment and sexual harassment) that impacted all employees. Moreover, the Defendant's willful and conscious decision to not move the Plaintiff to another building under its control compounded the hostile work environment created by its inadequate management, HR and security practices. The Plaintiff provided a reasonable request for relief and accommodation as the victim of sexual harassment and relied upon Joy Mining's executives to provide her a safe harbor. Despite her protests, the Defendant continued its willful pattern of disregarding the safety, security and well being of a sexual harassment complainant over what it perceived to be its labor and contractual obligations that would have had no reasonable impact on its workforce or profitability.**

The harassment and sexual harassment of Valerie Wakefield was reasonably foreseeable, much less preventable. Joy Mining and its management failed to warn Mrs. Wakefield and showed a careless disregard for her safety and security by allowing Larry Meade, an employee it knew had a pattern of sexual harassment, unwelcome or unwarranted harassing behavior resulting in a hostile work environment to have unsupervised access to female employees which were his hunting ground to prey on their emotions and feed is aberrant need for attention or sexual gratification. The lack of supervision, security, and following of its own policies and incidents known to Joy Mining could and should have resulted in changing its policies and practices and removing Larry Meade from the workplace or placing him under constant supervision to prevent future sexual harassment of its most valued assets – their employees, including the Plaintiff.

The breach of the standard of care rises to the level often associated with gross negligence. The dismissal or absence of commonly accepted business, security, HR and management practices and other serious acts of negligence demonstrate a reckless disregard for the most fundamental business practice of providing a hostile free, safe and secure workplace. Mr.

Meade was known to Joy Mining to prey upon female employees for over a decade. Knowing that those that engage in sexual misconduct or sexual harassment rarely do so in front of a third party, Joy Mining effectively communicated the following:

1. Joy Mining, its executive, managers and supervisors will not believe an employee reporting sexual harassment without an independent third party that witnessed the misconduct.
2. Commonly used tools used by employers will not be used such as the demeanor of the accused, past allegations of misconduct that we has intentionally and arbitrarily been discarded, destroyed, or secreted by Joy Mining that could reasonably help corroborate elements or facts presented, and admissions against self interest by the accused.  They will automatically believe the denials of the accused over the complaints of female employees who are *"one of the girls"* rather than evaluate the totality of investigative information available to it other than an oversimplification of looking for a third party witness to verify the instant complaint.  The word of a distraught victim of harassment will not be given sufficient weight or credibility when the sexual harassment occurs between the victim and employee engaging in the behavior.
3. Joy Mining will do nothing to protect you from being constantly reminded and damaged by the presence of sexually harassing male coworkers even when you provide a reasonable request to be transferred to another building away from your offender.  Joy Mining is more focused on labor contracts it negotiated that could and should have been known would tie management and the company's hands from providing a safe and secure workplace and arbitrarily dismissed a workplace free of harassing behavior or a sexually hostile workplace much less the constant reminder of past harassing by having to work side-by-side or in close proximity to your abuser.  Thus, Joy Mining created a hostile work environment and the very breeding ground to predatory sexual harassment.

## Commentary

Millwee Exhibit 1 is my current curriculum vitae.  Millwee Exhibit 2 is a list of the items reviewed by me and used in support of arriving at the opinions herein.  Millwee Exhibit 3 shows the missed opportunities by the Defendant.  Millwee Exhibit 4 graphically depicts my opinions.  Millwee Exhibit 5 is the Joy Mining Machinery Global Policy Sexual Harassment  - March, 2002 – Policy Number 1 consisting of two pages.  Millwee Exhibit 6 is the Sexual Harassment Policy – Joy Technologies Inc. – Franklin, Pennsylvania consisting of three pages.  Millwee Exhibit 7 is the Joy Global Worldwide Business Conduct Policy where four pages are used to amplify my opinions.  All items reviewed or portions thereof as listed in Millwee Exhibit 2 are intended by this expert to be used as exhibits at deposition or trial.

