# TAB "K"

# EXCERPTS FROM
# SUSAN STEWART, L.C.S.W.
# DEPOSITION

135

1    progressing as well as could be expected, at times

2    better than could be expected, meeting treatment goals

3    and doing things and processing well.

4         It is almost like when her son died, she was

5    laying on the road dead with him.  As therapy

6    progressed, and we dealt with family grief issues and

7    her own issues, her own grief issues, she was able to

8    kind of stand up, and she was able to stand up.  And

9    as she got up and as she stood up, and as she was in

10   the process of brushing herself off, saying, okay.  I

11   now know what I need to do.  I need to put this all

12   into my life somehow, there was the slam of the work-

13   related incident; and when somebody gets knocked back

14   down, it then creates much more of a chemical concern.

15   Q.    Let me ask you this:  You have dealt with both

16   grief issues and victimization issues; is that

17   correct?

18   A.    Yes.

19   Q.    And you have talked about the grief issues

20   creates a chemical situation in the brain?

21   A.    Yes.

22   Q.    Would someone who is in a grief posture, as it

23   were, in a grief situation, be more vulnerable to

136

1    victimization because of their particular state?

2        A.    Absolutely, which I think is how this started

3    happening here.

4        Q.    Explain.  I'm sorry.  That is my favorite

5    question.

6        A.    That's okay.  I was afraid, because you try to

7    be careful in my shoes not to give -- not to answer

8    more than what you are asked, and I was starting to do

9    that, but you just asked me more about that; but my

10   understanding of the situation is that Mr. Meade was

11   approaching Valerie as a friend who had been through

12   the same situation.  He had also lost a son very

13   tragically in an accident many years ago.  He was

14   aware of what she was feeling, must be going through,

15   was offering some support and consolation, which is

16   understandable.

17        And in the process of that, as he is hugging

18   her, as he is consoling her, as he is able to cry with

19   her and understand what she is going through, at some

20   point in time, Valerie's report was that he then began

21   to feel more for her, and she was becoming

22   uncomfortable with it, but there is that problem of,

23   "But this guy knows what I've been through," and it is

137

1    nice to be able to talk to somebody who truly

2    understands, because many people don't understand.

3         People will say very callous things about, "You

4    should be over this by now," or, "I don't understand

5    why this is such a big deal," and she knew he would

6    never say such things having been in that situation.

7         So even though she may have felt uncomfortable

8    at some point in time, she may have -- I do not know

9    this for a fact, but if you ask me in general terms,

10   it makes you more vulnerable because you don't want to

11   give that up.

12        But when it got beyond the point of hugging,

13   and when it progressed to more, according to Valerie,

14   that is when it became very uncomfortable, and then

15   that is when it was no more a consolation to her.

16   Q.   You were asked on direct examination about this

17   issue about Valerie being hugged and an allegation

18   about when this individual grabbed her buttocks and

19   touched her buttocks --

20   A.   Yes.

21   Q.   -- and you were asked if you were aware that

22   this had occurred 14 months before this was reported

23   to you this, which I think was in the June meeting,

138

1    correct?

2       A.    Yes.

3       Q.    And you said you were not aware.    Now my

4    question is:    Knowing what you know about grief,

5    knowing what you know about victimization, knowing

6    what you know about Valerie, are you surprised that

7    she would wait 14 months to tell you that?

8       A.    No.

9       Q.    Can you explain why not?

10      A.    Because it goes back to the whole idea of "If

11   this happens, who is going to believe me?    Am I going

12   to be blamed?    Did I do something wrong by accepting

13   his hugs to begin with?    Should I have seen it coming

14   and done something?"

15             There is that sense of shame and guilt; and

16   there is also the aspect of, "I can't deal with this

17   right now, because I've got all of this other stuff

18   that I'm already dealing with.    Maybe if I just put it

19   out of my system, it will go away."    There is a denial

20   phase.

21             There is a denial phase -- a sense of -- a bit

22   of shock, "I don't know what to do with it.    It's too

23   much for me.    I'm just going to suppress it."    Not

139

1    repress it; suppress it.  And that is very common

2    where people do not come forward for a long time

3    afterwards.

4      Q.    And there will be some event, then, that would

5    trigger her to bring it back out of suppression, I

6    take it?  If there were --

7      A.    That is often the case, yes.

8      Q.    In this particular case, I guess she did not

9    bring that out on March 2nd, did she?

10     A.    On March 2nd?

11     Q.    2003.

12             MS. COCHENOUR:  March 3rd.

13     A.    On March 3rd of 2003, I do not have down these

14   things specifically happened.  I have written down

15   that he had more intense feelings for her than

16   friendship.

17     Q.    Now, I would like to go to June 3rd, 2003, and

18   this is, I guess, you start crisis counseling.

19     A.    Yes.  This was a crisis counseling.

20     Q.    And I take it from your earlier testimony today

21   that she was in such a state that you physically could

22   not recognize her?  Is that what she meant?

23     A.    Yes.

145

1    occur.

2      Q.    Can we agree that from looking at your notes

3    that this anxiety went on for some time; is that

4    correct?

5      A.    Yes.  It continued to be present until she

6    requested to be moved to a different building.

7      Q.    All right.  Now, I think you were asked about

8    whether you were aware that there was one time that

9    she actually saw Mr. Meade.

10      A.    I am aware of one specific time.  I don't

11    recall being told of other times.

12      Q.    Well, ma'am, if I -- would it be unusual for

13    her to have all this anxiety over this substantial

14    period of time of seeing Mr. Meade if she, in fact,

15    only saw him one time?

16              MS. COCHENOUR:  Objection to the use of

17          the word "substantial."

18      Q.    You can answer.

19      A.    I would answer that as even if she had only

20    seen him one time, there would still be cause for her

21    to have anxiety about seeing him, absolutely, because

22    he is still present in the building, and there is the

23    concern that he would not abide by the restrictions

146

1    that were placed on him.

2        Q.    Okay.  You were going to say something else?

3        A.    I was going to say I don't know whether this is

4    a reflection of that question, but I know, you know,

5    when you talk about did she only see him one time?  I

6    don't know the time frame of it, but I know there was

7    a time, and it may have been before or after he was

8    being told to stay away that he was seemingly

9    frequently in places where she was that was out of his

10   area of his own office.

11       Q.    One other thing:  In the Axis IV, I think prior

12   to -- first of all, what is Axis IV, so we can

13   establish that?

14       A.    Axis IV are the stressors and the severity of

15   them.

16       Q.    Can we agree that prior to June 3, '03, there

17   was nothing in Axis IV about victimization at work?

18       A.    Correct.

19       Q.    And then we see that from there until I believe

20   it is 1-26-04, there are victim issues, grief and/or

21   parenting throughout the Axis IV diagnoses on the

22   progress notes; is that correct?

23       A.    That is correct.  Up until a certain period of