IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VALERIE W. WAKEFIELD, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | Civil Action No. 05 CV 79 – Erie |
| | ) | |
| v. | ) | Honorable Maurice B. Cohill, Jr. |
| | ) | |
| JOY MINING MACHINERY | ) | JURY TRIAL DEMANDED |
| COMPANY, a division of Harnischfeger | ) | |
| Industries, | ) | |
| | ) | *Electronically Filed* |
| Defendant. | ) | |

### DEFENDANT'S RESPONSE TO PLAINTIFF'S "OTHER MATERIAL FACTS THAT ARE NECESSARY FOR THE COURT TO DETERMINE THE MOTION FOR SUMMARY JUDGMENT"

AND NOW, comes Defendant, Joy Mining Machinery Company, by and through its counsel, Pietragallo Bosick & Gordon LLP, and files the following Response to Plaintiff's "Other Material Facts that are Necessary for the Court to Determine the Motion for Summary Judgment."

1.   Larry Meade followed the Plaintiff to the portrait studio at Wal-Mart. "I said, what are you ding here? He said, oh, I heard you telling the girls at work you were going to be out here getting Jonathan's picture taken and thought maybe I'd come out and see you." (Plaintiff Deposition, p. 99:24-100:3).

**Joy's Response:**

It is admitted, only, that this was the Plaintiff's testimony. The Defendant objects to the averments contained in this paragraph as they are immaterial to the issues in the case.

2.   The Plaintiff changed her daily routine in order to avoid Larry Meade. (Plaintiff Deposition, p. 104:19-24).

**Joy's Response:**

Denied. To the contrary, and in fact, Joy adjusted the Plaintiff's working location following her complaint regarding Mr. Meade's conduct in order that she not be assigned to the area in which Mr. Meade worked. Plaintiff acknowledged that the change in work area had helped. (See notes of June 25, 2003 meeting between Johan Maritz, Diane Kemick and Valerie Wakefield. "Johan told Val that if there is anything else the company can do to help her in this regard, to let him know. He asked her if moving her work area had helped, and she responded that yes it had.") (Attached as Tab 19.) (See also, notes of interview with Laura Tate evidencing a change in the Plaintiff's work area (Attached as Tab 20).) In fact, Laura Tate, the Plaintiff's co-worker at the time the allegations concerning Mr. Meade's conduct was reported, indicated that following the work reassignment, the Plaintiff told Ms. Tate that, "Things were okay and they could switch places back. Laura [Tate] said the boss said no, they could not switch." (See Tab 20.) Moreover, when the Plaintiff first made her complaint to the company on March 14, 2003, Johan Maritz offered to move the Plaintiff from her current work area – a move which the Plaintiff initially declined. (See notes of interview with Plaintiff of March 14, 2003, Attached as Tab 21.)

3.  The Plaintiff described the initial hugs between her and Mr. Meade as "quick hug, a pat on the back and you feel better." (Plaintiff Deposition, p. 112.)

**Joy's Response:**

It is admitted that this was the Plaintiff's testimony.

4.  The Plaintiff spoke to her brother, a police officer, about filing criminal charges against Larry Meade. (Plaintiff Deposition, p. 150:17-24.)

**Joy's Response:**

It is admitted, only, that this was the Plaintiff's testimony. The Defendant objects to the averments contained in this paragraph as they are immaterial to the issues in the case.

5. The Plaintiff attempted to get a protection from abuse order against Larry Meade, but was told she could not because Mr. Meade was not a part of her household. (Plaintiff Deposition, p. 152:16-155:18.)

**Joy's Response:**

It is admitted, only, that this was the Plaintiff's testimony. The Defendant objects to the averments contained in this paragraph as they are immaterial to the issues in the case.

6. The Plaintiff suffered a mental breakdown in June 2003 and was hospitalized. The breakdown was caused in part by Larry Meade's conduct toward the Plaintiff. (Plaintiff Deposition, p. 224:2-225:12.)

**Joy's Response:**

It is admitted that in June 2003 the Plaintiff was hospitalized. There is no medical evidence of record as to the specific reason or reasons for the hospitalization or that Mr. Meade's conduct was a cause of the hospitalization.

7. Upon her return to work, the Plaintiff requested that the Defendant move her work location to another building so as to avoid Mr. Meade. (Plaintiff Deposition, p. 231:13-16.)

**Joy's Response:**

Admitted. However, there is no evidence in the record to suggest that the Plaintiff had any contact with Mr. Meade following her complaint to Joy in March of 2003.

8.     The Plaintiff was never moved to another building. (Plaintiff Deposition, p. 231:13-16.)

**Joy's Response:**

Denied. Efforts were made, pursuant to Ms. Wakefield's request, to move her to Plant #1. Joy was agreeable to allowing the move to the Plant. The move did not occur in 2003, not because of Joy's unwillingness to do so, but because the Union, of which the Plaintiff was a member, determined that it could not contractually comply with her request. (See notes of meetings collectively attached as Tab 22.) Additionally, the Plaintiff currently works in Plaint #1 having been transferred pursuant to her request. (See Affidavit of Johan Maritz, Tab 23.)

