IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VALERIE W. WAKEFIELD, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | Civil Action No. 05 CV 79 – Erie |
| | ) | |
| v. | ) | Honorable Maurice B. Cohill, Jr. |
| | ) | |
| JOY MINING MACHINERY | ) | JURY TRIAL DEMANDED |
| COMPANY, a division of Harnischfeger | ) | |
| Industries, | ) | |
| | ) | ***Electronically Filed*** |
| Defendant. | ) | |
| | ) | |
| | ) | |

## JOINT CONCISE STATEMENT OF MATERIAL FACTS[1]

AND NOW, comes the Defendant, Joy Mining Machinery ("Joy"), by and through its

counsel, Pietragallo Bosick & Gordon LLP, and Pamela G. Cochenour, Esquire, and files the

within Joint Concise Statement of Material Facts.

## FACTS AND CLAIMS MADE

### Background

1.    Plaintiff Valerie Wakefield's ("Plaintiff") claims arise out of her allegations

that, for a period while she worked at Joy, she had been subjected to a sexually hostile work

environment based on the conduct of a co-worker, Larry Meade ("Mr. Meade") (See

---

[1] This document consists of a combination of the Defendant's Concise Statement of Material Facts Filed in Support of Motion for Summary Judgment; the Plaintiff's Response to Defendant's Concise Statement of Materials Facts Filed in Support of Motion for Summary Judgment and Other Material Facts that are Necessary for the Court to Determine the Motion for Summary Judgment; and the Defendant's Response to Other Materials Facts Submitted by the Plaintiff and Joy's Response Thereto.

Complaint filed in the Court of Common Pleas of Venango County, Pennsylvania, at case number 290-2005 ("Complaint") at Tab "1" of the Appendix filed herewith, at ¶¶122-124) [2]

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 1 are undisputed. (The facts stated in Defendant's corresponding Footnote 2 are also undisputed.)

## Plaintiff's and Larry Meade's Employment With Joy

2.    Plaintiff has been employed with Joy as a cleaning service person since August of 2001, and remains in that position today (Deposition of Valerie W. Wakefield taken September 15, 2006 ("Plaintiff Deposition"), excerpts of which are at Tab "2" of the Appendix filed herewith, at p. 15:l.13-19.

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 2 are undisputed.

3.    Larry Meade ("Mr. Meade") has been employed with Joy as a draftsman for 30 years, and remains in that position today (Deposition of Larry Meade taken September 20, 2006 ("Meade Deposition"), excerpts of which are at Tab "3" of the Appendix filed herewith, at p.68:l.14-15, p.70:l.1-7).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 3 are undisputed.

4.    Mr. Meade's position as a draftsman is not a supervisory position at Joy. [3]

---

[2] The Complaint originally included Plaintiff's husband, Harold Wakefield, as a plaintiff, Mr. Meade as a defendant and various state law claims. By Order dated March 29, 2006, this Court granted Joy's Motion to Dismiss, which resulted in Mr. Wakefield, Mr. Meade and the state law claims being dismissed.

[3] In questioning Mr. Meade, Plaintiff's counsel did not establish that Mr. Meade has any supervisory duties at Joy (Meade deposition at p. 70:l.1-14).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 4 are undisputed.

5. Through the course of her employment, Plaintiff's job required her to visit various locations in Joy's Administration Building in order to perform her cleaning duties, including areas on the first and second floors (Plaintiff Deposition at p 52:l 4-13).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 6 are undisputed.

6. The engineering department in which Mr. Meade works is on the second floor of the Administration Building (Plaintiff Deposition at p.58:l 6-8).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 6 are undisputed.

7. From the time Plaintiff began working at Joy in August 2001 to December 2001, she would see Mr. Meade in the Administration Building and the two of them would exchange pleasantries, such as saying "hi, how are you doing today, how is your day going" (Plaintiff Deposition at p.51:l 18-23, p 55:l 13-18, p 56:l 2-23).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 7 are undisputed.

8. Prior to the death of her stepson, Justin, in April 2002, Mr. Meade and Plaintiff had a conversation at work during which Mr. Meade shared that he had suffered the tragic loss of his teenage son as a result of an automobile accident (Plaintiff Deposition at p.56:l 24-p.57:l.13, p.61:l.4-7).

**Plaintiff's Response:**

The averments of fact of Paragraph 8 are specifically denied. The Plaintiff admits that she and Mr. Meade had a conversation at work during which Mr. Meade shared that he had suffered the loss of his teenage son. It is disputed that the conversation took place in April 2002 and that Mr. Meade shared that he had lost his son as a result of an automobile accident. (See Plaintiff's Deposition attached as Defendant's Tab "A" p. 56:24-p. 57:13, p. 61:4-7).

9.    During that conversation, Mr. Meade seemed sad and Plaintiff felt sympathy for him and his wife (Plaintiff Deposition at p.61:l.8-10).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 9 are undisputed.

### Plaintiff's Family Background

10.    Plaintiff is married to Harold Wakefield (Mr. Wakefield), who is also a Joy employee (Complaint at ¶ 1; Deposition of Harold I. Wakefield taken September 14, 2006 ("Mr. Wakefield Deposition"), excerpts of which are at Tab "4" of the Appendix filed herewith, at p.19:l.5-17).

**Plaintiff's Response:**

The Plaintiff admits that the averments of fact contained in Paragraph 10 are undisputed.

11.    Mr. Wakefield had been previously married on two occasions and had a son, Justin, during one of those marriages (Mr. Wakefield Deposition at p.7:l.17-21, p.10:l.8-10, 23-p.11:l.3).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 11 are undisputed.

12.    On or about April 9, 2002, Justin was killed as a result of a single vehicle accident (Complaint at ¶ 7).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 12 are undisputed

### The Days Following Justin's Death

13.    Co-workers from Joy, including Mr. Meade, visited Plaintiff's home following Justin's death and offered their condolences (Plaintiff Deposition at p.62:l.14-p.63:l.1, p.63:l 22-p.64:-l 7; Mr. Wakefield Deposition at p.72:l.11-23).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 13 are undisputed.


14    Plaintiff testified that she introduced Mr. Meade to her husband and Mr. Meade shared with him that he and his wife had also lost a son, stated that he knew exactly what the Wakefields were going through and offered to help them if they ever needed help, which the Wakefields found comforting (Plaintiff Deposition at p.63:l.3, 9-21; Mr. Wakefield Deposition at p.64:l.23-p.65:l.14).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 14 are undisputed.

15.    Plaintiff also testified that she recalled that Mr. Meade called her home and spoke to Mr. Wakefield a few days later, asking how the Wakefields were doing (Plaintiff Deposition at p.64:l.25-p.65:l.4).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 15 are undisputed.

### Plaintiff's Return to Work and Support She Received From Others at Work

16.    Plaintiff returned to work at Joy at the end of April 2002 (Plaintiff Deposition at p.65:l.5-9)

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 16 are undisputed

17    Plaintiff testified that a co-worker, Cornelia Adams ("Ms. Adams"), who worked in the Human Resources Department at Joy and who had also lost a son, was particularly supportive and helpful after Justin's death (Plaintiff Deposition at p.68:l.2-10).[4]

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 17 are undisputed; however, the Plaintiff objects to these averments as they are immaterial to the issues in the case. The Plaintiff further admits that the averments of fact contained in Footnote 4 of Paragraph 17 are undisputed; however, also objects to these averments as immaterial to the motion for summary judgment as Ms Adams' relationship with the

---

[4] Ms. Adams testified that she lost her son in 1992 and offered Plaintiff help and support (Deposition of Cornelia Adams taken September 21, 2006 ("Adams Deposition"), excerpts of which are at Tab "5" of the Appendix filed herewith, at p.7:l.5).

Plaintiff is not in question and is not a factor in determining Joy's liability for Mr. Meade's actions.