The Defendant created an environment that was the proximate cause for a hostile work environment and allowed a known sexual harasser, if not sexual predator, to have unrestricted and unsupervised access to the Plaintiff.  A significant problem found with the Defendant's institutionalized standards is found in its harassment and sexual harassment policy.

The policy reads, ***"If there is no foundation other than the complaint, then, whether the accused is a supervisor or co-worker, no record will be placed in the accused's file and no dissemination of the charge will be made."*** (Paragraph C – <u>Resolving a sexual harassment case</u>.)

The Defendant created an unconscionable hostile environment where a person accused of harassment engages in such behavior alone with the complainant and without witnesses is allowed to not only return to work, but the company prohibits any institutional record of the investigation or complaint. Thus, an employee engaging in harassing behavior could repeatedly re-offend without supervisors, executives or employees that might be adversely impacted by future bad behavior being aware of past allegations. Moreover, the lack of historical complaint records willfully disallowed the employer from reasonably finding or acting upon a pattern of inappropriate behavior or similarities between complaints. The Defendant's own policy provided a "smoking gun" showing its willful blindness and a self-created "Chinese wall" or barrier to past complaints. Experts agree that past behavior is the best predictor of future behavior. By discarding past behavior of sexual harassment or misconduct, Joy Mining eliminated one of the most important facts that virtually eliminates the probability of every finding for a complainant that blows the whistle of sexual harassment in its workplace.

The policy reads, ***"All records will be checked to obtain any pertinent facts which may have a bearing on the case."*** (Paragraph 4 – <u>Investigating a sexual harassment charge</u>.) Since the company arbitrarily places no record of past complaints in an employee's file (Paragraph C.1) when it concluded there was no foundation other than the complaint, it causes me to opine, "The willful absence or destruction of records of past complaints prohibits management from finding that a harasser has been accused of similar conduct in the past and the identities of other victims or potential witnesses that would become relevant and important in investigating future allegations of sexual harassment, harassment, or employee misconduct."

The message the Defendant is sending potential victims of harassment and this Plaintiff is that it intends to take no action unless there are witnesses or other corroboration beyond an unwitnessed complaint. This type of antiquated policy and practice only educates employees to not report harassment in the workplace and to not expect remedial action when you comply with the policy by reporting the misconduct as the complaint will be unfounded unless you have a third party witness. This "old school" or antiquated mentality is the breeding ground for a sexual predator or harasser to be free to engage in inappropriate, if not criminal behavior. The unwanted touching, fondling, or kissing of another is a criminal act known as battery.

The policy reads that Human Resources is to interview the complainant and accused. Regardless of the qualifications or skill sets, the HR manager, or his designee, is bound by the company policy to becoming *de facto* investigators (Paragraphs B.1). Moreover, HR becomes the sole adjudicator in determining the actions to be taken, if any, by the company. The policy further reads, ***"Witnesses, if any, will also be interviewed in an effort to clarify any conflicting statements obtained from the interviews with the complainant and the accused."*** (Paragraph B.3 – <u>Investigating a sexual harassment charge</u>.) The policy does not direct the "fact finder" to interview potential witnesses to

corroborate the statements of the complainant or accused. The purpose of interviewing witnesses is simply to clarify potential conflicts in the statements by the accused and complainant, according to the policy. The company has effectively tied the hands of its "fact finders" as many interview and investigative methods must be employed to determine fact from fiction, credibility, and appropriate remedial actions. One such example is looking for tacit admissions against self-interest where the accused admits inappropriate conduct that mirrors the allegations, but may fall short of confessing to the more serious misconduct. Predators, criminals and sexual harassers admissions to these lesser behaviors provides sufficient corroboration that a complainant is credible. Experienced and well-trained fact finders of sexual misconduct, harassment, and sexual harassment can confront the accused in an effort to obtain additional admissions of misconduct that more fully expose the events in question. Often employers use legal counsel as the "de facto" fact finder, as they are able to use their knowledge of the law and investigative prowess to resolve complaints. The Defendant's policy is designed to relegate complaints to a "she said, he said" mentality rather than acting upon the totality of information easily available to determine that an employee has been victimized by another employee.