9.     Larry Meade had previously acted inappropriately toward other female employees at Joy Mining. (Eleanor Averill Deposition, attached as Plaintiff's Tab "D," p. 6:19-7:20; Jill Seyler Deposition, attached as Plaintiff's Tab "E," p. 8:7-16, 10:2-23:1.)

**Joy's Response:**

The characterization that Mr. Meade "previously acted inappropriately" toward other female employees is denied. Moreover, the conduct described by Ms. Averill allegedly occurred in the early 1980's – over 20 years ago, and are not relevant to the issues in this case.

10.    Ms. Eleanor Averill testified that in the early 1980s Larry Meade cornered her while she was alone in the phone room at Joy Mining and pushed her up against the wall, trying to kiss her. She did not know Larry Meade. When she pushed him away, he told her that "all divorced women want it." Ms. Averill reported this incident to her superior. (Averill Deposition, p. 6:19-7:20.)

**Joy's Response:**

It is admitted that Ms. Averill testified, as noted in ¶ 10. By way of further response, however, it is denied that Ms. Averill reported this alleged incident to her superior. (See Affidavit of Howard Horton attached as Tab 24.) By way of further response, the allegations contained in ¶ 10 are irrelevant to the issues presented in this summary judgment motion, or in this case, given the fact that the alleged conduct occurred more than twenty (20) years prior to the allegations which constitute the factual basis of the within case.

11. Jill Seyler testified that after her husband died, Larry Meade began stopping at her desk daily and hitting on her, to the point that she found him "obnoxious." She mentioned this to her superior in passing. When Ms. Seyler threatened that she was going to report the behavior to human resources, the behavior stopped. (Seyler Deposition, p. 10-23.)

**Joy's Response:**

It is denied, as represented by ¶ 11, that Mr. Meade began stopping at Ms. Seyler's desk "daily" and "hitting on her." Neither of those phrases appear anywhere in Ms. Seyler's testimony. By way of further response, Ms. Seyler did not report Mr. Meade's actions to anyone in human resources (Seyler Deposition, p. 11:4-12; p. 23:2-5). Moreover, Ms. Seyler never reported Mr. Meade's conduct to her supervisor other than to mention it in passing (p. 23:8-11) and she did not specifically tell her supervisor what kind of attention she was getting. (p. 22:9-22.) Moreover, Ms. Seyler's supervisor specifically denies having received any complaints from Ms. Seyler regarding Mr. Meade's conduct. (See Affidavit of Dan Blauser, Tab 25.)

12. Larry Meade was known around the Joy Mining engineering department as a "dirty old man." (Johan Maritz notes attached as Plaintiff's Tab "I" marked "Interview with Bob Dahle-June 4, 2004.)

**Joy's Response:**

Denied. Mr. Dahle testified, in explaining the notes of his interview by Mr. Maritz (attached as Tab "I" to the Plaintiff's Exhibits) that "just one person" in the engineering department referred to Mr. Meade as "dirty old man." (See Excerpts of Robert Dahle's Deposition, p. 10:14-25; p. 11:1-2, Tab 26.)

13. None of these incidents or information appeared in Larry Meade's work file. (Johan Maritz Deposition, 19:11-12.)

**Joy's Response:**

Admitted. By way of further response, to the extent the Plaintiff suggests that Mr. Maritz in any way acknowledged that these "incidents" or "information" occurred or were reported to management, that suggestion is specifically denied. It is admitted that none of these incidents appeared in Mr. Meade's work file because none of them were reported to management -- if, in fact, they had even occurred.

14. An employee's file record is one of the things the Defendant considers in determining what form of discipline to issue to an employee for sexual misconduct. (Maritz Deposition, p. 61:5-8.)

**Joy's Response:**

Denied as stated. Mr. Maritz testified that the employee's file record is considered in determining what form of discipline to issue an employee. The testimony was not specifically related to "sexual misconduct."

15. The Defendant does not have a written protocol as to how to conduct sexual harassment investigations. (Johan Maritz Deposition, 9:8-10.)

**Joy's Response:**

Denied as stated. Mr. Maritz testified that there is not a written protocol as to how to conduct investigations under the company harassment policy – which policy addresses all types of harassment.

16. The Defendant does not have any textbooks, guidelines, manuals or any other reference for its Human Resources department to use to assist in how to address a sexual harassment claim besides the actual "policy" itself. (Maritz Deposition, p. 72:2-7.)

**Joy's Response:**

Denied. The Plaintiff has mischaracterized Mr. Maritz's deposition testimony. Mr. Maritz testified that there is not a "single prescribed procedure or textbook that we use." (Maritz deposition, p. 72:6-7.) But his testimony clearly indicates that there were publications that he had access to.

17. The Defendant's Manager of Human Resources in Franklin from 2002-2004, Johan Maritz, only investigated one complaint of sexual harassment during that period, which was the Plaintiff's. (Maritz Deposition, 11:21-12:6.)

**Joy's Response:**

Admitted.