18.     Specifically, Ms. Adams offered to be there if Plaintiff needed to talk to someone anytime and gave Plaintiff some books dealing with loss, including the loss of a child (Plaintiff Deposition at p.68:l.18-p.69:l.1, p.69:l.14-21).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 18 are undisputed; however, the Plaintiff objects to these averments as immaterial to the motion for summary judgment as Ms. Adams' relationship with the Plaintiff is not in question and is not a factor in determining Joy's liability for Me. Meade's actions.

19.     Thereafter and at least until four to five months after Justin died, Plaintiff found Ms. Adams easy to speak to and spoke to her in person when they would contact one another during working hours, and via telephone outside of working hours when Plaintiff would call Ms. Adams at home, regarding how Justin's death was affecting Plaintiff and her family (Plaintiff Deposition at p.69:l.2-14, 22-p.70:l.2, p.72:l.12-p.73:l.22).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 19 are undisputed; however, the Plaintiff objects to these averments as immaterial to the motion for summary judgment as Ms. Adams' relationship with the Plaintiff is not in question and is not a factor in determining Joy's liability for Mr. Meade's actions.

20.     Plaintiff was fully receptive to Ms. Adams' help and did not view anything Ms. Adams said or did as intrusive (Plaintiff Deposition at p.71:l.23-p.72:l.11).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 20 are undisputed; however, the Plaintiff objects to these averments as immaterial to the motion for summary judgment as Ms. Adams' relationship with the Plaintiff is not in question and is not a factor in determining Joy's liability for Mr. Meade's actions.

21    Her first day back to work, Plaintiff and Mr. Meade had a "basic, brief conversation" during which Mr. Meade asked Plaintiff how everything was going and whether she was okay (Plaintiff Deposition at p.85:l 22-p.86:l 5).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in undisputed; however, the Plaintiff objects to these averments as immaterial to the motion for summary judgment as Ms. Adams' relationship with the Plaintiff is not in question and is not a factor in determining Joy's liability for Mr. Meade's actions

22    Plaintiff recorded in a written narrative, which was prepared sometime beginning in March 2003 and discussed below ("Narrative"), that Mr. Meade would ask her how she and her family were doing and made casual conversation and that she "felt comfortable with talking about the death with him due to the fact that he had the same experience with his son" (Plaintiff Deposition at p 164:l.3-13; See Exhibit 1 to Plaintiff Deposition, Narrative, excerpts of which are at Tab "6" of the Appendix filed herewith, at p. 1).[5]

---

[5] Joy has added page numbers to the Narrative and, due to the fact that it is handwritten and may be difficult to read, has highlighted the text to which it is citing, for ease of reference

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 22 as undisputed.

23.    Plaintiff and Mr. Meade "mutually and voluntarily embraced" each other "[m]aybe once a month" beginning within the first 2 weeks that she returned to work at the end of April 2002 (Plaintiff Deposition at p.111:l.11-19, p.164:l.14-p.165:l.3; See Narrative at p. 1).[6]

**Plaintiff's Response:**

The Plaintiff specifically denies the averments of fact of Paragraph 23.  To the contrary, the record demonstrates that the Plaintiff did not state that she and Mr. Meade "mutually and voluntarily embraced" each other once a month, but merely responded to Defense counsel's wording of "mutually and voluntarily embraced" as to this one particular hug. (Plaintiff's Deposition, p. 112:4-8.)

> Q.    This day he said, I think you need a hug; you said, I know I need a hug; he said he needed a hug as well so the two of you mutually and voluntarily embraced?
>
> A.    Yes.

(p. 112:4-8.)

To say that the Plaintiff testified that she and Mr. Meade "mutually and voluntarily embraced" "[m]aybe once a month" is piecing together parts of the Plaintiff's testimony to create an inaccurate depiction of what she said.  Importantly, the language "mutually and voluntarily embraced" was Defense counsel's wording, not the Plaintiff's.  Additionally, the

---

[6] Plaintiff's Narrative states: "He would often give me a hug when I was feeling depressed and sad. He always seemed to know when I was having a bad day" (Plaintiff Deposition at p.164:l.8-13; See Narrative at p. 1)

Plaintiff at this point in her deposition testimony was describing the hug in which Mr. Meade grabbed her buttocks. (p. 114:l.2-7.)

24.    Plaintiff agreed that the hugs they exchanged were friendly, platonic hugs (Plaintiff Deposition at p. 121:l.2-7).

**Plaintiff's Response:**

The Plaintiff specifically denies the averments of fact of Paragraph 24.  To the contrary, the Plaintiff stated that some of the hugs, were friendly, platonic hugs.  Plaintiff further testified that on this occasion, she hugged Larry Meade only after he had cornered her in the men's restroom while she was cleaning it (Plaintiff deposition, p. 120:14-22). "[H]e kept getting closer and closer to me and I kept backing up; and then he finally got close enough to me that he told me that he needed a hug, and dummy me, I agreed to it; and that time he tried hugging me, he tried kissing me that time." Id.

Plaintiff had testified that she changed her cleaning routine to avoid Larry Meade (p. 104:19-24). "When I did see him, he would try talking to me and I would just tell him I was busy, I had to keep moving." (p. 104:22-24.)  Such testimony hardly describes "friendly, platonic hugs," despite Defense counsel's continuous attempts to characterize them as such throughout the Plaintiff's deposition.

25    Plaintiff testified that their hugs were brief and that she and Mr. Meade hugged face-to-face with her arms over Mr. Meade's shoulders and Mr. Meade's arms around her waist or on the small of her back behind her waist (Plaintiff Deposition at p.113:l.21-p.114:l.12, p.115:l.17-24).

**Plaintiff's Response:**

The Plaintiff specifically denies the averments of fact of Paragraph 25. While the Plaintiff did state that their hugs were brief and that she and Mr. Meade hugged face-to-fact with her arms over Mr. Meade's shoulders, she stated that Mr. Meade's arms were always around her waist. (Plaintiff Deposition p. 113:21-p. 114:12) Plaintiff then stated that on this particular occasion, Mr. Meade's hands "wandered down onto my butt." (p. 114:19) Later, Plaintiff was asked where Mr. Meade's hands were when she pushed him away, to which she responded, "On my butt." (p. 116:6-8)

26.    Plaintiff states that Mr. Meade always asked her permission before hugging her and that she declined a few times because she did not want one, which Mr. Meade respected (Plaintiff Deposition at p.111:l.20-p.112:l.3).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 26 are undisputed.

27.    Plaintiff testified that others in the office gave Plaintiff hugs following the death of her son, including Ms. Adams, Diane Kemick and Mike Calderone, who had also lost a son and knew what she was going through (Plaintiff Deposition at p.145:l.8-13).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 27 are undisputed; however, the Plaintiff objects to these averments as immaterial to the motion for summary judgment as the conduct of Larry Meade, not the conduct of Ms. Adams, Diane Kemick, or Mike Calderone, is at issue.

28.    Plaintiff agrees that she hugged Mr. Meade more frequently than anyone else in the office (Plaintiff Deposition at p.145:l 14-17)

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 28 are undisputed.

29.    In May and June 2002, Mr. Meade checked in on Plaintiff for a few minutes daily at work to see how she was doing and, some of those days, Plaintiff was not doing well (Plaintiff Deposition at p.86:l 6-17, p.87:l 10-17).

**Plaintiff's Response:**

The Plaintiff specifically denies the averments of fact in Paragraph 29 as the Plaintiff did not testify that Mr. Meade "checked in" on the Plaintiff. Rather, the Plaintiff testified that Mr. Meade made it a point to find out where she was and to see her every day. "And then if he didn't see me he would ask somebody if they seen me, where was I. It just seemed that he made it a point that he had to see me every day." (Plaintiff Deposition, p. 86:19-22) "If I wasn't in an area that he thought I should be in, he would ask somebody where I was at, because then the next day they would say, hey, Larry was asking about you." (p. 87:4-7).