The Defendant by its actions concluded that Larry Meade had violated its sexual harassment policy. It knew that Mr. Meade had engaged in past inappropriate behavior as evidenced by its own continuing investigation after the Plaintiff was hospitalized. However, its ongoing investigation was not designed to remedy its mistakes of either disbelieving the Plaintiff or refusing to provide effective remedial steps, but was an apparent attempt to mitigate potential damages rather than conclude that Meade had a longstanding history of sexual harassment and battery related misconduct. Joy Mining arbitrarily dismissed any new information it received that proved Larry Meade was unfit and a sexual harasser even though witnesses were providing testimony that showed they had taken ineffective remedial steps by allowing his continued employment. The Defendant did not interview supervisors that were notified of Meade's past sexual harassment conduct resulting in the pervasive attitude that it was more concerned about damage control than ferreting out a known harasser from its ranks and recognizing that the Plaintiff was a credible complainant who courageously reported harassment and sexual harassment. Effectively, the Defendant punished the very person who blew the whistle on the company's mismanagement, negligence, and pattern of allowing harassment to continue unabated in the workplace.

Moreover, the Defendant harmed the Plaintiff by its ineffective policy and investigation. By finding partly that the Plaintiff's allegations were at least in part true, its failure to terminate the employment of a known predator and sexual harasser communicated to her that the company did not care about her safety, security, and general sense of well-being. It communicated that despite her emotional and fragile state over the harassment and sex-oriented battery by one of their employees that they would not move her or him to another location so that she could be free of fear and any future hostile or retaliatory environment. The mere presence of Larry Meade in the same position and the same location of the company were by its design compounding an already hostile work environment. The company effectively communicated to the Plaintiff that it was allowing her harasser to work in view of her as a constant reminder of the hostile work environment she was left to endure with hollow assurances the he would never harass

again and if he did so her only company sanction recourse was to report being victimized again.  The company further communicated that despite being placed on notice for reasonable relief by being moved to an adjacent building that the employer had little fortitude to provide her this modest remedial or corrective protection.  Thus, the Defendant demonstrated disinterest in the Plaintiff's credibility, safety, security, well-being, and/or emotional stability. Forced to work with Larry Meade despite her protests, the Plaintiff was left to ask where does a frightened, emotionally fragile victim of sexual harassment turn when her employer has willfully chosen to not provide a modicum of reasonable security and protection from one that has an established history of repeated harassment.

The Defendant, being a global company had untold resources to remove Meade entirely from the physical location if it reasonably believed his continued employment elsewhere in the company was merited.  However, the Defendant's own flawed investigation found that Meade had engaged in similar if not identical predatory conduct that would cause reasonable employers to terminate Meade's employment.  The remedial action to terminate the harasser's employment coupled with an apology are the strongest messages an employer can send to victims of harassment and sexual "battery related" misconduct that it does not hide the past, but uses it along with the present allegations of misconduct to provide the safest workplace free of unwarranted and unwelcome behaviors that include sexual advances, stalking, kissing, fondling, touching, requests for matrimony though married to another, and criminal sexual battery.

The Defendant in its Worldwide Business Conduct Policy writes in its ***"Statement of Purpose"*** that each manager shall, [an imperative command] review this Policy with all employees for whom he or she has direct operational responsibility and with new employees as they are hired. The manager shall have each employee sign the attached certificate certifying that the employee has received a copy of the Policy and that the employee understands the Policy and agrees to comply with it.  It further reads that during annual performance reviews. Managers of U.S. full-time salaried employees who are not members of a collective bargaining group shall review this Policy with each such employee….  ***"The annual compliance certificate confirms that the employee has brought to the attention of his or her immediate supervisor, to management or to the Company's in-house lawyers all violations of this Policy of which the employee has become aware since his or her last certification."***  The Defendant designed a flawed system that intentionally left union employees exempt from compliance with its core statement of purpose to report and adequately deal with violations of its policy.  A union or collective bargaining employee was given unwarranted free reign to avoid consistent re-training, re-education, or awareness of a proper code of conduct and the consequences of violations.  The Defendant bargained against the interests of its employees who entrusted them to provide adequate training and protections for all workers.  Predators feed their need for unrequited love by "rescuing" workers they believe to be vulnerable to their intrusive, hostile and unwelcomed sexual advances.  A grief stricken employee that is suffering over the loss of a child is an easy target for the predator that has years of unabated sexual harassing pathology.  Larry Meade used his position of trust and experience of losing a child to prey upon the workforce similar to power and control behaviors used by domestic batterers.