18.  In his career in human resources, Johan Maritz, the Defendant's Manager of Human Resources from 2002-2004 has only investigated one other sexual harassment complaint besides the Plaintiff's. The other case was when he worked in South Africa. (Maritz Deposition, p. 66:5-12.)

**Joy's Response:**

Admitted

19.  The Defendant's "sexual harassment policy" requires that acts of sexual misconduct be witnessed by a third party before the Defendant will take any action with regard to a report of sexual misconduct. (The Defendant's Sexual Harassment policy attached as Plaintiff's Tab "G;" Millwee Expert Report attached as Plaintiff's Tab "H" at Page 2.)

**Joy's Response:**

Denied. The Plaintiff's characterization of the content of Joy's Harassment Policy is incorrect. There is no language in Joy's Harassment Policy applicable to the Franklin facility (Tab #10) which even suggests the interpretation offered by Plaintiff. Moreover, the other documents which Plaintiff suggests constitute the Harassment Policy of Joy Mining as applicable in Franklin, Pennsylvania does not contain any language as represented by ¶ 19. (See Affidavit of Johan Maritz, Tab 23.)

20.  The Defendant gave Larry Meade a written reprimand only because he had admitted to going to the Plaintiff's home and to "hugging going on." (Maritz Deposition, 57:20-24; 64:18-65:20.)

**Joy's Response:**

It is admitted that Joy issued a written reprimand to Larry Meade because he had admitted to going to the Plaintiff's home and to hugging the Plaintiff. Mr. Maritz testified, further, that the written reprimand was also issued because of the Plaintiff's complaint.

21. The Defendant never disciplined Larry Meade for any of the other inappropriate conduct with regard to the Plaintiff because the Defendant could not find a "single person" for specific evidence about any of the incidents. (Maritz Deposition, 69:11-19.)

**Joy's Response:**

Denied. Mr. Maritz did not testify that Mr. Meade was not disciplined for any of the other conduct of which the Plaintiff complained. The deposition testimony cited by the Plaintiff indicates, only, that Mr. Maritz did not resolve the conflicting statements provided by the Plaintiff and Mr. Meade in favor of _either_ individual because there was no "specific evidence about any of those incidents." (Maritz Deposition, p. 64:21-25; p. 65:1-1-3; 69:11-19.)

22. When the Defendant has "he said/she said" disputes, the Defendant does not resolve the differences without the corroboration of outside witnesses. (Maritz Deposition, p. 71:3-9.)

**Joy's Response:**

Denied. By way of further response, however, Mr. Maritz testified that he does not resolve "he said/she said" disputes without outside witnesses because, "It's difficult to resolve." (Maritz Deposition, p 71:6.) In investigating sexual harassment complaints, Mr. Maritz testified that his "focus is to stop the behavior." (Maritz Deposition, p. 72:21.)

23.     The Defendant does not believe the Plaintiff as to what happened because there was "nobody supporting that with any direct evidence of witnessing it." (Maritz Deposition, 64:9-14) (see also Defendant's repeated use of the word "alleges" with regard to the Plaintiff's testimony about Larry Meade's conduct in its Motion, Concise Statement, and Brief.)

**Joy's Response:**

Denied. Mr. Maritz's testimony was not that he did not believe the Plaintiff as to what happened because there was "nobody supporting that with any direct evidence of witnessing it." Rather, the testimony quoted by the Plaintiff evidences that Mr. Maritz did not reach a decision as to whether either the Plaintiff or Mr. Meade was telling the truth with regard to the Plaintiff's assertion that Mr. Meade had kissed her. Mr. Maritz testified, "Nobody supporting that with any direct evidence of witnessing it. So how could I say I believe either one of them." (Maritz Deposition, p. 64:12-14.) Moreover, Mr. Maritz testified that he "did not believe or disbelieve [Mrs. Wakefield]." (Maritz Deposition, p 63:13.)

Respectfully submitted,

*/s/ Pamela G. Cochenour, Esquire*
PAMELA G. COCHENOUR, ESQUIRE
Pa. I.D. #47761
ERIC P. REIF, ESQUIRE
Pa. I.D. #00194
PIETRAGALLO BOSICK & GORDON LLP
Firm #834
One Oxford Centre
The Thirty-Eighth Floor
Pittsburgh, PA  15219
(412) 263-2000

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing **DEFENDANT'S RESPONSE TO PLAINTIFF'S "OTHER MATERIAL FACTS THAT ARE NECESSARY FOR THE COURT TO DETERMINE THE MOTION FOR SUMMARY JUDGMENT"** will be forwarded via the ECF system to counsel of record listed below this **11th** day of **May, 2007**:

Alexander H. Lindsay, Jr., Esquire
The Lindsay Law Firm, P.C.
128 South Main Street
Butler, PA 16001

*/s/ Pamela G. Cochenour, Esquire*
PAMELA G. COCHENOUR, ESQUIRE
Pa. I.D. #47761
PIETRAGALLO BOSICK & GORDON LLP
Firm #834
One Oxford Centre
The Thirty-Eighth Floor
Pittsburgh, PA 15219

(412) 263-2000