30.    Once or twice in May and a few times a week in June and July 2002, Mr. Meade and Plaintiff would talk while she was cleaning the men's restrooms on the second floor where Mr. Meade worked (Plaintiff Deposition at p.88:l 1-9:l 1-8, p.89:l 1-15, p.91:l 9-13).

**Plaintiff's Response:**

The Plaintiff specifically denies the averments of fact of Paragraph 30. To the contrary, the Plaintiff testified that if she would be cleaning the men's restroom, she would put signs up that the restroom was closed. Mr. Meade would bypass these signs and come right into the restroom. The Plaintiff testified that most of the time, she would ask Mr. Mead to leave because she was cleaning but that a couple of times she didn't ask him to leave because he told her an interesting story. (Plaintiff Deposition, p. 89:16-23)


31.     Plaintiff testified that, other than the fact that some of their conversations occurred in the men's restrooms, there was nothing troublesome about the conversations she had with Mr. Meade during that time (Plaintiff Deposition at p.91:l.13).

**Plaintiff's Response:**

The Plaintiff specifically denies the averments of fact of Paragraph 31. To the contrary, although the Plaintiff initially agreed with Defendant's counsel that there was nothing troublesome about the conversations during that time, Plaintiff later testified that in June 2002, Mr. Meade came in to see how she was doing, gave her a hug, and tried to kiss her. (Plaintiff Deposition, p. 165:4-6) Plaintiff testified that this attempted kiss was unwelcome and that she pushed him away from her (p. 121:19-p. 122:23)


32.     Plaintiff and Mr. Meade talked, not only about the loss of their sons during that time, but also about other subjects, including what they did the night before or on the weekend (Plaintiff Deposition at p.89:l.19-p.90:l.4, p.90:l.18-p.91:l.8).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 32 are undisputed.

33.    In September or October 2002, Plaintiff alleges that Mr. Meade invited her two or three times to his come to see an oil painting of his deceased son, since it was very nice and she may want one as well (Plaintiff Deposition at p 97:l.11-17, p.98:l. 1-3)

**Plaintiff's Response:**

The Plaintiff specifically denies the averments of fact of Paragraph 33. To the contrary, the Plaintiff testified that Mr. Meade invited her to his house two or three times to see an oil painting of his deceased son despite the fact that the Plaintiff told him she would not be interest in having an oil painting of her deceased stepson. (Plaintiff Deposition, p. 97:19-25)

34.    Also in September of October 2002, Plaintiff alleges that she shared with Mr. Meade that she and her husband were making plans for their son Justin's headstone and that, thereafter, Mr. Meade invited her to go to the cemetery to see his son's headstone because he thought it might help them in making their plans (Plaintiff Deposition at p.98:l 4-19)

**Plaintiff's Response:**

The Plaintiff specifically denies the averments of fact of Paragraph 34. To the contrary, the Plaintiff testified that Mr. Meade "kept inviting" her to go to the cemetery to see his son's headstone. (Plaintiff Deposition, p. 97:17-18

## Plaintiff's Allegations of Unwelcome Conduct by Mr. Meade

35.    Plaintiff alleges that, in August 2002, Mr. Meade started asking personal questions, such as what kind of underwear she had on, told her how pretty she looked and

that she could be working somewhere more glamorous than Joy and that she would look good in a bikini (Plaintiff Deposition at p 92:1.5-19).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 35 are undisputed.

36.    Plaintiff alleged that Mr. Meade asked her what color her underwear was only "maybe once or twice." (Plaintiff Deposition at p 93:l.22-25).

**Plaintiff's Response:**

The Plaintiff specifically denies the averments of fact of Paragraph 36. To the contrary, the Plaintiff testified that Mr. Meade asked what color her underwear was "maybe once or twice," only during the month of August, 2002:

> Q:    What in particular made you uncomfortable?    Be specific.
>
> A.    Well, when he started commenting about, what kind of underwear do you wear.
>
> Q.    How often did he do that *in August?*
>
> A.    I'm thinking maybe once or twice.

(Plaintiff Deposition, p. 93:20-25) (emphasis added).

37.    Plaintiff alleges that Mr. Meade told her in August 2002 that he had a boat and a cottage in Florida that his family went to every year and that "if [she] wanted to . . . [she could] go with him there and . . . [could] lay out on his boat out in the sun" (Plaintiff Deposition at p 92:l 5-p 93:l.4).

**Plaintiff's Response:**

The Plaintiff specifically denies the averments of fact of Paragraph 37 as the Defendant has left out important details from the Plaintiff's testimony by conveniently filling in these details with ellipses. After stating that Mr. Meade told her she would look good in a bikini, the Plaintiff went on to discuss Mr. Meade's comment about her going to his Florida home with him. (Plaintiff Deposition, p. 92:18-19) The Plaintiff's full testimony at this point reads as: "He told me that he had a boat that matched the same color as my Jeep, that I would look good on the boat; and I told him I didn't care to be on this boat. He told me about his family having some kind of a cottage in Florida that they go to every year, that if I wanted to that I can go with him there and I can lay on his boat out in the sun; and I told him I didn't want to." (p. 92:21-93:4)

38    Plaintiff testified that she did not think Mr. Meade was serious about wanting her to go to Florida (Plaintiff Deposition at p 93:1.9-15).[7]

**Plaintiff's Response:**

The Plaintiff specifically denies the averments of fact of Paragraph 38 as the Defendant has misstated the Plaintiff's testimony. To the contrary, the Plaintiff testified that at first she didn't think Mr. Meade was serious about wanting her to go to Florida, implying that later she did believe he was serious

> Q.    Did you think he was really serious about wanting you to go to Florida and be on his boat?
>
> A.    *At first, no. At first* I just thought he was making talk, just flapping his lips about whatever came to the tope of his mind at that time

---

[7] In fact, when asked whether she was offended by any comments Mr. Meade made in August 2002, Plaintiff did not mention these alleged comments about going to Florida or on the alleged boat (Plaintiff Deposition at p.93:1.16-25).

(p. 93:9-15) (emphasis added)

The Plaintiff then testified that at times, she did think Mr. Meade was serious:

> Q.    Did you really think he was serious about the two of
>       you just picking up and going to Florida together at the
>       drop of a hat?
>
> A.    Days yes and days no, because I told him I wasn't going
>       because I had my own family to do things with and I
>       wasn't going nowhere with him.

(p. 97:2-8).

The Plaintiff further denies the averments of fact contained in Footnote 7 as the Defendant has again mischaracterized the Plaintiff's testimony. The Defendant alleges that the Plaintiff was not offended by the comments about going to Florida or going on Mr. Meade's boat because when asked whether she was offended by any comments Mr. Meade made in August, 2002, the Plaintiff "did not mention" the comments about Florida and the boat. However, in making this assertion, the Defendant fails to recognize that the Florida/boat comments were made by Mr. Meade in conjunction with telling the Plaintiff she would "look good in a bikini." Had the Defendant quoted the Plaintiff's entire statement rather than take out pieces with ellipses, this fact would be obvious. Again, the Plaintiff's testimony reads, "He told me that he had a boat that matched the same color as my Jeep, that I would look good on the boat; and I told him I didn't care to be on his boat." (p. 92:21-24) This comment is immediately proceeded by the Plaintiff's testimony that Mr. Meade told her she "would look good in a bikini." Additionally, when the Plaintiff was then asked if she was offended by any of the comments Mr. Meade made, she responded, "About the underwear and the bikini *and stuff*, yeah." (P. 93:16-25) (emphasis added) Clearly, the Plaintiff is referring to the Florida and boat comments in this statement.