However, the Defendant's policy regarding penalties reads, *"In some cases the Company may have an obligation to call violations of this Policy to the attention of appropriate law enforcement authorities where a violation of this Policy may also be a violation of the law."* However, the Defendant failed to comply with its policy to notify law enforcement once it learned that Larry Meade had stalked, battered, falsely imprisoned, and sexually accosted its female workers by detaining them in a men's bathroom and telephone room designed to restrict their freedom of movement.

The interview of Larry Meade by Johan Maritz, the HR manager, on June 17, 2003 at 1:00 PM. underscores certain undisputable facts that support the allegations made by the Plaintiff. Meade admitted:

- Calling the Plaintiff at home to see how she was handling the death of her son,
- Hugging the Plaintiff when she was to have asked for it when having a bad day,
- Asking the Plaintiff for a hug if he was having a bad day,
- Standing in the doorway of the men's bathroom while the Plaintiff was cleaning it but claiming he was not stupid enough to enter,
- Telling the Plaintiff about an oil painting of his son on the wall of his home,
- Going to the Plaintiff's home not as a friend attempting to comfort a grief-stricken co-worker over the loss of her child, but to relieve his own depression and discomfort over the loss of his own child, and
- Losing his temper and becoming angry when the Plaintiff resisted his unwelcome intrusion.

Analyzing the contemporaneous notes of the interview of Larry Meade by the human resource manager established that Larry Mead engaged in inappropriate misconduct that violated the company policy. Moreover, Meade's statements were minimizing, rationalizing, and designed to blame some of his conduct on the victim, which are common defense mechanisms or responses used by one that has engaged in criminal or inappropriate harassment or sexual harassment misconduct.

Meade, according to the official notes, admitted going to the Plaintiff's home after packing up equipment at the fire hall. This statement conflicts with his sworn testimony that he picked up equipment at the hospital. One of the more important details in this statement was that he admitted telling the Plaintiff, *"next place you will probably see me is Morrison's Funeral Home." "Said it because I was so depressed."* This admission is a serious confession of misconduct. A reasonable fact finder or manager would ask why is Meade attempting to make a female coworker feel guilty and making tacit suicidal or death related statements if his intent was to simply see how a grieving co-worker was coping over the loss of a child? This statement is inconsistent with Mr. Meade's version of the events and should have raised great concern about his veracity, much less his pathology to prey on unsuspecting, vulnerable and grieving female employees.

The interview by Larry Meade was designed to read the allegations of the Plaintiff to Meade and allow him to admit or deny some or all of the allegations. This type of interview, often referred to as a simply Q & A (Question and Answer) is not designed to dig deeper for the truth by confronting the subject with inconsistencies or other

information that causes the interviewer to question the veracity or accuracy of one's statement.