39      Plaintiff claims that, at the end of August, she told Mr. Meade that she didn't mind their discussions about their sons and about normal daily activities, but did not want him to make any more comments about what she is wearing or her appearance, and Mr. Meade said "okay" (Plaintiff Deposition at p.94:l.1-15, p.104:l.25-p.105:l.12).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 39 are undisputed.


40      From September through December 2002, Plaintiff states that she and Mr. Meade engaged in non-problematic conversations regarding how each other was feeling and that she shared with Mr. Meade that she and her family were planning a trip to Florida to visit her husband's brothers. (Plaintiff Deposition at p 105:l 13-p.106:l.19, p. 107:l 8-13).

**Plaintiff's Response:**

The Plaintiff specifically denies the averments of fact contained in Paragraph 40. The Plaintiff was questioned whether Mr. Meade did or said anything specifically in November and December 2002 that was problematic. (Plaintiff Deposition, p. 105:22-106:16) The Plaintiff did, however, testify to several incidents during those months that made her uncomfortable. In particular, the Plaintiff described an incident that occurred during this time frame in which Mr. Meade followed her to the portrait studio at Wal-Mart. "I said, what are you doing here? He said, oh, I heard you telling the girls at work you were going to be out here getting Jonathan's picture taken and thought maybe I'd come out and see you." (p. 99:24-100:3) This conversation at Wal_Mart can hardly be characterized as "non-problematic."

The Plaintiff also testified that it was sometime in September or October that Larry Meade began inviting her to his house to see the oil painting of his son and that the

continued to invite her to come to his house despite that fact that she told him she was not interested in oil paintings. (p. 97:11-25) Mr. Meade also kept asking the Plaintiff to go with him to his son's grave during this time frame. (p. 97:17-19)

When asked if she could recall anything else occurring in September and October, the Plaintiff described an incident in which Larry Meade called Cornelia Adams to find where the Plaintiff was working. (p. 103:18-104:8) The Plaintiff also testified that she changed her daily routine so as to avoid Larry Meade during this time frame. (p. 104:19-24)

Thus, stating that the Plaintiff testified that the conversations between she and Mr. Meade during this time frame were "non-problematic" is a misstatement of the Plaintiff's testimony.

41.    In her deposition, Plaintiff testified that in late January or early February 2003, she and Mr. Meade hugged while she was cleaning a restroom at work (Plaintiff Deposition at p.111:l 6-10).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 41 are undisputed.

42.    At the time of the alleged hug in January or February 2003, Plaintiff alleges she was not "feeling good and thinking about Justin and everything," Mr. Meade noticed she looked bad and offered to give her a hug, stating that he needed one, too, as he was also having a bad day (Plaintiff Deposition at p.109:l.24-p 111:l 7).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 42 are undisputed.

43.    Plaintiff testified that the hug was as other hugs in the past, with her arms on Mr. Meade's shoulders and Mr. Meade's arms around her waist or on the small of her back behind her waist (Plaintiff Deposition at p 114:l 4-15, p 115:l 17-24).

**Plaintiff's Response:**

The averments of fact of Paragraph 43 are denied. To the contrary, the Plaintiff testified that this hug was not as other hugs in the past, as Mr. Meade grabbed her buttocks during this particular hug.

> Q    The hug at the end of January, early February, is it as we just described?
>
> A    Yes.
>
> Q.    Anything else?
>
> A.    Yes.
>
> Q    What happened?
>
> A.    His hands wandered down onto my butt.
>
> Q.    Both hands?
>
> A.    Yes.

p. 114:13-21)

44.    During the alleged hug, Plaintiff first testified that the hug lasted approximately 30 seconds or less and that Mr. Meade's hands wandered down to the top of her butt closest to her waist (Plaintiff Deposition at p.114:l 19-21, p 115:l 6-9, 24-p 116:l 12).

**Plaintiff's Response:**

The averments of fact of Paragraph 44 are denied. To the contrary, the Plaintiff testified that both of Mr. Meade's hands "wandered down onto my butt," and that she had to push him away to get him to stop. (Plaintiff Deposition, p. 114:18-21) When questioned by defense Counsel about the position of Mr. Meade's hands, the Plaintiff again stated that his hands were on her buttocks.

> Q.    Where were his hands when you pushed him away?
>
> A.    On my butt.

(p. 116:6-8)

45    When asked whether she actually felt Mr. Meade's hands move from her waist to a little bit below or whether they just started there, Plaintiff testified that "[t]hey just like started there" (Plaintiff Deposition at p. 116:l.13-16).

**Plaintiff's Response:**

The averments of fact of Paragraph 45 are denied. To the contrary, the Plaintiff testified that Mr. Meade's hands started at behind her waist and crept down. (Plaintiff Deposition, p. 115:19:116:16) When the Plaintiff asked where Mr. Meade's hands started on this particular hug, she stated that both hands started on the small of her back and then crept down. The Plaintiff testified that when she realized the Mr. Meade was trying to grab her buttocks, she pushed him away. (p. 116:4-8)

46.    Plaintiff testified that she did not see Mr. Meade for 3-4 weeks, including Valentine's Day and the most of February 2003 (Plaintiff Deposition at p.118:l.24-p.119:l.12).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 46 are undisputed.

47. Thereafter, Plaintiff testified that at the end of February or beginning of March, she and Mr. Meade had a conversation while she was cleaning a restroom regarding how they were doing and the death of Mr. Meade's son, since his son's birthday was coming up (Plaintiff Deposition at p.120:l.2-16).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 47 are undisputed.

48. Plaintiff alleges that Mr. Meade kept getting closer and told her he needed a hug, that Plaintiff agreed and that Mr. Meade tried to kiss her (Plaintiff Deposition at p.120:l.17-22).

**Plaintiff's Response:**

The averments of fact contained in Paragraph 48 are denied. To the contrary, the Plaintiff testified that she only hugged Mr. Meade because he had cornered her in the restroom and kept moving closer to her to the point where she felt she had no choice but to hug him.

"We just go into talking about the death of his son, how he dealt with is birthday and everything; and he came up-he kept getting closer and closer to me and I kept backing up; and then he finally got close enough to me that he told me that he needed a hug, and dummy me, I agreed to it; and that time he tried hugging me, he tried kissing me that time. (Plainitiff Deposition, p.120:14-22)

49.    Plaintiff states that right before she went to release off of Mr. Meade's shoulders, Mr. Meade turned his head toward her and tried to kiss her on the lips, so she pushed him away, told him to leave and he left (Plaintiff Deposition at p.121:l.22-23, p.122:l.6-7, 14-16, p.123:l.19-22).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in paragraph 49 are undisputed.

50.    When asked how she knew Mr. Meade was trying to kiss her, she responded that it was "so close to her" that she could "feel his lips right at the corner of her lips" (Plaintiff Deposition at p.122:l.8-12).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 50 are undisputed.

51.    When asked to clarify the time frame during which this kiss occurred, Plaintiff agreed that she was clear in her recollection that the alleged attempted kiss occurred sometime during the end of February or early March 2003 (Plaintiff Deposition at p.123:l.23-p.124:l.9).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 51 are undisputed

52.    Plaintiff later testified that the alleged incident where Mr. Meade touched the top of her butt occurred at the end of January or beginning of February 2003, and that the alleged incident where Mr. Meade tried to kiss her occurred at the end of February 2003 (Plaintiff Deposition at p.137:l 4-15, 21-23).