Elsewhere Diane Kemick from HR who was present as the scribe and witness wrote that Meade said that he did not go inside the Plaintiff's home on this uninvited visit nor told her that he was falling in love with her. He said he had no place in Florida and knew know one in Florida. However, he admits that the Plaintiff's husband (Harold Wakefield) angrily called him at work over what he said to his wife. The report reads, ***"Larry told Harry "I am sorry, I didn't mean to say that Morrison Funeral Home comment."*** He said, ***"Well, that is not the comment I'm talking about."*** Here is the importance of this section of the report. Mr. Maritz and Ms. Kemick did not inquire or document what was said in the phone call between Larry Meade and the plaintiff's husband. Moreover, the mere fact that both the plaintiff had called Meade's wife to complain and Mr. Wakefield called Mr. Meade upset about his behavior and comments that were not about the funeral home comment were major red flags that Meade had engaged in serious misconduct. An angry husband calls his wife's co-worker to confront him about inappropriate statements to his wife. A wrongly accused husband would want to know what was said to defend himself against a misunderstanding or words taken out of their intended context. The damning statement by Meade, ***"I am sorry"*** is a direct admission of wrongdoing that supports that he knowingly engaged in offensive and hostile behavior.

The official interview notes further record that Larry Meade reported that the Plaintiff's husband called him at the union hall and said, ***"what's going on?"*** Again, the inadequate training and/or experience of Mr. Maritz show that he did not explore why would the Plaintiff's husband confront Meade again by telephone.

The company report further records one of the most alarming and incriminating admissions against self-interest by Mr. Meade. The record reads, ***"Larry could not recall any incident of giving the girls in the cafeteria neck messages*** [sic – massages]***. "Possibly, but I don't remember it."*** One need not be a skilled or trained investigator to discern that Meade was confirming one of the most egregious allegations. Meade was engaged in the most important and potentially career ending conversations with a human resource executive. On a critical area of wrongfully, if not criminally, touching or massaging coworkers where there were witnesses, Mr. Meade suddenly experienced memory loss. Meade said that it was possible that he massaged the necks of female coworkers. Company officials failed to recognize the significance of a married male employee making a tacit admission of massaging female coworkers that made them feel uncomfortable that confirmed his sexual harassing behavior. Failing to recognize the significance of the sudden memory loss coupled with the incriminating admission resulted in the unskilled interviewers from seizing upon the opportunity to obtain a full confession of misconduct involving the Plaintiff and other victims of sexual harassment.

Mr. Meade admitted giving a hug to Jill Seyler when her husband died. He claims that the touch was not inappropriate and that he did not touch her thereafter. However, Jill Seyler's statements further corroborated the inappropriate conduct of Larry Meade. Her description of Meade's behavior mirrored the behavior he engaged with the Plaintiff in

her time of grief. Another missed opportunity by the Defendant to recognize the serious pattern of sexual harassment that Larry Meade had engaged within its ranks.

The Plaintiff reported to Johan Maritz and Diane Kemick on June 18, 2003 that Jill Seyler said to a *"group of girls"* to watch out for Larry Meade. The Plaintiff clearly proscribes what she believes to be the effective remedial response of the company, which is for it to not happen to her again, not happen to other female employees, and that Mr. Meade be terminated from employment. The employer failed to act upon the effective and reasonable remedial steps recommended by the very victim seeking modest relief.

The unannounced, unprovoked, and unwanted intrusion at the Plaintiff's home was the direct result of Meade being employed by the Defendant and not being terminated for his past sexual harassment that preceded the events with the Plaintiff. The only common threads between the Plaintiff and Larry Meade were that they were coworkers that had never engaged in intimate conversations or intimacy and had lost children to death. If not for Meade's continued employment or negligent retention by the Defendant he would have not preyed upon the fragile Plaintiff.

One of the most alarming acts complained of by Ms. Wakefield is found in Ms. Kemick's official company notes from their meeting with the Plaintiff on June 18, 2003. According to the Plaintiff, Meade kissed her in the men's restroom while she was cleaning it. Meade showed feelings of guilt as he apologized to the Plaintiff the next day. One must ask if both the kisser and the kissee are welcoming or enjoying the intimate embrace, then why would Meade feel compelled to apologize the next day, as had been his pattern with other female employees. The words *"I'm sorry"* in this context mean "I did wrong." The report reveals, *"Apologized the next day. Said I am really sorry if I shocked you, I didn't think it would scare you so much."* Meade, according to the Plaintiff, admitted the kiss was unexpected, unwelcome, shocking, and a frightening experience for the Plaintiff. Victims of crime or sexual harassment provide explicit memories versus the failed memory as provided by Meade. This statement of misconduct supports that he attacked the Plaintiff in the restroom on the second floor across from Peggy Doyle's office on June 7, 2002. Moreover, the statement established that Meade lied in the investigation about never going into a company bathroom alone with the Plaintiff. A half- truth is a whole lie during the course of an investigation. The logical reason for someone to be untruthful is that the allegations merit believing. Meade had placed himself in the very doorway of what was to become the crime scene for his forcibly kissing the Plaintiff.