**Plaintiff's Response:**

The averments of fact contained in Paragraph 52 are denied. To the contrary, the Plaintiff did not testify that Mr. Meade touched the top of her butt but rather, that Mr. Meade *did* touch her buttocks and that she *thought* the incidents occurred in February, 2003 but wished to check her diary to be certain of the dates. (Plaintiff Deposition, p. 114:13-21; p. 116:6-8; p. 137:16-23) Curiously, the Defense only cites to lines 4-15 and 21-23 of the Plaintiff's deposition testimony, failing to cite several important lines of the Plaintiff's. In these particular lines, the Plaintiff asks to check her diary to refresh her recollection as to the date of these events as she wasn't certain of the exact time frame

Q.    Both the hug touching the top of your butt—

A.    Yeah.

Q.    and the attempted kiss, it's your testimony that they occurred in February of 2003?

A.    Yes.

Q.    You're certain of that?

A.    If I could look at my diary, I could tell you for certain because I wrote down the exact time frame.

Q.    I need your recollection

A    I'm *thinking* the end of January, beginning of February the first one. The end of February the second one.

(p. 137:9-23)

Regardless, these averments are immaterial to the issues in the case, as the Defendant is attempting to attack the Plaintiff's credibility in this paragraph. In resolving a Rule 56 motion for summary judgment, courts should not weigh conflicting evidence or make factual findings, but rather should "consider all evidence in the light most favorable to the non-moving party" to decide whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Schnall v. Amboy Nat'l Bank*, 279 F.3d 205, 209 (3d Cir. 2002).

Credibility is not an issue for summary judgment, but rather is a factual determination to be made at trial. "However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." *Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).

53.    Plaintiff at first stated that nothing occurred with Mr. Meade the rest of March 2003 (Plaintiff Deposition at p.124:l.22-25).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 53 are undisputed. However, the statements contained in Paragraph 53 are immaterial and misleading. Again, the Defendant is attempting to attack the Plaintiff's credibility where the Plaintiff's credibility is not properly at issue in a motion for summary judgment.

Credibility is not an issue for summary judgment, but rather if a factual determination to be made at trial. "However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." *Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).

54.    Later in her deposition, Plaintiff recalled an alleged event on Sunday of the first weekend of March where Mr. Meade allegedly came to her home knowing her husband and son were not there, professed his love for her and stated that he wanted to marry her and asked her to have sex with him (Plaintiff Deposition at p.132:l.7, p 133:l.18-p 134:l.20, p.136:l.7-12).

**Plaintiff's Response:**

The averments of fact contained in Paragraph 54 are denied. To the contrary, the event described by the Plaintiff is not an "alleged event" where Mr. Meade "allegedly" came to the Plaintiff's home, as stated by the Defendant. Rather, both the Plaintiff and Mr. Meade testified that Mr. Meade did in fact go to the Plaintiff's home. (Plaintiff Deposition, p. 133:17-13; Deposition of Larry Meade Deposition, attached as Defendant's Tab "C," p. 5:5-9) The Plaintiff further testified that MR. Meade told her he was "madly in love" with her and wanted to marry her; that they could to off to Florida and have a wonderful time together; that she didn't need her husband and son; and that he could take care of here because he had lots of money. She stated that Mr. Meade had come to her home knowing that her husband and son were not there and would not be home for awhile and that he then told her he wanted to have sex with her right then and there. (Plaintiff Deposition, p. 134:24-136:21).

55.    During this alleged incident, which was five to ten minutes or less long, Plaintiff alleges that Mr. Meade was standing inside her house in the foyer near the doorway and that she was further into the house into the dining room area approximately 13 feet apart (Plaintiff Deposition at p 138:l.1-8, p.139:l.8-18, 24-25, p.140:l.3-6).

**Plaintiff's Response:**

The averments of fact contained in Paragraph 54 are denied. To the contrary, and as stated above, the Defendant refers to the occurrence as an "alleged incident" when both the Plaintiff and Mr. Meade testify that Mr. Meade in fact went to the Plaintiff's house at that time. (Plaintiff Deposition, p. 133:17-13; Larry Meade Deposition, p. 5:5-9) The Plaintiff testified that as she was outside getting groceries, she noticed a vehicle pull into her driveway. Larry Meade got out of the vehicle and suggested that the two step inside her house, as it was raining and cold "So we stepped right inside my door and he shut the door behind him." (Plaintiff Deposition, p. 133:17-134:9) When asked by Defense counsel where the two were standing, the Plaintiff stated that Mr. Meade was standing in her foyer and she was in the dining room approximately 13 feet away from him and that the exchange lasted anywhere from 5 to 10 minutes. (p. 139:25-140:5).

56.    Plaintiff agreed that Mr. Meade did not touch her at any time during this alleged incident (Plaintiff Deposition at p. 140:l.1-2).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in paragraph 56 are undisputed.

57.    Plaintiff alleges that she responded by telling Mr. Meade: "you are playing with fire here and you're not just playing with a little fire, you're playing with a big, burning bush fire" and telling Mr. Meade that he was "going overboard with everything" and that the two of them together "couldn't be" (Plaintiff Deposition at p.135:l.19-p.136:l.7).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 57 are undisputed.

58.    Plaintiff asked Mr. Meade to leave, he did so and, as he was leaving, made a comment that the next time Plaintiff would see him would be at Morrison's Funeral Home, got in his car and pulled away with the tires squealing (Plaintiff Deposition at p.136:l.19-p.137:l.2).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 58 are undisputed.

59.    Plaintiff alleges that she went to work the next day and did not see Mr. Meade (Plaintiff Deposition at p.142:l.14-22).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 59 are undisputed

60.    Plaintiff testified that, thereafter, on March 4, 2003, Plaintiff spoke to her brother (a police officer), who suggested that she keep a diary of events that occurred (Plaintiff Deposition at p.150:l.5-11, p.161:l.2).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 60 are undisputed, but that such averments are incomplete. The Plaintiff testified that she spoke to her brother with regard to filing possible criminal charges against Larry Meade and he

told here there was little the police could do as she had not been harmed physically. (Plaintiff Deposition, p. 150:17-24) He suggested to her that she begin to keep a diary of all the events (p. 160:13-20) The Plaintiff further testified that she tried to obtain a Protection From Abuse Order (PFA) against Mr. Meade, but was told a PFA was not possible as Mr. Meade was not part of her household. (p. 152:16-155:18)

61. Plaintiff thereafter started to prepare a document from memory and her best recollection of past events, the "Narrative" discussed earlier herein, which was not prepared on a daily basis contemporaneous with the events as they occurred (Plaintiff Deposition at p. 162:1.5-p.163:1.8; See Narrative)

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 61 are undisputed.

62. Plaintiff also prepared another document or "Journal" in a composition book after speaking to her brother in March 2003 that was also prepared from memory at first and eventually was prepared contemporaneously as events occurred, but Plaintiff could not say when that occurred (Plaintiff Deposition at p.179:1.3-6, p.181:1.9-21, p 182:1.6-14, p.183:1.11-p.184:1.4, l.14-p.186:1.17, p.187:1.7-p 188:1.9, p.189:1.23-p.190:1.1, p.199:1.9-17); See Journal, excerpts of which are at Tab "7" of the Appendix filed herewith).[8]

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 62 are undisputed.

---

[8] Joy has also added page numbers to the Journal and, due to the fact that it is handwritten and may be difficult to read, has highlighted the text to which it is citing, for ease of reference.

63.    Despite Plaintiff's earlier testimony that the alleged incident where Mr. Meade attempted to kiss her occurred at the end of February or beginning of March 2003, Plaintiff's Narrative provides: "One day in June 2002 he came to see how I was doing, gave me a hug and tried to kiss me" (Plaintiff Deposition at p. 165:l.4-8; See Narrative at p. 1).

**Plaintiff's Response:**

The averments of fact of Paragraph 63 are denied.    To the contrary, and as previously addressed, when the Plaintiff was asked if she was certain that the incident in which Mr. Meade tried to kiss her occurred in February of March, the Plaintiff asked to see diary to be certain of the time frame. (Plaintiff Deposition, p 137) Defense counsel refused to allow the Plaintiff to use her diary, telling the Plaintiff to answer from her "recollection only." (p. 137:17-23) It is therefore not surprising that the Defendant now seeks to once again attack the Plaintiff's credibility.