Johan Maritz, the human resource manager, official company reprimand to Meade on June 19, 2003 reads, *"We have concluded that you have engaged in conduct which was not welcomed by Mrs. Wakefield and which is in violation of the company policy on Sexual Harassment."* The Defendant is essentially telling Meade we have found that you impermissibly touched or assaulted a female coworker, stalked her, and/or engaged in sexual harassing conduct but we are going to let you keep your job. Moreover, it is most interesting that from the notes of the meeting with Mr. Meade by Johan Maritz and Diane Kemick telling him of their findings and reprimand that Meade did not protest the findings or reprimand. Having interviewed wrongfully accused employees and suspects over my 32 year career the behavior of Meade in this interview is most telling.

On June 25, 2003 Johan Maritz and Diane Kemick met with the Plaintiff to announce their findings.  They tell her that they concluded Meade violated company policy and formal discipline was issued, but that he would not be terminated.  Incredibly, Maritz tells the Plaintiff that he feels very confident that Meade will not exhibit any further unwelcome behavior to her or other female coworkers, despite the official and institutional knowledge that Larry Meade had engaged in, at the very least, a portion of the harassing behavior reported by the Plaintiff and similar harassing conduct as uncovered from corroborating witnesses.  This may be one of the most insensitive statements a company manager can make to a victim of sexual harassment.  Effectively, the Defendant communicated, "We know he did it, but we can assure you that you are safe and he will never do it again."  Hollow statements like these send a message of fear that a predator is going to be allowed to work around the victim with open and free access without adequate security or supervision.  Maritz repeats these statements to the Plaintiff in a hand delivered letter on June 25, 2003.

On July 1, 2003 the Plaintiff approached Mr. Maritz asking for a meeting with Diane Kemick and he at 1:00 PM.  She gave them a letter after asking for the company sexual harassment policy.  The Plaintiff writes her request for effective remedial measures to be moved to Plant 1 to be away from her offender.  She notifies the company that she is uncomfortable with the action it had taken on her complaint.  In the meeting she tells them that she feels uncomfortable in this building and wants to totally avoid Meade.  She is fearful and wants to cry each time she sees her harasser and is fearful of having an emotional breakdown.  The notes by Kemick of the meeting note that a junior ranking employee could be transferred allowing the Plaintiff this reasonable accommodation.  Yet, Mr. Maritz ends the meeting by stressing that he feels the company has taken sufficient action, but that if she would feel better and it would help her out, they would try to transfer her to Plant 1.  He is effectively communicating to the Plaintiff that I can not protect you, you are on your own, we have done all we can, and despite your fragile emotional and fearful state go back to work until we can see if we can move you to a different location to avoid all contact with your offender.

Alarmingly, 45 days later Maritz writes a memo to his file that the company is unwilling to move the Plaintiff to Plant 1.  Maritz writes, ***"Conclusion is that contractually we could not comply with her request."***  He writes that the contract with the union (IAM) and subsequent meetings found no support from the union to move her.  The message to the Plaintiff is clear again, "We don't care enough to have Meade or you work in a global company in a place where you do not feel that you are working in a <u>hostile-free zone of safety or work environment</u>.  The employer is mandated to provide a safe work environment.