The averments of fact contained in Paragraph 63 are further immaterial to a motion for summary judgment as the Defendant is again attempting to attack the Plaintiff's credibility.    Credibility is not an issue for summary judgment, but rather is a factual determination to be made at trial.    "However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." *Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).


64.    Plaintiff testified that Mr. Meade only attempted to kiss her once (Plaintiff Deposition at p.123:l.4-6, p.165:l.9-11).

**Plaintiff's Response:**

The Plaintiff admits the averment of facts contained in Paragraph 64 are undisputed.

65.    Plaintiff agreed that her earlier testimony was incorrect and that the attempted kiss occurred in June 2002, not February or March 2003 (Plaintiff Deposition at p. 165:1.12-23).

**Plaintiff's Response:**

The Plaintiff admits the averment of facts contained in Paragraph 65 are undisputed; however the averments contained in Paragraph 65 are immaterial to the motion for summary judgment. Once again, the Defendant is attacking the Plaintiff's credibility. Credibility is not an issue for summary judgment, but rather is a factual determination to be made at trial." However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." ***Boyle v. County of Allegheny Pennsylvania***, 139 F.3d 386, 393 (3d Cir. 1998).

66.    Plaintiff's Journal also confirms that such attempted kiss occurred either in late June or early July 2002 (Plaintiff Deposition at p. 192:1 15-p. 193:1.4; see also Complaint at ¶¶ 24-28)

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 66 are undisputed; however, the averments contained in Paragraph 66 are immaterial to the motion for summary judgment. Again, the Defendant is attacking the Plaintiff's credibility. Credibility is not an issue for summary judgment, but rather is a factual determination to be made at trial." However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." ***Boyle v. County of Allegheny Pennsylvania***, 139 F.3d 386, 393 (3d Cir. 1998).

67.    Similarly, despite Plaintiff's earlier testimony that the alleged incident where Mr. Meade's hand touched the top of her butt occurred in February or March 2003, Plaintiff's Narrative provides that such incident occurred in late June or early July 2002, three weeks after the attempted kiss in June 2002 (Plaintiff Deposition at p.165:l.24- p.166:l.12, 20-22; See Narrative at p. 1).

**Plaintiff's Response:**

The averments of fact contained in Paragraph 67 are denied.  To the contrary, the Plaintiff's earlier testimony was that Mr. Meade had, in fact, touched her butt.  (p. 115:24- 116:16)

The Plaintiff further objects to the averments as immaterial to the motion for summary judgment as the Defendant is once again attempting to attack the Plaintiff's credibility.  Credibility is not an issue for summary judgment, but rather is a factual determination to be made at trial."  However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder."  ***Boyle v. County of Allegheny Pennsylvania***, 139 F.3d 386, 393 (3d Cir. 1998).

68.    Plaintiff's Journal also confirms that such incident occurred in June 2002 (Plaintiff Deposition at p.192:l.9-14; See Journal at p. 13; see also Complaint at ¶¶ 19-21)

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 68 are undisputed.

69.    Plaintiff testified that Mr. Meade only touched her butt once (Plaintiff Deposition at p.166:l.13-15).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 69 are undisputed.

70.    Plaintiff agreed that her earlier testimony was incorrect and that Mr. Meade allegedly touched her butt in late June or early July 2002, not February or March 2003 (Plaintiff Deposition at p 166:l 20-p.167:l.12).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 70 are undisputed but objects to the averments as immaterial to the motion for summary judgment, as the Defendant is again attempting to attack the Plaintiff's credibility. Credibility is not an issue for summary judgment, but rather is a factual determination to be made at trial. "However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." *Boyle v. County of Allegheny Pennsylvania* 139 F.3d 396, 393 (3d Cir. 1998).

71.    According to Plaintiff, nothing happened between her and Mr. Meade after March of 2003 (Plaintiff Deposition at p 175:l.16-24, p.216:l.2-8).

**Plaintiff's Response:**

The averments of fact contained in Paragraph 71 are specifically denied. To the contrary, the testimony attributed to the Plaintiff in support of this averment does not reflect that the Plaintiff testified that nothing happened between her and Mr. Meade after March of 2003. The first portion of the Plaintiff's testimony cited by the Defendant merely states:

Q    There is a gap in time, wouldn't you say, between your recording of events here?  Right before the paragraph that starts "On June 3rd," you were writing about what was happening in early March; correct?

A    Ah-huh.

Q    Did anything happen *between March and June* that is not reflected in this document?

A    No.

(Plaintiff Deposition, p. 175:16-24) (lines cited to by the Defendant in support of this averment.)

The Defendant's second reference to the Plaintiff's deposition testimony in support of its averment of fact also only refers to the time period between March and June of 2003.

Q    You were just thinking about things *between March and June* –

A    Yeah.

Q    --is that right?  Nothing new happened, you were just thinking about the things that had happened; correct?

A    Yeah . . .

(p. 216:2-8) (Deposition testimony cited by the Defendant) (emphasis added).

Clearly, the Plaintiff's deposition testimony to which the Defendant has referred states only that from March to June of 2003, there were no new occurrences between her and Larry Meade.


72    Plaintiff testified that, on June 3, 2003, she called her supervisor, Wayne Hilliard, to tell him she needed to go home and Mr. Hilliard told her not to leave, but that he would come to talk to her because he knew she was not feeling well (Plaintiff Deposition at p 216:l.18-p 217:l.7).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 72 are undisputed

73.    Mr. Hilliard offered to drive Plaintiff home and Plaintiff agreed (Plaintiff Deposition at p 217:l.19-25).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 73 are undisputed, but objects to such averments as immaterial to the motion for summary judgment.

74.    Plaintiff did not have any physical contact with Mr. Meade in June or July 2003 (Plaintiff Deposition at p.230:l.16-p.231:l.3).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 74 are undisputed

75.    Plaintiff saw Mr. Meade in July 2003, but Mr. Meade did not speak to her (Plaintiff Deposition at p.231:l.4-10).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 75 are undisputed.

76.    Plaintiff filed a grievance on June 20, 2003 (See Request for Negotiating Employees' Grievances at Tab "8" of the Appendix filed herewith).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 76 are undisputed.

77.    According to Plaintiff, she did not have any problems with Mr. Meade after she filed her grievance on June 20, 2003 through the date of her deposition on September 15, 2006 (Plaintiff Deposition at p.239:l.11-14).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 77 are undisputed to the extent that Plaintiff responded to Defense counsel's question with a "No." The Plaintiff does, however, dispute the use of the word "problems" as this word was never defined by Defense counsel. The Plaintiff did testify that she had encountered Larry Meade at work after the filing of her grievance and that she had asked to be moved to another location as seeing Larry Meade made her uncomfortable and she was unhappy with the procedures the Defendant had undertaken in attempting to remedy her situation. (Plaintiff Deposition, p. 230:16-232:23)

78.    In fact, from March 2003 through the date of her deposition in September 2006, in over three years, Plaintiff only saw Mr. Meade once on April 24, 2006 in the lobby area at Joy (See Notes of April 25, 2006 meeting between Plaintiff, Jerry Miller, Diane Kemick and Gary Wozniak of Joy, April 24, 2006 meeting between Mr. Meade and Ms. Kemick and April 26, 2006 meeting between Plaintiff, Mr. Miller, Ms. Kemick and Randy Beightol of Joy, at Tab "9" of the Appendix filed herewith).[9]

---

[9] Mr. Meade did not speak to or make any eye contact with Plaintiff when she saw him in the lobby area on April 24, 2006 (See Notes of April 25, 2006 meetings).