The investigation by the Defendant was reopened after the company learned that the Plaintiff had an emotional breakdown requiring hospitalization and being forewarned of an impending lawsuit.  Maritz and Kemick met with several employees.  They learned from Ellie Averill that the Plaintiff had told her contemporaneously about being harassed by Meade.  She also told the company fact finders that Meade had also harassed her.  She described being held against her will (false imprisonment) in the 1980's in the basement telephone room in engineering where she was a secretary for the MIS department.  The

memo reads, *"He came in and starting hinting around about having an affair and so on and I said I am not interested and he pushed me up against the wall and said well you divorced women are always wanting it."…. "I reported the incident to my boss and he said he would take care of it."* The company was on notice as early as the 1980s that Meade was a sexual predator and harasser as the employee reported the matter to her supervisor. Yet, no single record of the remedial actions or investigation appears to exist about the Averill complaint, much less any other complaint of prior harassment by Larry Meade.

The company also learned of another witness that could establish Meade's lecherous unwanted sexual advances. Averill identified a former employee, Diane Ace, who said that Meade tried to push himself on women.

As corroboration to Averill's statement the windows in the basement were covered after the attack by Meade in the telephone room so that those on the outside could not see women working alone in the room. The cardboard covering was still attached to the windows as of June 3, 2004. The sexual misconduct by Meade against Averill mirrors the same type of sex-crime or sexual harassment victimology as she said that she continued to be uncomfortable when returning to the telephone room as she remembered the incident quite well. She further said she was uncomfortable when she saw her attacker, Larry Meade.

On June 4, 2004 Johan Maritz and Diane Kemick interviewed Bob Dahle after learning that Meade had made telephone calls to Dahle's wife. Dahle related that some twenty years earlier while traveling on business his wife received a couple of anonymous phone calls. Years later some of his coworkers told him that it was Larry Meade that made the calls, as Meade had also called their wives while they were out of town. The memo reads, *"Bob did mention that some of the guys in Engineering, the "ones that really know Larry" refer to his* [sic him] as **"the dirty old man."**

Dahle also related an incident in the late 1970's where Meade had grabbed the buttocks of a young female employee. He said that Meade was reprimanded. The victim was likely Sally Strain.

It is my opinion that the proximate cause of the unwelcome assault, battery, false imprisonment, harassment, sexual harassment, and hostile work environment in this case was the willful and wanton disregard for safety and security of the Plaintiff by the Defendant. Joy Mining had ample opportunity to correct its policy, human resource, management, safety, and security defects.

Therefore in closing, it is my opinion that Joy Mining did not act appropriately or within reasonable business, human resources, security, and employment practices in 2003.

The Defendant uncovered that it had known for two to three decades that Larry Meade was engaged in a pattern of sexual misconduct and sexual harassment of its unsuspecting employees and their spouses. Yet, despite the mounting corroboration Larry Meade remains on the job.

It is my opinion that my opinions set forth in this report will assist the jury or court in understanding the negligence of the Defendant. It is my belief based on my extensive experience that my opinions will help the court and jury conclude that the acts and omissions of the Defendant, coupled with its knowledge that it had an unfit employee who had engaged in a decade pattern of unwanted sexual advances and sexual harassment is the pivotal or proximate cause for the harassment and injuries endured by the Plaintiff.

Sincerely,

SecurTest, Inc.

Steven C. Millwee, CPP
Board Certified in Security Management
President and Chief Executive Officer

Attached:

1. Millwee Exhibit 1 Curriculum Vitae
2. Millwee Exhibit 2 Items Review
3. Millwee Exhibit 3 Missed Opportunities by the Defendant
4. Millwee Exhibit 4 Graphically Display of Opinions
5. Millwee Exhibit 5 is the Joy Mining Machinery Global Policy Sexual Harassment - March, 2002 – Policy Number 1 consisting of two pages.
6. Millwee Exhibit 6 is the Sexual Harassment Policy – Joy Technologies Inc. – Franklin, Pennsylvania consisting of three pages.
7. Millwee Exhibit 7 is the Joy Global Worldwide Business Conduct Policy where four pages are used to amplify my opinions.

***[All items reviewed or portions thereof as listed in Millwee Exhibit 2 are intended by this expert to be used as exhibits at deposition or trial.]***