**Plaintiff's Response:**

The averments of fact contained in Paragraph 78 are specifically denied. To the contrary, and as pointed out by the Defendant in Paragraph 75, the Plaintiff testified that she had seen Mr. Meade from March of 2003 until the date of her deposition in September 2006 on more than one occasion. The Plaintiff testified that in both June and July of 2003, she saw Mr. Meade at work. (Plaintiff Deposition, p. 230:20-21: 231:4-5)

79.    Further, Joy has received no further reports of any contact between Plaintiff and Mr. Meade

**Plaintiff's Response:**

The averments of fact of Paragraph 79 are specifically denied as the Plaintiff is unaware of what the Defendant did or did not receive.

### Joy's Sexual Harassment Policy

80.    Joy has a Harassment Policy in place, which was in effect at all times during the incidents Plaintiff alleges occurred with Mr. Meade (See copy of Joy's Harassment Policy at Tab "10" of the Appendix filed herewith; Deposition of Johan Maritz taken September 20, 2006 ("Maritz Deposition"), excerpts of which are at Tab "11" of the Appendix filed herewith, at p.7:1.3-8, p.7:1.23-p.8:1.7).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 80 are undisputed. The Plaintiff does however, dispute the Defendant's submitted Joy's Harassment Policy as it appears at Tab "10" of the Defendant's Appendix as incomplete. The Plaintiff has included at Plaintiff's Tab "G" what documents she feels accurately and more fully reflects the Defendant's policy.

81.    The Harassment Policy is posted on notice boards and available electronically on Joy's intranet (Maritz Deposition at p.7:l.3-17).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 81 are undisputed.

82.    Plaintiff was aware of the fact that Joy had a sexual harassment policy at the time of all of the alleged instances of unwelcome conduct (Plaintiff Deposition at p.157:l.8-12).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 82 are undisputed.

### Plaintiff's Reporting of Mr. Meade's Alleged Unwelcome Conduct

83.    Plaintiff did not tell anyone at Joy, including her supervisor or anyone in Human Resources, or her husband about her interaction with Mr. Meade, including all alleged instances of Mr. Meade's claimed unwelcome conduct, from May 2002 through March 2003 (Plaintiff Deposition at p.90:l.5-10, p.91:l.16-p.92:l.4, p.94:l.16-21, p.101:l.20-p.102:l.5., p. 104:l.11-15, p.106:l.20-p.107:l.2, l.8-10, p.117:l.20-p.118:l.6, p.124:l.12-21, p.151:9-22, p.156:l.16-p.157:l.10, p.159:l.25-p.160:l.8, p.188:l.19-20).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 83 are undisputed.

84.    Plaintiff did not tell anyone at work about any interaction with Mr. Meade at all until March 14, 2003 (Plaintiff Deposition at p.177:l.9-23, p.204:l.12-15; Maritz Deposition at p.12:l.6-12).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 84 are undisputed.

85.    Plaintiff alleges that she first talked to Cornelia Adams alone and tried telling her about what Mr. Meade had allegedly done to her, but could not because she was crying, and the only words she could get out were "Larry Meade being mean" (Plaintiff Deposition at p.208:l.3-p.210:l.1).

**Plaintiff's Response:**

The averments of fact of Paragraph 85 are specifically denied.  Specifically, the Plaintiff testified that she first talked to Cornelia Adams alone and tried telling her about what Mr. Meade had done to her, but could not because she was crying, and the only words she could get out were "Larry Meade being mean" (Plaintiff Deposition, p. 208:3-210:1)

86.    Plaintiff and her husband then met with Johan Maritz, who was Joy's then Manager of Human Resources in Franklin, Pennsylvania, but has since been promoted, and Jerry Miller, also of Joy's Human Resources Department, and Plaintiff told them that Mr. Meade had come to her home (Plaintiff Deposition at p.211:l.16-p.212:l.10; Maritz Deposition at p.5:l.21-23, p.8:l.8-10).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 86 are undisputed.

87.    At that meeting on March 14, 2003, Plaintiff did not tell Mr. Maritz or Mr. Miller (and also had not yet told her husband) about the hugs she and Mr. Meade shared, the alleged attempted kiss or the alleged hug with Mr. Meade's hands on the top of her butt (Plaintiff Deposition at p 212:l.17-p.213:l.2).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 87 are undisputed.

88.    Plaintiff also did not share these alleged incidents with her counselor, Susan Stewart, in March 2003 upon meeting with her and discussing the alleged March 2003 visit to her home (Plaintiff Deposition at p.171:l.11-22). Plaintiff, in fact, did not tell Ms. Stewart about the alleged June 2002 instances until June 2003 (Plaintiff Deposition at p.220:l.21-22, p.221:l.20-p.222:l.5).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 88 are undisputed, however, the Plaintiff objects to these averments as they are immaterial to the issues in this case. Whether or not the Plaintiff discussed the incidents with her counselor is of no consequence to the Defendant's title VII liability. To the extent that this fact would be deemed material, such materiality would only be to the extent of the Defendant once again attacking the Plaintiff's credibility. In resolving a Rule 56 motion for summary judgment courts should not weigh conflicting evidence or make factual findings, but rather should "consider all evidence in the light most favorable to the non-moving party" to decide whether "the evidence is such that a reasonable jury *could* return a verdict for the nonmoving party." ***Schnall v. Amboy Nat'l Bank***, 279 F.3d 205, 209 (3d Cir. 2002).

Credibility is not an issue for summary judgment, but rather is a factual determination to be made at trial. "However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." *Boyle v. County Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d cir 1998).

89    Plaintiff also did not tell Mr. Maritz that Mr. Meade said he wanted to have sex with her (Maritz Deposition at p 18:l 9-11).

**Plaintiff's Response:**

The averments of fact contained in Paragraph 89 are specifically denied, as the Plaintiff only admits that Mr. Maritz testified that the Plaintiff did not tell him that Mr. Meade said he wanted to have sex with her

90    Plaintiff testified that, on June 3, 2003, on her way home with Mr. Hilliard, she shared additional factual allegations with him that she had not previously shared with Joy's Human Resources personnel in March 2003, including their mutual hugs and the alleged attempted kiss (Plaintiff Deposition at p.218:l 4-12).

**Plaintiff's Response:**

The averments of fact contained in Paragraph 90 are denied. To the contrary, the Plaintiff testified that on her way home with Mr. Hilliard, she told him about "Larry hugging me and walking in the restrooms and that he had tried to kiss me and he was at my house." (Plaintiff Deposition, p. 218:7-9)

91    Plaintiff testified also that, on June 3, 2003, she told her husband for the first time about the mutual hugs, including that she would sometimes ask Mr. Meade for hugs,

and Mr. Meade's alleged offer to come to see the oil painting of his son and to see his son's
headstone (Plaintiff Deposition at p.218:l 13-p.219:l.10).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 91 are
undisputed.


92    Despite the fact that Ms. Adams, who worked in the Human Resources
Department, and Plaintiff had frequent contact regarding Ms. Adams' support to help
Plaintiff deal with the grief of losing her stepson, Ms. Adams' testimony indicates that the
first time Plaintiff informed her that she was having any problems with Mr. Meade was in
June 2003, when Plaintiff told her about the alleged March 2003 incident at Plaintiff's
home (Adams Deposition at p.5:l 9-21, p 10:l 6-10)

**Plaintiff's Response:**

The averments of fact contained in Paragraph 92 are denied. To the contrary, there
was confusion between Plaintiff's counsel, Defense counsel, and Ms. Adams as to which
incident Ms. Adams was describing in her deposition testimony and on what date that
incident occurred.

> Q    Do you recall two instances where Valerie Wakefield
>       came to Mr. Maritz's office where you were with her
>       when she was very emotionally upset?
>
> A.    No.
>
> Q    There was only one?
>
> A.    Yes.
>
> Q.    And you don't know whether it's in June or March?
>
> A    Yes.
>
> Q.    You do know?

A       No—true.

Q       I'm sorry. But we're talking about whatever incident, whether it was in June or—

A       Yes. There was only one time I ever was in Johan's office with Valerie while she was upset.

Q       Well, whenever that was, we're talking about that incident, okay?

A       Okay.

(Cornelia Adams Deposition, attached at Plaintiff's Tab B," p. 13:7-24)

The Defendant is well aware of the confusion as it was Defense Counsel who pointed out the confusion. To state the Ms. Adams testified that this incident occurred in June is a misstatement of her testimony.

### Remedial Action Taken by Joy
### Following Plaintiff's Reporting of Mr. Meade's Unwelcome Conduct

93      As provided above, a meeting was held on March 14, 2003 at which Plaintiff, her husband and Johan Maritz were present, and at which time Plaintiff reported only the alleged March 2003 incident of Mr. Meade coming to her home (Maritz Deposition at p.12:16-8; See notes of March 14, 2003 meeting marked "JOY051" and at Tab "12" of the Appendix filed herewith).

**Plaintiff's Response:**

The averments of fact contained in Paragraph 93 are denied. More specifically, the Plaintiff reported at the March 14, 2003 meeting not only that Mr. Meade had come uninvited to her home, but also that he had said things that she didn't find welcomed. Mr. Maritz testified that the Plaintiff told him that Mr. Meade had made proposals that they should go away together, that he loved her, and that she should leave and be with him (Johan Maritz Deposition, attached at Plaintiff's Tab "F," at p. 12:13-13:7).

94.    Mr. Maritz asked Plaintiff at that meeting to provide him with names of anyone who could provide further information, but Plaintiff could not (Maritz Deposition at p.19:l.3-7).

**Plaintiff's Response:**

The Plaintiff admits only that Mr. Maritz alleged that he asked Plaintiff at that meeting to provide him with names of anyone who could provide further information.

95.    That same day, Mr. Maritz, along with Cornelia Adams, met with Mr. Meade, told him the matter would be investigated and to have no contact with Plaintiff (Maritz Deposition at p.17:l.3-23; See notes of March 14, 2003 meeting marked "JOY052" and at Tab "13" of the Appendix filed herewith).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 95 are undisputed.

96.    Plaintiff admits that nothing happened between her and Mr. Meade after March of 2003 (Plaintiff Deposition at p.175:l.16-25, p.216:l.2-8).

**Plaintiff's Response:**

The averments of fact of Paragraph 96 are specifically denied. To the contrary, the testimony cited to by the Defendant in support of this averment indicates that the Plaintiff testified that she saw Larry Meade after March 2003 at work and that the thought of seeming him made her extremely uncomfortable to the point where she suffered a mental breakdown in June of 2003. Additionally, the testimony cited by the Defendant in support of its averments reflects only that the Plaintiff was asked if anything *else* happened

between *March* and *June*. (Plaintiff Deposition, p. 175:21-22; p. 216:2-8) (emphasis supplied) To say that the Plaintiff admits nothing happened after March of 2003 is an overly broad characterization of the Plaintiff's testimony specifically dealing with March through June of 2003.

97.    After Plaintiff went home on June 3, 2006, Johan Maritz called Plaintiff at home to inquire into what had happened that day, to see how Plaintiff was doing and to see if there was anything Joy could do (Mr. Wakefield Deposition at p.132:l.9-21, p.134:l.15-17; Maritz Deposition at p.22:l.15-25)

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 97 are undisputed.

98.    In a follow-up meeting, Mr. Maritz, along with Don Biondi of Joy, met with Plaintiff and her husband in mid-June 2003 for at least an hour, which is the first time Plaintiff described the alleged harassment other than Mr. Meade having come to her home (Maritz Deposition at p.28:l.16-21, p.29:l.8-p.30:l.3 p.32:l.13-20).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 98 are undisputed.

99    Plaintiff testified that Diane Kemick of Joy's HR Department followed up with her from time to time to make sure Plaintiff was doing okay (Plaintiff Deposition at p.249:l.11-14)

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 99 are undisputed.

100.    Ms. Kemick who has been a Human Resources Representative at Joy for approximately 8 years, met with Mr. Meade in April 2006 to make sure he remembered he was not to have any contact with Plaintiff (Deposition of Diane Kemick taken September 20, 2006 ("Kemick Deposition"), excerpts of which are at Tab "14" of the Appendix filed herewith, at p.6:l.6-11, p.14:l.20-24).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 100 are undisputed.

101.    Sometime in 2006, Ms. Kemick recalls Mr. Meade, who is also an Emergency Medical Technician, calling her to let her know that he had left his work area to assist with a medical emergency near Plaintiff's work area (Kemick Deposition at p.15:l 2-9).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 101 are undisputed

102.    Mr. Meade wanted HR to be aware that he was going to be in that area for that purpose (Kemick Deposition at p.15:l.9-11).

**Plaintiff's Response:**

The averments of fact of Paragraph 102 are specifically denied. Ms. Kemick did testify that Mr. Meade told her he wanted HR to be award that he was going to be in that

area for that purpose. However, the Plaintiff objects to the Defendant stating what Mr. Meade wanted based on Ms. Kemick's testimony where Mr. Meade himself was deposed.

### Procedural Background

103. On or about March 7, 2005, Plaintiff and her husband filed a Complaint at No. 290-2005 in the Court of Common Pleas of Venango County against Joy Mr. Meade, purporting to state the following claims:

- *Count I: Intentional Infliction of Emotional Distress*: Husband and Wife Plaintiffs v. Joy and Meade;

- *Count II: Negligent Infliction of Emotional Distress*: Husband and Wife Plaintiffs v. Joy and Meade;

- *Count III: Negligent Retention of an Employee*: Husband and Wife Plaintiffs v. Joy;

- *Count V: Negligence*: Husband and Wife Plaintiffs v. Joy;

- *Count VI: Violation of Title VII of the Civil Rights Act of 1964*: Husband and Wife Plaintiffs v. Joy and Meade

(See Complaint).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 103 are undisputed.

104. Joy and Mr. Meade removed this action to this Court on or about March 10, 2005 (See Notice of Removal at Tab "15" of the Appendix filed herewith).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 104 are undisputed.

105.    Upon consideration of a Motion to Dismiss filed by Joy and Mr. Meade, on March 29, 2006, the Court dismissed Counts I, II, III and V of the Complaint containing all of Plaintiffs' state law claims as barred by the applicable statutes of limitation, leaving only Count VI containing the Title VII claim (See March 29, 2006 Opinion and Order at Tab "16" of the Appendix filed herewith).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 105 are undisputed.

106.    The court also dismissed Mr. Meade as a Defendant in the remaining Title VII claim (See March 29, 2006 Opinion and Order).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 106 are undisputed.

107.    Thereafter, on or about June 12, 2006, since the Court's March 29, 2006 Opinion and Order resulted in the dismissal of any claims brought against Mr. Meade and the dismissal of any claims brought on behalf of the Husband-Plaintiff, Joy and Mr. Meade filed a Motion to Amend the Caption requesting that the Court delete Mr. Meade and Mr. Wakefield from the caption of this action, which was granted on or about June 13, 2006 (See June 13, 2006 Order at Tab "17" of the Appendix filed herewith).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 107 are undisputed, but objects to these averments as they are immaterial to the motion for summary judgment.

108. The only claim remaining is one for alleged violation of Title VII of the Civil Rights Act of 1964 based on allegations of sexual harassment by a co-worker.

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 108 are undisputed.

109. Plaintiff noticed and took the depositions of 13 current Joy employees in an effort to prove her claim (See Deposition Notices at Tab "18" of the Appendix filed herewith).

**Plaintiff's Response:**

The Plaintiff admits the averments of fact contained in Paragraph 109 are undisputed